STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY; and RAMSEY-PEELE CORPORATION,

         Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute Trustee; SUBSTITUTE TRUSTEE SERVICES, INC.; WILMINGTON SAVINGS FUND SOCIETY, FSB, D/B/A CHRISTIANA TRUST, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II; and PHH MORTGAGE CORPORATION,

         Defendants.

---

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. § 1334(b), and 1452(a) and Rule 9027 of the Federal Rules of Bankruptcy Procedure, Defendant Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II (hereinafter "Wilmington Savings"), by and through counsel, hereby removes the civil action filed on November 10, 2025 presently pending before the Clerk of Superior Court of Mecklenburg County, case #25CV060201-590 (hereinafter "Removed Civil Action"). In support thereof, Wilmington Savings shows the Court as follows:

### THE REMOVED CIVIL ACTION

1.     On November 10, 2025, C. Ray Kennedy, Cynthia M. Kennedy and Ramsey-Peele Corporation filed the Removed Civil Action before the Clerk of Superior Court of Mecklenburg County,

1

NC.

2.      Pursuant to 11 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b), the Removed Civil Action involves a civil proceeding arising under Title 11 of the United States Code or arising in or related to cases under Title 11 of the United States Code.  In particular, C. Ray Kennedy and Cynthia M. Kennedy (hereinafter collectively "Debtors") filed a Chapter 11 proceeding before the Clerk of the U.S. Bankruptcy Court for the Western District of North Carolina on February 19, 2020, case #20-30208.  Thereafter, the Debtors filed a Second Amended Plan of Reorganization and obtained an Order Confirming Plan of Reorganization (doc #s 119 and 126, respectively).  Paragraph 12.3 of the Second Amended Plan of Reorganization provided that the Bankruptcy Court retained jurisdiction to hear and determine any claim, disputed interest and all disputes among creditors and holders of interest with respect to their claims and interest.

3.      Wilmington Savings was served with the Complaint in the Removed Civil Action on November 17, 2025.

4.      Wilmington Savings subsequently received an extension of time to file an Answer through January 16, 2026.

5.      Each of the claims in the Removed Civil Action involve claims or rights of Wilmington Savings which involve the Debtors, involve the administration of the Debtors' estate and the determination of the claim of Wilmington Savings filed in the Debtors' Chapter 11 bankruptcy proceeding and its rights against Ramsey-Peele Corporation.

**THE BANKRUPTCY ACTION AND WILMINGTON SAVINGS' BASIS FOR REMOVAL**

6.      The Debtors' Chapter 11 proceeding is currently pending before this Bankruptcy Court.

7.      Section 1452(a) of Title 28 of the United States Code provides:

2

A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

Section 1334(b) of Title 28 of the United States Code provides, in relevant part:

Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

8.    A civil proceeding is related to a bankruptcy case and, in turn, is within the bankruptcy court's jurisdiction under 28 U.S.C. § 1334(b), when:

the outcome of that proceeding **could conceivably have any effect on the estate being administered in bankruptcy**. [Citations omitted]. **Thus, the proceeding need not necessarily be against the debtor** or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate.

*Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis added); *see also, In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) (adopting *Pacor* test).

9.    This Court has jurisdiction over the Removed Civil Action pursuant to 28 U.S.C. § 1334(b). The outcome of the Removed Civil Action will have an effect on Debtors' bankruptcy case, including payment of Wilmington Savings' claim and involves the rights of Wilmington Savings in certain tracts of improved real property owned by the Debtors and against Ramsey-Peele Corporation.

## OTHER PREREQUISITES FOR REMOVAL HAVE BEEN SATISFIED

10.    The prerequisites for removal under 28 U.S.C. § 1452 and Rule 9027 have been met.

11.    The Removed Civil Action was commenced after the Petition Date and this Notice of Removal is being filed before the expiration of 30 days following service on of the Summons and Complaint in the Removed Civil Action. This Notice of Removal therefore, is timely pursuant to Rule

9027(a)(3) of the Federal Rules of Bankruptcy Procedure.

12.     The Removed Civil Action is a core proceeding within the meaning of 28 U.S.C. §§ 157 and 1334.  To the extent the proceeding is non-core, Wilmington Savings consents to the entry of a final order or judgment by the Bankruptcy Court.

13.     The Removed Civil Action is not a proceeding before the United States Tax Court and is not a civil action by a governmental unit to enforce its police or regulatory power.  Thus, removal of the Removed Civil Action is proper under 28 U.S.C. § 1452(a) and Rule 9027 of the Federal Rules of Bankruptcy Procedure.

14.     Venue of the Removed Civil Action is proper in this Court pursuant to 28 U.S.C. § 1452(a) because the Debtors' bankruptcy proceeding is presently pending in this District and in this Division.

15.     As required by 28 U.S.C. § 1446(d) and by Rule 9027 of the Federal Rules of Bankruptcy Procedure, promptly after filing this Notice of Removal, Wilmington Savings will file a copy of this Notice of Removal with the Clerk of Superior Court of Mecklenburg County in the bankruptcy proceeding and the Removed Civil Action.

16.     As required by 28 U.S.C. § 1446(d), Wilmington Savings will provide notice of this removal to Plaintiff through its attorneys of record.

17.     All pleadings, process, and orders served upon Wilmington Savings from the Removed Civil Action are attached to this Notice of Removal as required by 28 U.S.C. § 1446(a).

18.     Wilmington Savings alleges that the Removed Civil Action does not involve any claim in 28 U.S.C. § 1453 which would prohibit the removal of this action.

19.     Wilmington Savings has not previously sought similar relief in relation to the Removed Civil Action.

20.    If any question arises as to the propriety of the removal of this action, Wilmington Savings requests the opportunity to present a brief and oral argument in support of its position that this case is removable and should be adjudicated in the Bankruptcy Court.

21.    A true and correct copy of all pleadings filed in the Removed Civil Action are attached hereto and as follows:

     a.  Verified Complaint and Motions For Temporary Restraining Order and Preliminary Injunction
     b.  Civil Summons to Wilmington Savings Fund Society and PHH Mortgage Corporation
     c.  Civil Summons to William F. Kirk in his capacity as Substitute Trustee and to Substitute Trustee Services, Inc.
     d.  General Civil Action Cover Sheet
     e.  Temporary Restraining Order
     f.  Affidavit of Service on PHH Mortgage Corporation
     g.  Affidavit of Service on William F. Kirk
     h.  Request for Duplicate Copy of Verbatim Audio Court Record
     i.  Notice of Appearance and Certificate of Service
     j.  Notice of Hearing and Certificate of Service
     k.  Brief in Support of Defendant Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity by solely as Owner Trustee of Residential Credit Opportunities Trust II's Bond Determination and Certificate of Service
     l.  Affidavit of William Walt Pettit and Certificate of Service
     m.  Request to Take Judicial Notice and Certificate of Service
     n.  Affidavit of Juliana Thurab and Certificate of Service
     o.  Withdrawal of Notice of Hearing and Certificate of Service
     p.  Voluntary Dismissal as to William F. Kirk and Certificate of Service
     q.  Motion to Extend Time and Certificate of Service
     r.  Order Extending Time

**WHEREFORE**, Wilmington Savings, desiring to remove this case to the United States Bankruptcy Court for the Western District of North Carolina, prays that the filing this Notice of Removal shall effect the removal of the Removed Civil Action to this Court; and for such and other relief as the Court may deem just and proper.

5

This the 9th day of December, 2025.

HUTCHENS LAW FIRM, LLP
Attorneys for Defendants Wilmington Savings Fund
Society, FSB, d/b/a Christiana Trust, not in its individual
capacity but solely as the Owner Trustee of Residential
Credit Opportunities Trust II and PHH Mortgage
Corporation

By: _____

William Walt Pettit
N.C. Bar No. 9407
6230 Fairview Road, Suite 315
Charlotte, N.C. 28210
Telephone: (704) 362-9255
Telecopier: (704) 362-9268
Email: walt.pettit@hutchenslawfirm.com

6

a.

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25-CVS-

25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY; and RAMSEY-PEELE CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute Trustee; SUBSTITUTE TRUSTEE SERVICES, INC.; WILMINGTON SAVINGS FUND SOCIETY, FSB, D/B/A CHRISTIANA TRUST, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II; and PHH MORTGAGE CORPORATION;

Defendants.

**VERIFIED COMPLAINT AND MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

NOW COME the Plaintiffs, by and through counsel and says and alleges as follows:

**PARTIES**

1. Plaintiff C. Ray Kennedy is a citizen of North Carolina and resides in Mecklenburg County.

2. Plaintiff Cynthia M. Kennedy is a citizen of North Carolina and resides in Mecklenburg County.

3. Plaintiff Ramsey-Peele Corporation is a domestic corporation organized and existing under the laws of the State of North Carolina and maintains a principal place of business in Mecklenburg County.

4. Defendant William F. Kirk (hereinafter "Substitute Trustee") is a citizen of North Carolina and resident of Mecklenburg County. This action is brought against Kirk in his capacity as Substitute Trustee for the deed of trust dated September 28, 2017 and recorded in Book 32153 at Page 103 of the Mecklenburg County Registry. Defendant's address for service

1

of process is 3430 Toringdon Way, Suite 101, Charlotte, North Carolina 28277.

5.  Defendant Substitute Trustee Services, Inc. is a domestic corporation organized and existing under the laws of the State of North Carolina. Defendant's address for service of process, by and through its registered agent, C.L. Leader, is 201 S. McPherson Church Road, Suite 201, Fayetteville, North Carolina 28303.

6.  Defendant Wilmington Savings Fund Society, FSB, d/b/a Christina Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II (hereinafter "Wilmington Savings") is a federal savings bank organized and existing under the laws of the United States with a principal place of business in Seal Beach, California.

7.  Defendant PHH Mortgage Corporation is a foreign corporation organized under the laws of the State of New Jersey. Defendant's address for service of process, by and through its registered agent, Corporation Service Company, is 2626 Glenwood Avenue, Suite 550, Raleigh, North Carolina 27608.

### JURISDICTION & VENUE

8.  As a court of general jurisdiction, this Court has subject matter jurisdiction over Plaintiffs' claims, which are founded upon the laws of the United States and the State of North Carolina, including Plaintiffs' claims for equitable and injunctive relief pursuant to N.C. Gen. Stat. § 45-21.34.

9.  This Court has personal jurisdiction over Defendants because each is a citizen of North Carolina and/or each Defendant is authorized to conduct business in North Carolina and has conducted substantial business activity in North Carolina.

10. This Court can otherwise exercise personal jurisdiction over Defendants pursuant to N.C.

2

Gen. Stat. § 1-75.4 *et seq* and other applicable law.

11. Venue is appropriate in Mecklenburg County because Mecklenburg is the county in which Plaintiffs reside.  Further, venue is otherwise appropriate in Gaston County pursuant to N.C. Gen. Stat. §§ 1-80 and 1-82.

## FACTS

**A. 16701 Northcross Drive and 6025 Clark Creek Parkway.**

12. C. Ray Kennedy and Cynthia M. Kennedy (hereinafter "Mr. and Mrs. Kennedy") are the present record owners of two tracts of real property and two commercial buildings located at 16701 Northcross Drive, Charlotte, North Carolina (hereinafter "Northcross Property") and 6025 Clark Creek Parkway, Charlotte, North Carolina (hereinafter "Clark Creek Property").

13. The Northcross Property is more fully described as follows:

Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat thereof recorded in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

14. The Clark Creek Property is more fully described as follows:

Lying and being situated in Mecklenburg County, NC and being more particularly described as follows:
Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), accordingly to the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deeds of Mecklenburg County, NC.

**B. Defendants Initiate Power of Sale Foreclosure Proceedings**

15. On 6 January 2025, the Substitute Trustee filed a special proceedings action and sought foreclosure by power of sale in in Mecklenburg County Superior Court, case number 25-SP-000031-590 (hereinafter "Foreclosure Proceeding").

3

16. The Substitute Trustee alleged Mr. and Mrs. Kennedy had committed a number of defaults with respect to a security agreement, promissory note, and deed of trust dated September 26, 2017 executed in favor of Cherrywood Commercial Lending, LLC that secured the Northcross and Clark Creek Properties.

17. The Substitute Trustee also alleged Defendant Wilmington Savings was the holder of the note and deed of trust securing the Northcross Property and the Clark Creek Property. The Substitute Trustee further alleged Defendant PHH Mortgage Corporation was the servicer of the indebtedness alleged owned by Defendant Wilmington Savings.

18. On May 14, 2025, the Honorable Jessica C. Davis, Assistant Clerk of Superior Court (hereinafter "Judge Davis") presided over Substitute Trustee's petition for power of sale foreclosure under N.C. Gen. Stat. § 45-21.16.

19. On July 10, 2025, Judge Davis entered an order denying Substitute Trustee's petition for foreclosure by power of sale. In part, Judge Davis found the Substitute Trustee did not prove that Wilmington Savings was the "holder" of the note and deed of trust such that it was authorized to foreclose on the Kennedys' property.

20. According to Judge Davis, without proof regarding (1) the existence of a valid debt of which the party seeking to foreclose is the holder; (2) default; or (3) the right to foreclose under the instrument, the Substitute Trustee and Wilmington Savings failed to meet their burden of proof as required by N.C. Gen. Stat. § 45-21.16 in the Foreclosure Proceeding.

21. A true and accurate copy of Judge Davis's order denying foreclosure is attached as Exhibit 1.

22. On July 11, 2025, the Substitute Trustee filed a notice of appeal to the Mecklenburg County Superior Court.

23. On October 8, 2025, the Honorable Nathanial Poovey entered an order authorizing Substitute Trustee's petition for foreclosure by power of sale under N.C. Gen. Stat. § 45-21.16. A true and accurate copy the order is attached as Exhibit 2.

24. On October 14, 2025, Mr. and Mrs. Kennedy filed a notice of appeal to the North Carolina Court of Appeals. A true and accurate copy is attached as Exhibit 3.

25. Despite having appealed to the North Carolina Court of Appeals, Defendants are attempting to circumvent Plaintiffs' statutory right to appellate review by moving forward with foreclosure by power of sale. Defendants have unilaterally noticed the power of sale to occur on November 18, 2025 at 10:00am. A true and accurate copy of the notice of sale is attached as Exhibit 4.

26. Plaintiffs have filed a motion to stay the foreclosure by power of sale under N.C. Gen. Stat in the Foreclosure Proceeding. However, the matter cannot be heard until December 2, 2025. A true and accurate copy of the motion for stay and notice of hearing is attached as Exhibit 5.

**C. Defendants Have Failed to Properly Account for Payments, Charges, and Late Fees**

27. Throughout the course of the dealings between Plaintiffs and Defendants, Defendants have demanded payment of certain sums, which Plaintiffs allege and believe are incorrect, in that all payments have not been correctly credited toward the indebtedness. Plaintiffs dispute the amounts owed to Defendants under the note, the amount of Plaintiffs' alleged default and indebtedness, and the amount of other charges.

28. On August 15, 2024, Plaintiffs, through counsel and pursuant to N.C. Gen. Stat. § 45-36.4, requested the full payoff amount on the loan as of August 25, 2024. Plaintiffs requested

5

an itemized breakdown of all charges and documentation necessary to confirm the payoff

amount.  Defendants were requested to provide the following documentation:

    a.   Complete records of the "Custodial Account";

    b.   Current Loan Repayment History from February 20, 2020 through present;

    c.   Current Escrow Statement, showing the escrow balance, as well as an account of all

        amounts paid into escrow and paid out of escrow since February 20, 2020, including

        the date and payee of any amount paid out of the Escrow Account;

    d.   Each "Servicing Report", as that term is defined in the Servicing Agreement, sent to

        Wilmington Savings by PHH since February 20, 2020; and

    e.   Each "Special Servicing Resolution Request", as that term is defined in the Servicing

        Agreement, sent to Wilmington Savings by PHH since February 20, 2020.

29. A true and accurate copy of Plaintiffs' counsel's correspondence is attached as Exhibit 6.

30. On August 26, 2024, Defendants, through counsel, provided a payoff statement, but did

    not produce any documentation requested of Plaintiffs to verify the amount.

31. In the payoff statement that was provided, Defendants demanded total compensation in the

    amount of $2,927, 555.80.  Among others, Defendants included the following charges:

    a.   $ 44,818.32 in interest;

    b.   $ 4,296.89 in late charges;

    c.   $ 41,613.58 in default interest;

    d.   $ 47,032.59 in attorneys' fees;

    e.   $ 2,500 in trustee's commission.

32. Defendants did not provide any documentation as to how these amounts were determined.

    Defendants did not identify the applicable interest rates or otherwise provide Plaintiffs with

a formula to calculate the actual amount owed on the loan with references to the applicable

loan documents.  A true and accurate copy of Defendants' correspondence and payoff

demand is attached as Exhibit 7.

33. In the Foreclosure Proceeding, however, Defendants claimed a different amount due from

what was provided in the payoff demand.  In total, Defendants claimed $3,007,407.00 with

$209,729.30 being assessed as interest.  Defendants provided the following breakdown

through an Affidavit of Indebtedness:

    a.   The principal sum of $2,778,221.79 with interest accruing on said sum at the rate of

        9.209% per annum from and after February 28, 2025 until paid;

    b.   Past due interest in the sum of $106,602.70;

    c.   For escrow advances in the sum of $15,746.11;

    d.   For unpaid late charges in the sum of $2,864.69;

    e.   For default interest in the sum of $103,126.55;

    f.   For property inspections in the sum of $420.00; and

    g.   Bankruptcy BPO in the sum of $425.00.

34. A true and accurate copy of the Affidavit of Indebtedness Defendants used in support of

the Foreclosure Proceedings is attached as Exhibit 8 (exhibits have been omitted).

35. The unexplained differences between Defendants' payoff demand dated August 26, 2024,

and the amount of indebtedness identified in the Foreclosure Proceeding is deeply

concerning.  By way of example and without limitation, the discrepancies are as follows:

    a.   Despite including an assessment of $47,032.59 in attorneys' fees and $2,500.00 as a

        trustee's commission in their payoff demand, Defendants claimed in the Foreclosure

7

Proceeding that the amount of indebtedness "[did] not include trustee's commission, attorneys' fees or expenses." *See* Affidavit of Indebtedness, paragraph 15.

b. Defendants only included $86,431.90 for interest in the payoff demand, but assessed $209,729.25 as interest in the Foreclosure Proceeding;

c. Defendants did not include any escrow advances in the payoff demand, but assessed $15,746.11 in escrow advances in the Foreclosure Proceeding;

d. Defendants included $4,296.89 as late charges in the payoff demand, but assessed $2,864.69 in late charges in the Foreclosure Proceeding without accounting for any payments by Plaintiffs;

e. Defendants included $315.00 in property inspections in the payoff demand, but assessed $420.00 in property inspections in Foreclosure.

36. The Plaintiffs' account statement dated November 1, 2025 shows further accounting errors. By way of example and without limitation, the discrepancies are as follows:

a. The account statement shows an outstanding principal balance due of $2,778,221.79, but the payoff demand shows an outstanding balance of $2,786,342.42.

b. The account statement includes $96,477.75 in "unpaid late charges, return item charges, shortages, and other fees" while the payoff demand only included $4,296.89 in "unpaid late charges";

c. The account statement includes $56,003.44 in "assessed expenses", but the payoff statement does not include any "assessed expenses."

d. The account statement includes $56,003.44 in "assessed expenses", but there are no "assessed expenses" in the Affidavit of Indebtedness to support the Foreclosure Proceeding;

8

   e.  The account statement references $367,558.96 in "past due payments" but "past due payments" are never referenced in the payoff statement or Affidavit of Indebtedness to support Foreclosure.

37. A true and accurate copy of the November 1, 2025 account statement is attached as Exhibit 9.

38. Defendants failed to account for payments made by the Plaintiffs in the payoff demand, Affidavit of Indebtedness, and the account statement. By way of example and without limitation, the unaccounted payments made by Plaintiffs are as follows:

   a.  $71,627.85 paid by Plaintiffs on March 19, 2024 to Defendants' attorney, Walt Pettite, through check number 1595. A true and accurate copy of this check is attached as Exhibit 10.

   b.  $30,205.03 paid by Plaintiffs to Defendant PHH Mortgage Corporation on December 3, 2024 through check number 85033. A true and accurate copy of this check is attached as Exhibit 11.

39. Defendants knowingly and intentionally elected to receive continuing payments from Plaintiffs, including but not limited to Plaintiffs' payment of $30,205.03 on December 3, 2024. Defendants' acceptance of Plaintiffs' partial performance constitutes a waiver of Defendants' right to accelerate the balance of the loan and foreclose on the properties.

**D. Defendants' Attempted Foreclosure Affects Third Parties Not Joined in the Foreclosure Proceeding**

40. To support the Foreclosure Proceeding, Defendants allege in their Affidavit of Indebtedness that Ramsey-Peele Corporation is "jointly and severally" liable for the $3,007,407.00 owed on the loan. *See* Affidavit of Indebtedness, paragraph 15. As such,

Defendants are attempting to hold Ramsey-Peele liable for any deficiency on the alleged debt without due process of law.

41. Ramsey-Peele Corporation did not execute the promissory note or the loan and security agreement to Cherrywood Commercial Lending, LLC. Thus, Ramsey-Peele is not a proper party to the Foreclosure Proceedings.

42. Ramsey-Peele Corporation executed a guaranty agreement whereby it assumed an obligation of payment under the promissory note if the Kennedys did not perform. The remedies available under the guaranty agreement did not include power of sale foreclosure against Ramsey-Peele. Rather, a separate lawsuit for breach of contract is required.

43. Defendants recognized the need for separate litigation against Ramsey-Peele under the guaranty agreement, and filed a lawsuit against Ramsey-Peele alleging breach of contract in Mecklenburg County Superior Court, case number 20-CVS-015335 (hereinafter "Ramsey Peele Litigation"). The Ramsey Peele Litigation, however, was administratively closed on March 31, 2023 by the Honorable Carla Archie. A true and accurate copy of the administrative order is attached as Exhibit 12.

44. Defendants did not re-file the Ramsey Peele Litigation within the one-year period allowed by Rule 41 of the North Carolina Rules of Civil Procedure. The dismissal, therefore, operates as an adjudication on the merits, and Ramsey Peele cannot be held liable through Defendants' power of sale foreclosure or any deficiency resulting therefrom under the doctrine of *res judicata* and collateral estoppel.

45. Ramsey-Peele Corporation currently occupies the Northcross Property and Clark Creek Property pursuant to a lease agreement. A true and accurate copy of the lease is attached as Exhibit 13.

46. In accordance with lease, Ramsey-Peele Corporation operates a daycare out of the properties. The daycare business uses the assumed business name University Child Development Center. Ramsey-Peele has approximately 465 children currently enrolled with University Child Development Center.

47. Defendants' foreclosure by power of sale will cause Ramsey-Peele Corporation to suspend its business operations and deprive 465 children of day care services, which will, in turn, create additional hardships for those families.

48. On November 1, 2025, Plaintiffs entered into a contract for the sale of the property with Gustafson Properties, LLC. A true and accurate copy of the offer to purchase and contract is attached as Exhibit 14.

49. In addition, on November 7, 2025 Plaintiffs obtained a letter of interest from Kennedy Funding (no relationship to Plaintiffs) to refinance the loan on the Northcross Property and Clark Creek Property. A true and accurate copy of the letter of interest is attached as Exhibit 15.

50. Given the offer to purchase and contract and potential refinance of the Northcross Property and Clark Creek Property, there is good cause to believe that the dispute between the Plaintiffs and Defendants will be resolved without the need for foreclosure.

51. Plaintiffs are entitled to all equitable relief to fairly and accurately determine all amounts owed to Defendants under the applicable mortgage documents.

52. Plaintiffs are entitled to all equitable relief to enjoin the foreclosure by power of sale so that Plaintiffs will not be deprived of their legal interests in the properties.

### FIRST CLAIM FOR RELIEF
### Temporary Restraining Order
### N.C. Gen. Stat. § 45-21.34 and N.C. Gen. Stat. 1A-1, Rule 65

11

53. Plaintiffs incorporate by reference and re-allege each of the prior allegations as if fully set

forth herein.

54. In a pertinent part, N.C. Gen. Stat. § 45-21.34 states:

> Any owner of real estate, or other person, firm or corporation having a legal or
> equitable interest therein, may apply to a judge of the superior court, prior to the
> time that the rights of the parties to the sale or resale becoming fixed pursuant to
> G.S. 45-21.29A to enjoin such sale, upon the ground that the amount bid or price
> offered therefor is inadequate and inequitable and will result in irreparable damage
> to the owner or other interested person, or upon any other legal or equitable ground
> which the court may deem sufficient . . .

55. Defendants have demanded payment of late charges, interest, penalties, costs, and

attorneys' fees that has been compounded incorrectly.

56. An accounting is necessary to determine the correct balance on the note.

57. An accounting is necessary to determine the correct application of interest at the legal rate.

58. An accounting is necessary to determine the appropriate amount of attorneys' fees, if any,

that should be assessed against the Plaintiffs.

59. Defendants have accepted payment from Plaintiffs, including without limitation

$30,205.03 on December 3, 2024. Defendants' acceptance of Plaintiffs' partial

performance constitutes a waiver of Defendants' right to accelerate the balance of the loan

and foreclose on the properties.

60. To allow Defendants to proceed with foreclosure on the basis of an inaccurate and incorrect

purported indebtedness would constitute unjust enrichment.

61. The North Cross Property and the Clark Creek Property are unique.

62. If foreclosure by power of sale occurs as scheduled for November 18, 2025, Plaintiffs will

suffer immediate and irreparable harm before notice can be served upon the Defendants

and a hearing held in this matter.  The *status quo* should be maintained prior to a trial on the merits.

63. Plaintiffs do not have otherwise have an adequate remedy at law.

64. There is a substantial likelihood that Plaintiffs will be successful on the merits of this claim. Balancing the equities allows this Court to enter a temporary restraining order pending a hearing on Plaintiffs' claim for a preliminary injunction in accordance with Rule 65(b) of the North Carolina Rules of Civil Procedure and N.C. Gen. Stat. § 45-21.34.

### SECOND CLAIM FOR RELIEF
### Preliminary Injunction
### N.C. Gen. Stat. § 45-21.34 and N.C. Gen. Stat. 1A-1, Rule 65

65. Plaintiffs incorporate by reference and re-allege each of the prior allegations as if fully set forth herein.

66. In a pertinent part, N.C. Gen. Stat. § 45-21.34 states:

> Any owner of real estate, or other person, firm or corporation having a legal or equitable interest therein, may apply to a judge of the superior court, prior to the time that the rights of the parties to the sale or resale becoming fixed pursuant to G.S. 45-21.29A to enjoin such sale, upon the ground that the amount bid or price offered therefor is inadequate and inequitable and will result in irreparable damage to the owner or other interested person, or upon any other legal or equitable ground which the court may deem sufficient . . .

67. Defendants have demanded payment of late charges, interest, penalties, costs, and attorneys' fees that has been compounded incorrectly.

68. An accounting is necessary to determine the correct balance on the note.

69. An accounting is necessary to determine the correct application of interest on the note at the legal rate.

70. An accounting is necessary to determine the appropriate amount of attorneys' fees, if any, that should be assessed against Plaintiffs.

13

71. Defendants have accepted payment from Plaintiffs, including without limitation $30,205.03 on December 3, 2024. Defendants' acceptance of Plaintiffs' partial performance constitutes a waiver of Defendants' right to accelerate the balance of the loan and foreclose on the properties.

72. To allow Defendants to proceed with foreclosure on the basis of an inaccurate and incorrect purported indebtedness would constitute unjust enrichment.

73. The North Cross Property and the Clark Creek Property are unique.

74. If foreclosure by power of sale occurs, Plaintiffs will suffer immediate and irreparable harm. The status quo should be maintained prior to a trial on the merits.

75. Plaintiffs do not have otherwise have an adequate remedy at law.

76. There is a substantial likelihood that Plaintiffs will be successful on the merits of this claim. Balancing the equities allows this Court to enter a preliminary injunction pending a final trial on the merits in accordance with Rule 65 of the North Carolina Rules of Civil Procedure and N.C. Gen. Stat. § 45-21.34.

### THIRD CLAIM FOR RELIEF
**Permanent Injunction**
**N.C. Gen. Stat. § 45-21.34 and N.C. Gen. Stat. 1A-1, Rule 65**

77. Plaintiffs incorporate by reference and re-allege each of the prior allegations as if fully set forth herein.

78. In a pertinent part, N.C. Gen. Stat. § 45-21.34 states:

Any owner of real estate, or other person, firm or corporation having a legal or equitable interest therein, may apply to a judge of the superior court, prior to the time that the rights of the parties to the sale or resale becoming fixed pursuant to G.S. 45-21.29A to enjoin such sale, upon the ground that the amount bid or price offered therefor is inadequate and inequitable and will result in irreparable damage to the owner or other interested person, or upon any other legal or equitable ground which the court may deem sufficient . . .

14

79. Defendants have demanded payment of late charges, interest, penalties, costs, and attorneys' fees that has been compounded incorrectly.

80. An accounting is necessary to determine the correct balance on the note.

81. An accounting is necessary to determine the correct application of interest on the note at the legal rate.

82. An accounting is necessary to determine the appropriate amount of attorneys' fees, if any, that should be assessed against Plaintiffs.

83. Defendants have accepted payment from Plaintiffs, including without limitation $30,205.03 on December 3, 2024. Defendants' acceptance of Plaintiffs' partial performance constitutes a waiver of Defendants' right to accelerate the balance of the loan and foreclose on the properties.

84. To allow Defendants to proceed with foreclosure on the basis of an inaccurate and incorrect purported indebtedness would constitute unjust enrichment.

85. The North Cross Property and the Clark Creek Property are unique.

86. If foreclosure by power of sale proceeds, Plaintiffs will suffer immediate and irreparable harm. The status quo should be maintained.

87. Plaintiffs do not have otherwise have an adequate remedy at law.

88. There is a substantial likelihood that Plaintiffs will be successful on the merits of this claim. Balancing the equities allows this Court to enter a permanent injunction in accordance with Rule 65 of the North Carolina Rules of Civil Procedure and N.C. Gen. Stat. § 45-21.34.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Judgment**
**N.C. Gen. Stat. 1-253 et seq and N.C. Gen. Stat. 1A-1, Rule 57**

89. Plaintiffs incorporate by reference and rely upon all previous allegations contained herein.

90. There exists a real and actual controversy between the Plaintiffs and Defendants as to the extent of indebtedness Plaintiffs owe Defendants.

91. Plaintiff contends that as a result of the statutory and case law governing the formation and enforcement of mortgage contracts, Defendant have assessed inappropriate charges, interests, attorneys' fees, and other costs.

92. In addition and/or in the alternative, to allow Defendants to proceed with foreclosure on the basis of an inaccurate and incorrect purported indebtedness would constitute unjust enrichment.

93. In addition and/or in the alternative, by accepting payments following any alleged default, Defendants have waived the right to foreclose by power of sale under the applicable mortgage documents and/or should be estopped from exercising a foreclosure by power of sale.

94. Further, the dismissal of Defendants' prior action against Ramsey-Peele Corporation operates as an adjudication on the merits, and therefore, bars Defendants from obtaining any deficiency against Ramsey-Peele following a power of sale foreclosure under the doctrines of *res judicata* and collateral estoppel.

95. Plaintiffs seek all remedies, including a declaratory judgment pursuant to N.C. Gen. Stat. § 1-253 *et seq.* and North Carolina Rule of Civil Procedure 57.

## FIFTH CLAIM FOR RELIEF
### Action for Accounting

96. Plaintiffs incorporate by reference and rely upon all previous allegations as if fully set forth herein.

97. The accounts at issue between the parties are so complicated that Plaintiffs cannot determine the specific sums due under the applicable mortgage documents.

98. The information necessary to determine the actual amounts due under the mortgage documents is within the possession and control of the Defendants.

99. Plaintiffs do not have an adequate remedy at law.

100.    Plaintiffs are entitled to an accounting from Defendants.

101.    An accounting is necessary to determine the correct balance on the note.

102.    An accounting is necessary to determine the correct application of interest on the note at the legal rate.

103.    An accounting is necessary to determine the appropriate amount of attorneys' fees, costs, and other penalties, if any.

**WHEREFORE**, Plaintiffs demand relief of and from the Defendants as follows:

1. That this verified complaint be taken and accepted as an affidavit from which the Court may fashion all relief in this case;

2. For a temporary restraining order, enjoining the foreclosure of Plaintiffs' property in accordance with N.C. Gen. Stat. § 45-21.34 and Rule 65 of the North Carolina Rules of Civil Procedure;

3. For a preliminary injunction, enjoining the foreclosure of Plaintiffs' property in accordance with N.C. Gen. Stat. § 45-21.34 and Rule 65 of the North Carolina Rules of Civil Procedure;

4. For a permanent injunction, enjoining the foreclosure of Plaintiffs' property in accordance with N.C. Gen. Stat. § 45-21.34 and Rule 65 of the North Carolina Rules of Civil Procedure;

5. For a declaratory judgment pursuant to N.C. Gen. Stat. § 1-253 *et seq.* and North Carolina
   Rule of Civil Procedure 57;

6. For an accounting determining the actual amounts due, if any, to Defendants;

7. For all costs incurred in the prosecution of this action, including interest and a reasonable
   attorney's fee as provided by law;

8. For such other and further relief as the Court deems just and equitable.

This is the __10__ day of November 2025.

Thomas D. Bumgardner
LAW OFFICE OF THOMAS D. BUMGARDNER, PLLC
Attorney for the Plaintiff
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
Phone: (704)-887-4981
Fax: (704)-496-2280
Email: thomas@ballantynelegal.com

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBERG**

## <u>VERIFICATION</u>

After being duly sworn, C. Ray Kennedy states that he has read the foregoing Complaint and Motions for Temporary Restraining Order and Preliminary Injunction and knows the contents therein to be true to his best knowledge, except for those matters and things alleged upon information and belief, and as for those matters and things, he believes them to be true.

This is the _10th_ day of November 2025.

_____
C. Ray Kennedy

Sworn to and subscribed before me
This is the _10th_ day of _November_ 2025.

_____
Notary Public
My Commission Expires _June 26, 2029_

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBERG**

## VERIFICATION

After being duly sworn, Cynthia M. Kennedy states that he has read the foregoing Complaint and Motions for Temporary Restraining Order and Preliminary Injunction and knows the contents therein to be true to her best knowledge, except for those matters and things alleged upon information and belief, and as for those matters and things, she believes them to be true.

This is the _10th_ day of November 2025.

Cynthia M. Kennedy

Sworn to and subscribed before me
This is the _10th_ day of _November_ 2025.

_____
Notary Public
My Commission Expires: _June 26, 2029_

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBERG**

<u>**VERIFICATION**</u>

After being duly sworn, Calvin Ray Kennedy, II states that he has read the foregoing Complaint and Motions for Temporary Restraining Order and Preliminary Injunction; that he is the current president of Ramsey-Peele Corporation, and knows the contents therein to be true to her best knowledge, except for those matters and things alleged upon information and belief, and as for those matters and things, she believes them to be true.

This is the _16th_ day of November 2025.

_____
Calvin Ray Kennedy, II

Sworn to and subscribed before me
This is the _10th_ day of _November_ 2025.

_____
Notary Public
My Commission Expires: _June 26, 2029_



FILED
DATE: July 10, 2025
TIME: 4:38:01 PM
MECKLENBURG COUNTY
CLERK OF SUPERIOR COURT
BY: J. Davis

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
BEFORE THE CLERK
25SP000031-590

IN THE MATTER OF THE FORECLOSURE
by Substitute Trustee Services, Inc., Substitute
Trustee, of a Deed of Trust, Assignment of
Leases and Rents, Security Agreement and
Fixture Filing executed by C. Ray Kennedy
and Cynthia M. Kennedy filed on September
28, 2017 and recorded in Book 32153 at Page
103 of the Mecklenburg County Public
Registry.

**ORDER DENYING FORECLOSURE BY
POWER OF SALE**

THIS CAUSE coming on to be heard and being heard by the Honorable Jessica C. Davis, Assistant Clerk presiding over the 14 May 2025 civil session of Mecklenburg County Superior Court. Upon Substitute Trustee Services, Inc., Substitute Trustee,'s petition for an order to proceed with a power of sale foreclosure under N.C. Gen. Stat. § 45-21.16, Cynthia M. Kennedy and C. Ray Kennedy (hereinafter "Mr. and Mrs. Kennedy or the Kennedys") were represented by attorneys James H. Henderson and Thomas D. Bumgardner, with Mrs. Kennedy being present. Also present at the hearing were William Kirk, Substitute Trustee, and William Walt Pettit, attorney for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II (hereinafter "Wilmington Savings"). Having reviewed the pleadings, considered the evidence presented, reviewed the applicable law, and listened to the arguments of counsel, this Court finds as follows:

### FINDINGS OF FACT

1. C. Ray Kennedy and Cynthia M. Kennedy are the present record owners of two tracts of real property with a commercial building located at 16701 Northcross Drive, Charlotte, North Carolina (hereinafter "Northcross Property") and 6025 Clark Creek Parkway, Charlotte, North Carolina (hereinafter "Clark Creek Property").

2. The Northcross Property is more fully described as follows:

   Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat thereof recorded in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

3. The Clark Creek Property is more fully described as follows:

   Lying and being situated in Mecklenburg County, NC and being more particularly described as follows:

Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), accordingly to the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deeds of Mecklenburg County, NC.

4. On 6 January 2025, the Substitute Trustee filed a notice of hearing on foreclosure by deed of trust alleging the Kennedys had committed a number of defaults with respect to a loan and security agreement, and promissory note ("the Note"), and deed of trust dated September 26, 2017 executed by the Kennedys in favor of Cherrywood Commercial Lending, LLC that secured the Northcross and Clark Creek Properties.

5. Wilmington Savings alleged that it was was the current holder of the deed of trust and of the debt secured thereby, and alleged the Kennedys had defaulted as follows:

   a. The Note and Agreement are currently due for the October 1, 2024 and subsequent monthly payments as required by the Agreement, Note and Deed of Trust;

   b. The real property described in the Deed of Trust is not adequately insured for liability and casualty with Wilmington Savings being noted as first mortgagee under each policy;

   c. That junior materialmen and mechanic liens have filed liens against the real property described in the Deed of Trust which have not been paid or resolved;

   d. C. Ray Kennedy and Cynthia M. Kennedy have failed to pay rents and profits derived from the real property to Wilmington Savings; and

   e. C. Ray Kennedy and Cythnia M. Kennedy have defaulted under other provisions of the Agreement, Note and Deed of Trust as set forth in an order from the Bankruptcy Court entered on September 16, 2024 in the C. Ray Kennedy and Cynthia M. Kennedy Bankruptcy proceeding.

6. All parties to whom notice of this hearing was required to be sent were properly served with such notice as required under the provisions of N.C. Gen. Stat. § 45-21.16.

7. The Court has taken judicial notice of certain documents filed in the Kennedys' Chapter 11 bankruptcy proceeding, pending as Case No 20-30208 before the United States Bankruptcy Court for the Western District of North Carolina ("the Bankruptcy Proceeding").

8. The Court has received as evidence and examined the Affidavit of Indebtedness (hereinafter "the Affidavit") filed on 3 March 2025. The Affidavit is executed by Juliana Thurab, the contract management coordinator for PHH Mortgage Corporation ("PHH"). PHH is alleged to be the servicer of the indebtedness alleged to be owned by Wilmington Savings.

9. Attached to the Affidavit as Exhibit 1 appears to be a copy of a promissory note executed by the Kennedys on September 26, 2017 in favor of Cherrywood Commercial Lending,

LLC in the principal amount of $3,000,000. The original Note was not presented as evidence at this hearing.

10. Wilmington Savings has not established that it is the "holder" of the Note, under the Uniform Commercial Code ("UCC"), as adopted by North Carolina, which controls the meaning of the term as it used in section 45-21.16 of the North Carolina General Statutes for foreclosure actions under a power of sale. The "holder" of an instrument is defined as "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." N.C. Gen.Stat.§ 25-1-201(b)(21) (2009); *See In re Foreclosure by David A. Simpson*, 711 S.E. 2d 165 (N.C. App. 2011). Wilmington Savings has not proven that it is in possession of the Note, or that it is otherwise the "holder" of the Note.

11. Attached to the Affidavit as Exhibit 2 appears to be a copy of a loan and security agreement between the Kennedys and Cherrywood Commercial Lending, LLC executed September 26, 2017. The original loan and security agreement was not presented as evidence at the hearing.

12. Attached to the Affidavit as Exhibit 4 is a copy of a deed of trust, assignment of leases and rents, security agreement, and fixture filing executed by the Kennedys on September 26, 2017 in favor of Cherrywood Commercial Lending, LLC. The original deed of trust, assignment of leases and rents, security agreement, and fixture filing was not presented as evidence at this hearing.

13. Attached to the Affidavit as Exhibit 5 are various filings with the Mecklenburg County Register of Deeds. The Assignment of Deed of Trust, located at Page 809-811, Book 32522, is controlling on the issues in this case. This assignment was executed by Cherrywood Commercial Holdings, LLC on September 25, 2017. The assignment attempts to convey Cherrywood Commercial Holding, LLC's interest in Exhibits 2, 3, and 4 of the Affidavit to Wilmington Savings.

14. Cherrywood Commercial Lending, LLC and Cherrywood Commercial Holdings, LLC are separate and distinct legal entities. No evidence was presented regarding the assignment of Exhibits 2, 3, or 4 to the Affidavit from Cherrywood Commercial Lending, LLC to Cherrywood Commercial Holdings, LLC.

15. The Assignment of Deed of Trust (the "Assignment"), located at Page 809-811, Book 32522 was executed before the documents attached as Exhibits 1, 2, 3 and 4 to the Affidavit. As of September 25, 2017, Cherrywood Commercial Holdings, LLC did not have any legal or equitable interests in the documents attached as Exhibits 1, 2, 3, or 4 to the Affidavit that it could assign to Wilmington Savings.

16. The Kennedys are not prohibited by the Bankruptcy Proceedings from challenging the Substitute Trustee's or Wilmington Savings' attempts to foreclose on their property in this

case. According to the North Carolina Supreme Court, "Non-judicial foreclosure is not a judicial action: the Rules of Civil Procedure and traditional doctrines of res judicata and collateral estoppel applicable to judicial actions do not apply." *In Re Foreclosure of Deed of Trust Executed by Lucks*, 369 N.C. 222, 229 (2016).

17. The Court finds that the pleadings and orders produced in connection with the Bankruptcy Proceeding were entered by consent of the Kennedys and Wilmington Savings. Federal common law controls this Court's review of the preclusive effect of orders entered in a bankruptcy proceeding. *See Barrow v. D.A.N. Joint Venture Properties of N.C., LLC*, 232 N.C App. 528, 531, 755 S.E.2d 641,645 (2014), *cited by Waugh v. States Resources Corp., 857 S.E. 2d 789 (N.C. App. 2021)*. The pleadings and order in connection with the Bankruptcy Proceedings do not have any preclusive effect in this proceeding. Thus, the Kennedys are not barred in this proceeding from litigating the issue concerning what party is actually the holder of the Note.

18. The Court has not received sufficient evidence regarding (1) the existence of a valid debt of which the party seeking to foreclose is the holder; (2) default; or (3) the right to foreclose under the instrument as required by N.C. Gen. Stat. § 45-21.16 (d) to issue an order allowing foreclosure pursuant to a power of sale.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter of this case.

2. To issue an order to conduct a power of sale under N.C. Gen. Stat. § 45-21.16, this Court must find the existence of (1) a valid debt of which the party seeking to foreclose is the holder; (2) default; (3) the right to foreclose under the instrument; (4) proper notice to all parties with an interest in the property; (5) the underlying mortgage debt is not a home loan; and (6) those entitled to notice are not active members of the military.

3. The Court has not received sufficient evidence regarding (1) the existence of a valid debt of which the party seeking to foreclose is the holder; (2) default; or (3) the right to foreclose under the instrument. The Substitute Trustee and Wilmington Savings have failed to meet their burden of proof as required by N.C. Gen. Stat. § 45-21.16.

4. The Substitute Trustee and Wilmington Savings' petition for power of sale foreclosure should be denied.

Based upon the foregoing FINDINGS OF FACT and CONCLUSIONS OF LAW, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. The Substitute Trustee and Wilmington Savings' petition for power of sale foreclosure is denied without prejudice.

This is the __10th__ day of July 2025.


_Jessica Davis_

Honorable Jessica C. Davis
Assistant Clerk of Mecklenburg County Superior Court

PLAINTIFF'S
EXHIBIT
2

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE MATTER OF THE FORECLOSURE by
Substitute Trustee Services, Inc., Substitute
Trustee, of a Deed of Trust, Assignment of Leases
and Rents, Security Agreement and Fixture Filing
executed by C. Ray Kennedy and Cynthia M.
Kennedy filed on September 28, 2017 and
recorded in Book 32153 at Page 103 of the
Mecklenburg County Public Registry.

IN THE GENERAL COURT OF JUSTICE
BEFORE THE CLERK
25SP000031-590

FILED
DATE: October 8, 2025
TIME: 11:18:41 AM
MECKLENBURG COUNTY
CLERK OF SUPERIOR COURT
BY: B. Turner

## <u>ORDER ALLOWING FORECLOSURE</u>

THIS CAUSE, coming on to be heard and being heard before Nathanial Poovey, Superior

Court Judge presiding over the September 22, 2025 Civil Session of Mecklenburg County Superior

Court upon the Notice of Appeal filed herein by Wilmington Savings Fund Society, FSB, d/b/a

Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit

Opportunities Trust II by and through its servicer, PHH Corporation (hereinafter "Wilmington

Savings");

It appearing to the Court that Wilmington Savings timely appealed the Order of the Clerk

and properly served a Notice of Hearing on all parties, that adequate and timely notice was given

to all parties and that this matter was properly calendared and heard;

It further appearing to the Court that William Walt Pettit and Jeffrey A. Bunda appeared

and represented Wilmington Savings, that Thomas D. Bumgardner and James H. Henderson

appeared and represented Calvin Ray Kennedy and Cynthia M. Kennedy (hereinafter collectively

"Kennedys") and that William F. Kirk appeared as counsel for Substitute Trustee Services, Inc.,

the Substitute Trustee under the Deed of Trust executed by the Kennedys which is the subject of

this action; and

1

It further appearing to the Court that based on the four Affidavits submitted by Wilmington Savings including the Affidavits of Juliana Thurab filed March 3, 2025 and September 18, 2025, the Affidavit of Claribel Lopez filed September 12, 2025; and the Affidavit of William Walt Pettit filed September 22, 2025; and the Request to Take Judicial Notice and the Second Request to Take Judicial Notice which the Court takes judicial notice of the documents attached to each Request, the Court makes the following FINDINGS OF FACT:

### FINDINGS OF FACT

1.      On or about September 26, 2017, the Kennedys executed and delivered to Cherrywood Commercial Lending, LLC a certain Promissory Note (hereinafter "Note") in the principal sum of $3,000,000.00.

2.      Also on or about September 26, 2027, the Kennedys executed and delivered to Cherrywood Commercial Lending, LLC a certain Loan and Security Agreement.

3.      Contemporaneously with the execution of the Note and to induce Cherrywood Commercial Lending, LLC to extend credit to the Kennedys, Ramsey-Peele Corporation executed and delivered to Cherrywood Commercial Lending, LLC a certain Guaranty (Payment).

4.      Also on or about September 26, 2017, the Kennedys executed and delivered to Chicago Title as Trustee a certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (hereinafter "Deed of Trust").

5.      The Deed of Trust encumbers certain real property located at 6025 Clarke Creek, Charlotte, Mecklenburg County, North Carolina and 16701 Northcross Drive, Charlotte, Mecklenburg County, North Carolina (hereinafter collectively "Real Property") and more particularly described as follows:

**TRACT ONE:**

Lying and being situated in Mecklenburg County, NC and being more particularly described as follows:

Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), according to the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deeds of Mecklenburg County, NC.

For informational purposes: 6025 Clarke Creek, Charlotte, NC 28269

**TRACT TWO:**

Lying and being situated in Mecklenburg County, NC and being more particularly described as follows:

Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat thereof recorded in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

For informational purposes: 16701 Northcross Drive, Charlotte, NC 28269

6.     The Deed of Trust was properly filed on September 28, 2017 and recorded in Book 32153 at Page 103 of the Mecklenburg County Public Registry.

7.     Wilmington Savings presented the original Note at the hearing and the undersigned had an opportunity to review the same and finds that the original Note, containing blue ink signatures of both of the Kennedys as well as various endorsers, is identical to the Promissory Note featured as "Exhibit 1" in the Affidavit of Juliana Thurab filed on March 3, 2025. The original Note, together with the copy thereof, showed the proper endorsements from the original beneficiary, Cherrywood Commercial Lending, LLC, to Cherrywood Commercial Holdings, LLC and thereafter an endorsement in blank by Cherrywood Commercial Holdings, LLC.

8.     On February 19, 2020, the Kennedys filed a petition under Chapter 11 of Title 11

3

of the United States Code. Thereafter, the Kennedys obtained an Order confirming their Chapter 11 Plan. The Order, along with the other documents filed by Wilmington Savings in the Request to Take Judicial Notice and the Second Request to Take Judicial Notice, included numerous pleading and Orders provide that the Proof of Claim, claim #9, for $2,927,332.40 filed by Wilmington Savings was allowed, that it was treated as a secured creditor and that it retained it liens on the Real Property until paid.

9.      The Kennedys defaulted under the terms of the Note, Loan and Security Agreement and Deed of Trust by failing to pay as agreed and based on other defaults as set forth in the Affidavit of Indebtedness of Juliana Thurab filed March 3, 2025 and the Order filed September 16, 2024 (doc #281) entered by the Honorable J. Craig Whitley, United States Bankruptcy Judge (Exhibit 4 to the Request to Take Judicial Notice).

10.      Substitute Trustee Services, Inc. was duly substituted as Trustee in the above-described Deed of Trust by that Substitution of Trustee filed on September 12, 2024 and recorded in Book 39256 at Page 81 of the Mecklenburg County Public Registry. By virtue of such substitution, the Substitute Trustee is empowered with all the rights and obligations conferred upon the original Trustee by the Deed of Trust executed by the Kennedys filed on September 28, 2017 and recorded in Book 32153 at Page 103 of the Mecklenburg County Public Registry.

11.      Wilmington Savings is the current owner and holder of the Note, Guaranty, Deed of Trust and related loan documents.

12.      As of February 28, 2025, and after giving the Kennedys and Ramsey-Peele Corporation credit for all payments and other off-sets due them, Wilmington Savings contends there was presently owing Wilmington Savings by the Kennedys and Ramsey-Peele Corporation, jointly and severally, the principal sum of $2,778,221.79 with interest accruing on said sum at the

4

rate of 13.209% per annum from and after February 28, 2025 until paid, for past-due interest in

the sum of $106,602.70, for escrow advances in the sum of $15,746.11, for unpaid late charges in

the sum of $2,864.59, for default interest in the sum of $103,126.55 through February 28, 2025,

for property inspections in the sum of $350.00 and for bankruptcy BPO in the sum of $463.00.

These amounts do not include trustee's commission, attorneys' fees or expenses.

13.     This loan is not a home loan as defined in G.S. § 45-101(1b) because it is a

commercial loan (i.e., it was not made primarily for personal, family or household use). As a

result, no pre-foreclosure notice was required to be sent to any party under N.C.G.S. § 53-

244.111(22) or N.C.G.S. § 45-102, and N.C.G.S. § 45-21.16C is not applicable.

14.     Due to the defaults described above, all sums due under the Note were declared

immediately due and payable and demand has been made for payment of the same.

15.     The holder of said Note has substituted the Substitute Trustee under the Deed of

Trust and has instructed it to conduct foreclosure proceedings under the terms and provisions of

the Deed of Trust.

16.     Due demand was made by Wilmington Savings, as the owner and holder of the

Note, Guaranty and Deed of Trust and related loan documents, for payment of the delinquent

indebtedness.

17.     The above-described Deed of Trust contains in paragraph 5(a) on page 12 a power

of sale authorizing the Trustee, upon default by the Kennedys, and upon instructions by the holder

of the Note, to sell at public sale the real property described therein, after compliance with the

terms of the Deed of Trust and Article 2A of Chapter 45 of the North Carolina General Statutes.

18.     The Kennedys were properly served with the Notice of Hearing filed herein by

Substitute Trustee Services, Inc. as set forth in an Affidavit of Service filed herein by William F.

Kirk, counsel for the Substitute Trustee.

Based on the foregoing FINDINGS OF FACT, the Court makes the following CONCLUSIONS OF LAW:

1.      That the Findings of Fact are deemed Conclusions of Law to the extend they are the same.

2.      That Wilmington Savings is the holder of the Note as defined by N.C.G.S. § 25-1-201(b)(21)(a);

3.      That the Note was endorsed in blank by Cherrywood Commercial Holdings, LLC and thus it is payable to bearer and may be negotiated by the transfer of possession to Wilmington Savings alone pursuant to N.C.G.S. § 25-3-205(b);

4.      That, pursuant to N.C.G.S. § 47-17.2, the endorsements by Cherrywood Commercial Holdings, LLC in blank constituted an effective assignment of the Note, Loan and Security Agreement, Deed of Trust and related loan documents to Wilmington Savings;

5.      That Wilmington Savings has properly shown all the elements as set forth in N.C.G.S. § 45-21.16(d) including that: (i) it is the holder of a valid debt;, (ii) that defaults have occurred under the Deed of Trust by the Kennedys; (iii) that the Deed of Trust contains a power of sale upon default by the Kennedys which allows Wilmington Savings to seek foreclosure of the Deed of Trust; (iv) that the Kennedys were property served with the Notice of Hearing (v) that the Promissory Note and Deed of Trust do not involve a home loan as that term is defined in N.C.G.S. § 45-101(1b); and (vi)that the sale is not barred by N.C.G.S. § 45-21.12(A);

6.      That while counsel for the Kennedys made various legal arguments regarding the admissibility of certain evidence and other matters, the Kennedys did not present any evidence in to dispute or rebut the evidence submitted by Wilmington Savings;

6

7.     That, based on the foregoing, the Order of the Clerk should be reversed and that an Order should be entered allowing the Substitute Trustee to proceed with the foreclosure of the Real Property.

NOW, THEREFORE, IT HEREWITH IS ORDERED, ADJUDGED AND DECREED as follows:

1.     That the Order of the Clerk be and the same herewith is reversed based on the Findings of Fact and Conclusions of Law made herein; and

2.     That Wilmington Savings and the Substitute Trustee be and herewith are permitted to proceed with noticing and selling the Real Property and foreclosing on the same in accordance with North Carolina law.

This the _____ day of October, 2025.

**10/8/2025 8:18:39 AM**

_Nathaniel J. Poovey_

Nathaniel J. Poovey
Superior Court Judge

7

PLAINTIFF'S
EXHIBIT
3

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
COUNTY OF MECKLENBURG                 BEFORE THE CLERK
                                       25SP000031-590

IN THE MATTER OF THE FORECLOSURE
by Substitute Trustee Services, Inc., Substitute
Trustee, of a Deed of Trust, Assignment of
Leases and Rents, Security Agreement and
Fixture Filing executed by C. Ray Kennedy        **NOTICE OF APPEAL**
and Cynthia M. Kennedy filed on September
28, 2017 and recorded in Book 32153 at Page
103 of the Mecklenburg County Public
Registry.

TO THE HONORABLE NORTH CAROLINA COURT OF APPEALS:

NOW COME the Respondents, C. Ray Kennedy and Cynthia M. Kennedy, by and through undersigned counsel, and hereby gives notice of appeal to the North Carolina Court of Appeals from the 8 October 2025 Order Allowing Foreclosure; said Order having been entered in the Superior Court Division of the General Court of Justice for Mecklenburg County, North Carolina, by the Honorable Nathanial J. Poovey.

This is the 14 day of October 2025.

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
Attorney for Respondents-Appellants
N.C. Bar No:  38064
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
Phone:  (704)-887-4981
Fax:  (704)-496-2280
Email:  thomas@ballantynelegal.com

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
BEFORE THE CLERK
25SP000031-590

IN THE MATTER OF THE FORECLOSURE
by Substitute Trustee Services, Inc., Substitute
Trustee, of a Deed of Trust, Assignment of
Leases and Rents, Security Agreement and
Fixture Filing executed by C. Ray Kennedy
and Cynthia M. Kennedy filed on September
28, 2017 and recorded in Book 32153 at Page
103 of the Mecklenburg County Public
Registry.

**CERTIFICATE OF SERVICE FOR
NOTICE OF APPEAL**

I hereby certify that I have this day served a copy of the foregoing Notice of Appeal upon all
parties to this action by facsimile, eCourts File and Serve, and first-class United States Mail,
postage prepaid and addressed as follows:

Walt Pettit
Hutchens Law Firm
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Walt.pettit@hutchenslawfirm.com
*Attorney for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual
capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II*

William Kirk
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277
will@regentlawnc.com
*Substitute Trustee*

This is the 14 day of October 2025.

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Respondents-Appellants C. Ray
Kennedy and Cynthia Kennedy*



*POSTED BY SH*
*10/23/25*

1033137                                          25SP000031-590

**AMENDED**
**NOTICE OF SUBSTITUTE TRUSTEE'S FORECLOSURE SALE OF PERSONAL**
**AND REAL PROPERTY**

UNDER AND BY VIRTUE of the power and authority contained in that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (hereinafter "Deed of Trust") executed and delivered by C. Ray Kennedy and Cynthia M. Kennedy (hereinafter collectively "Borrowers") dated September 28, 2017 and recorded in Book 32153 at Page 103 in the Office of the Register of Deeds of Mecklenburg County, North Carolina; and because of the default in the payment of the indebtedness secured thereby and failure to carry out and perform the stipulations and agreements contained therein and, pursuant to demand of the holder of the indebtedness secured by the Deed of Trust, the undersigned Substitute Trustee will place for sale, at public auction, to the highest bidder for cash at the usual place of sale at Mecklenburg County Courthouse, 832 East Fourth Street, Charlotte, North Carolina on **TUESDAY, NOVEMBER 18, 2025 AT 10:00 A.M.**, all of Borrowers' right, title and interest in and to the personal property or "Mortgaged Property" as set forth in paragraphs 5 and 6 of the Deed of Trust as more particularly described on "Exhibit 1" which is attached hereto and incorporated herein by reference and the real property described hereinbelow, together with any improvements and fixtures existing or hereafter placed on or attached to the personal and real property, and all other appurtenant rights and privileges, situated, lying and being in Mecklenburg County, State of North Carolina, and being more particularly described as follows:

**TRACT ONE:**

**Lying and being situate in Mecklenburg County, NC and being more particularly described as follows:**

**Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), accordingly to the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deeds of Mecklenburg County, NC.**

**For informational purposes: 6025 Clarke Creek, Charlotte, NC 28269**

**TRACT TWO:**

**Lying and being situate in Mecklenburg County, NC and being more particularly described as follows:**

**Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat**

thereof recorded in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

For informational purposes: 16701 Northcross Drive, Charlotte, NC 28269

Addresses of property:      6025 Clarke Creek Parkway, Charlotte, North Carolina
and 16701 Northcross Drive, Charlotte, North Carolina

Tax Parcel IDs:      009-301-15 and 029-736-04

Present Record Owners:      C. Ray Kennedy and Cynthia M. Kennedy

The terms of the sale are that the personal and real property hereinbefore described will be sold for cash to the highest bidder. The Substitute Trustee reserves the right to require a cash deposit or a certified check not to exceed the greater of five percent (5%) of the amount of the bid or Seven Hundred Fifty Dollars ($750.00). In the event that the Note holder or its intended assignee is exempt from paying the same, the successful bidder may also be required to pay revenue stamps on the Trustee's Deed, any Land Transfer Tax, and the tax required by N.C.G.S. §7A-308(a)(1).

The personal and real property hereinabove described is being offered for sale "AS IS, WHERE IS" and will be sold subject to all superior liens, unpaid taxes, and special assessments. Other conditions will be announced at the sale. The sale will be held open for ten (10) days for upset bids as by law required.

If the Trustee is unable to convey title to this personal and real property for any reason, the sole remedy of the purchaser is the return of the deposit. Reasons of such inability to convey include, but are not limited to, the filing of a bankruptcy petition prior to the sale and reinstatement of the loan without the knowledge of the Trustee. If the validity of the sale is challenged by any party, the Trustee, in their sole discretion, if they believe the challenge to have merit, may declare the sale to be void and return the deposit.  The purchaser will have no further remedy.

<u>Additional Notice Where the Personal and Real Property is Residential With Less Than 15 Rental Units:</u>

An order for possession of the personal and real property may be issued pursuant to N.C.G.S. §45-21.29 in favor of the purchaser and against the party or parties in possession by the clerk of superior court of the county in which the personal and real property is sold.

Any person who occupies the personal and real property pursuant to a rental agreement entered into or renewed on or after October 1, 2007, may after receiving the notice of foreclosure sale, terminate the rental agreement by providing written notice of termination to the landlord, to be effective on a date stated in the notice that is at least 10 days but not more than 90 days, after the sale date contained in the this notice of sale, provided that the mortgagor has not cured the default at the time the tenant provides the notice of termination. Upon termination of a rental agreement, the tenant is liable for rent due under the rental agreement prorated to the effective date of the termination.

This the 22nd day of October, 2025.

Substitute Trustee Services, Inc.
Substitute Trustee
William Fay Kirk, III, Esq.
Regent Law
3430 Toringdon Way, Suite 101
Telephone: 704-315-2691
Email: will@regentlaw.com

Posted:_____

Witness:_____
      Assistant/Deputy Clerk of Superior Court

## EXHIBIT 1

**"Mortgaged Property"** means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

(a)     the Land;

(b)     the Improvements;

(c)     the Personalty;

(d)     current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(e)     insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

(f)     awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(g)     contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(h)     Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(i)     earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(j)     Imposition Deposits;

(k)     refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in

which this Security Instrument is dated);

     (l)     tenant security deposits;

     (m)    names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

     (n)     Collateral Accounts and all Collateral Account Funds;

     (o)     products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

     (p)     all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

PLAINTIFF'S
EXHIBIT
5

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
BEFORE THE CLERK
25SP000031-590

IN THE MATTER OF THE FORECLOSURE
by Substitute Trustee Services, Inc., Substitute
Trustee, of a Deed of Trust, Assignment of
Leases and Rents, Security Agreement and
Fixture Filing executed by C. Ray Kennedy
and Cynthia M. Kennedy filed on September
28, 2017 and recorded in Book 32153 at Page
103 of the Mecklenburg County Public
Registry.

**MOTION FOR STAY**

NOW COME the Respondents, C. Ray Kennedy and Cynthia M. Kennedy, by and through

counsel, and pursuant to Rule 62 of the North Carolina Rules of Civil Procedure and N.C. Gen.

Stat. § 1-292, and hereby move this Court for an order, setting a bond for the stay of this action

pending completion of the appellate process. In support, Respondents show the Court as follows:

1. C. Ray Kennedy and Cynthia M. Kennedy are the present record owners of two tracts of real

   property with a commercial building located at 16701 Northcross Drive, Charlotte, North

   Carolina (hereinafter "Northcross Property") and 6025 Clark Creek Parkway, Charlotte,

   North Carolina (hereinafter "Clark Creek Property").

2. On 6 January 2025, Substitute Trustee filed this special proceedings action for foreclosure

   by power of sale. Substitute Trustee alleged the Respondents defaulted with respect to a

   promissory note and deed of trust dated September 26, 2017 executed by the Kennedys in

   favor of Cherrywood Commercial Lending, LLC.

3. Substitute Trustee also alleged Wilmington Savings was the holder of the note and deed of

   trust, and that PHH Mortgage Corporation was the servicer of the indebtedness alleged

   owned by Wilmington Savings.

4. On 14 May 2025, the Honorable Jessica C. Davis, Assistant Clerk of Superior Court, presided

over Substitute Trustee's petition for an order to proceed with a power of sale foreclosure under N.C. Gen. Stat. § 45-21.16. 19. On July 10, 2025, the Honorable Jessica C. Davis, Assistant Clerk of Superior Court, entered an order denying Substitute Trustee's petition for foreclosure by power of sale.

5.  On 11 July 2025, Substitute Trustee filed a notice of appeal to the Mecklenburg County Superior Court. On 22 September 2025, the Honorable Nathanial Poovey presided over Substitute Trustee's petition for an order to proceed with a power of sale foreclosure under N.C. Gen. Stat. § 45-21.16. On 8 October 2025, the Honorable Nathanial Poovey entered an order authorizing Substitute Trustee's petition for foreclosure by power of sale.

6.  On October 14, 2025, the Respondents timely filed and served a notice of appeal to the North Carolina Court of Appeals from Judge Poovey's 8 October 2025 order.

7.  N.C. Gen. Stat. § 1-292 states:

> If the judgment appealed from directs the sale or delivery of possession of real property, the execution is not stayed, unless a bond is executed on the part of the appellant, with one or more sureties, to the effect that, during his possession of such property, he will not commit, or suffer to be committed, any waste thereon, and that if the judgment is affirmed he will pay the value of the use and occupation of the property, from the time of the appeal until the delivery of possession thereof pursuant to the judgment, not exceeding a sum to be fixed by a judge of the court by which judgment was rendered and which must be specified in the undertaking. When the judgment is for the sale of mortgaged premises, and the payment of a deficiency arising upon the sale, the undertaking must also provide for the payment of this deficiency.

8.  Respondents request this Court to set a reasonable bond in accordance with N.C. Gen. Stat. § 1-292, staying the order on appeal authorizing the foreclosure of Respondents' real property by power of sale.

9.  Respondents incorporate by reference and rely upon all affidavits, arguments, and citations to legal authority that may be presented at a hearing on this matter.

WHEREFORE, Respondents respectfully request relief as follows:

1. For an order, staying this action pending resolution of the appellate process;

2. Alternatively, for an order setting a reasonable bond in accordance with N.C. Gen. Stat. §
   1-292, which stays the order on appeal authorizing the foreclosure of Respondents' real
   property by power of sale.

3. For such other and further relief as the Court deems just and equitable.

This is the 4 day of November 2025.

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Respondents-Appellants C. Ray*
*Kennedy and Cynthia Kennedy*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing Motion for Stay upon all parties

to this action by eCourts File and Serve, and first-class United States Mail, postage prepaid and

addressed as follows:

Walt Pettit
Hutchens Law Firm
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Walt.pettit@hutchenslawfirm.com
*Attorney for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual
capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II*

William Kirk
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277
will@regentlawnc.com
*Substitute Trustee*

This is the 4 day of November 2025.

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Respondents-Appellants C. Ray
Kennedy and Cynthia Kennedy*

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
BEFORE THE CLERK
25SP000031-590

IN THE MATTER OF THE FORECLOSURE
by Substitute Trustee Services, Inc., Substitute
Trustee, of a Deed of Trust, Assignment of
Leases and Rents, Security Agreement and
Fixture Filing executed by C. Ray Kennedy
and Cynthia M. Kennedy filed on September
28, 2017 and recorded in Book 32153 at Page
103 of the Mecklenburg County Public
Registry.

**NOTICE OF HEARING**

PLEASE TAKE NOTICE that Respondents will bring their Motion for Stay on for hearing on 2
December 2025 at 3:00 p.m. in Courtroom 6310 of the Mecklenburg County Courthouse, which
is located at 832 E. Fourth Street, Charlotte, North Carolina, or as soon thereafter as the matter
may be heard.

This is the ⁤4 day of November 2025.

_____
Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Respondents-Appellants C. Ray
Kennedy and Cynthia Kennedy*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing Notice of Hearing upon all

parties to this action by eCourts File and Serve, and first-class United States Mail, postage prepaid

and addressed as follows:

Walt Pettit
Hutchens Law Firm
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Walt.pettit@hutchenslawfirm.com
*Attorney for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual
capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II*

William Kirk
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277
will@regentlawnc.com
*Substitute Trustee*

This is the 4 day of November 2025.

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Respondents-Appellants C. Ray
Kennedy and Cynthia Kennedy*



PLAINTIFF'S
EXHIBIT

6

*The Henderson Law Firm*

| JAMES H. HENDERSON | 2030 South Tryon Street, Suite 3H | T 704.333.3444 |
|---|---|---|
| HENDERSON@TITLE11.COM | CHARLOTTE, NORTH CAROLINA 28203 | F 704.333.5003 |

**VIA EMAIL walt.pettit@hutchenslawfirm.com/**

August 15, 2024

William W. Pettit, Esq.
Hutchens Law Firm
6230 Fairview Road, Suite 316
Charlotte, N.C. 28210

RE:   **Request for Payoff Amount and Itemization of Charges:** Loan Secured by Real
Estate, Wilmington Savings Fund Society, d/b/a Christina Trust, not in its individual
capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II
("Wilmington Savings"); Loan Servicer PHH Mortgage/PHH Mortgage
Services/PHH Mortgage Corporation ("PHH")
**Borrowers:** Calvin R. Kennedy and Cynthia M. Kennedy
**Loan Number:** xxx4836
**Property Addresses:** 6025 Clarke Creek Parkway and 16701 Northcross Drive

Dear Walt:

In connection with the Kennedy's prospective refinance of this loan, and per N.C.G.S. §45-
36.4, I am writing to request a full payoff statement as of August 25, 2024 (the "Payoff Date") for
the above-referenced loan secured by the above-referenced real estate. In addition to the total payoff
amount, I am requesting an itemized breakdown of all charges, including but not limited to:

1.  The "Unpaid Principal Balance" of the loan, as that term is defined in the December 21,
    2017, Servicing Agreement between Residential Credit Opportunities Trust II and Ocwen
    Loan Servicing, LLC (the "Servicing Agreement");
2.  Legal fees and expenses;
3.  Outstanding Unpaid Fees;
4.  Returned Item Charges;
5.  Shortages;
6.  Assessed Expenses;
7.  Suspense Balance;
8.  Past Unpaid Amounts;
9.  "Ancillary Income, "Servicing Advances" and "Servicing Fees" (as those terms are defined
    in the Servicing Agreement) paid or owed to PHH ; and
10. Any other charges or expenses related to the loan.

Also, please provide copies of the following documents, which are reasonably necessary to
calculate the payoff amount as of the requested payoff date, pursuant to N.C.G.S. § 45-36.7(e)(2):

1

1. Complete records of the "Custodial Account" (as that term is defined in the Servicing Agreement) for the Borrowers' loan;
2. Current Loan Payment History from February 20, 2020 to present;
3. Current Escrow Statement, showing the escrow account balance, as well as an accounting of all amounts paid into escrow and paid out of escrow since February 20, 2020, including the date and payee of any amount paid out of the Escrow Account;
4. Each "Servicing Report", as that term is defined in the Servicing Agreement, sent to Wilmington Savings by PHH since February 20, 2020; and
5. Each "Special Servicing Resolution Request", as that term is defined in the Servicing Agreement, sent to Wilmington Savings by PHH since February 20, 2020.

Pursuant to North Carolina General Statute § 45-36.7, this information should be received within 10 days of the date of this letter. This statute requires lenders to provide a payoff statement within the specified time frame upon written request. You may send the payoff statement, itemized list, and the requested documents to my email address henderson@title11.com . If you have any questions or require additional information to process this request, please do not hesitate to contact me directly at 704.333.3444. Thank you for your prompt attention to this matter.

Sincerely,

**THE HENDERSON LAW FIRM**

\s\ James H. Henderson

Cc:    Ray and Cynthia Kennedy

2



PLAINTIFF'S
EXHIBIT
7



# HUTCHENS
## — LAW FIRM —

### HIGH PERFORMANCE LAW™

William Walt Pettit | Managing Partner, Attorney at Law
Phone: 704-362-9255
Fax: 704-362-9268
Email: walt.pettit@hutchenslawfirm.com
https://HutchensLawFirm.com

Offices In:
FAYETTEVILLE, CHARLOTTE, WILMINGTON, NC | COLUMBIA, SC
6230 Fairview Road, Suite 315
Charlotte, NC 28210-3253

P.O. Box 12497
Charlotte, NC 28220-2497

August 26, 2024

James H. Henderson, Esq.
The Henderson Law Firm
1120 Greenwood Cliff ·
Charlotte, NC 28204

RE:   Calvin Ray Kennedy a/k/a C. Ray Kennedy and Cynthia M Kennedy
       Case No.: 20-30208 (Chapter 11)

Dear Jim:

We represent Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II in the above matter (Wilmington Savings).  At your request, this letter is a payoff statement regarding the amount due under the Note executed on September 26, 2017 in favor of Wilmington Savings.

As of August 31, 2024, the outstanding balance due Wilmington Savings will be $2,927,555.80.  This sum was calculated as follows:

| | |
|---|---|
| Principal Balance | $2,786,342.42 |
| Interest | $    44,818.32 |
| Unpaid Late Charges | $      4,296.89 |
| Default Interest | $    41,613.58 |
| UCC Filing Fees | $        150.00 |
| NSF Check | $        $25.00 |
| Property Inspections | $        315.00 |
| Bankruptcy BPO | $        462.00 |
| Trustee's Commission | $      2,500.00 |
| Attorneys' Fees and Commission (subject to Bankruptcy Court allowing the same upon application) | $    47,032.59 |
| **TOTAL AMOUNT DUE:** | $2,927,555.80 |

Interest continues to accrue at the rate of $1,042.10 a day until paid.  In the event that the Note will be paid after August 31, 2024, you will need to request a new payoff statement.

With best regards, I am

Very truly yours,
HUTCHENS LAW FIRM LLP

William Walt Pettit

WWP/drs



STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
BEFORE THE CLERK
25SP000031-590

IN THE MATTER OF THE FORECLOSURE by
Substitute Trustee Services, Inc., Substitute
Trustee, of a Deed of Trust, Assignment of Leases
and Rents, Security Agreement and Fixture Filing
executed by C. Ray Kennedy and Cynthia M.
Kennedy filed on September 28, 2017 and
recorded in Book 32153 at Page 103 of the
Mecklenburg County Public Registry.

## AFFIDAVIT OF INDEBTEDNESS

      Juliana Thurab (hereinafter "Affiant"), after being first duly sworn, according to

law, deposes and states as follows:

    1. At all times mentioned herein, Juliana Thurab was the Contract Management Coordinator

        of PHH Mortgage Corporation and that as such, is authorized to execute this Affidavit.

PHH Mortgage Corporation acts as servicing agent for Wilmington Savings Fund Society, FSB,

d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential

Credit Opportunities Trust II (hereinafter "Wilmington Savings").

    2.    This Affidavit is based upon the personal knowledge of Affiant who avers his/her

competency to testify as a sworn witness to the matters contained herein. The personal knowledge

was acquired as a result of Affiant reviewing the books and records of PHH Mortgage Corporation.

Accordingly, Affiant represents that he/she has personal knowledge of and familiar with the types

of records maintained regarding this loan and the procedures for creating those records. Finally,

Affiant has access to and has reviewed the books and records of PHH Mortgage Corporation

regarding the matters set forth herein.

    3.    Affiant is familiar with the books and records of PHH Mortgage Corporation acting

as servicing agent for Wilmington Savings. These books and records were kept in the ordinary

course of business of PHH Mortgage Corporation acting as servicing agent for Wilmington Savings at all times mentioned herein. Also, to the personal knowledge of Affiant, all events and transactions noted herein were recorded at or near the time of that particular event or transaction.

4.    On or about September 26, 2017, C. Ray Kennedy and Cynthia M. Kennedy executed and delivered to Cherrywood Commercial Lending, LLC a certain Promissory Note (hereinafter "Note") in the sum of $3,000,000.00 and a Loan and Security Agreement (hereinafter "Agreement"). True copies of the Note and Agreement are appended hereto, identified as "Exhibits 1 and 2," and the same are incorporated herein by reference.

5.    Contemporaneously with the execution of the Note and to induce Cherrywood Commercial Lending, LLC to extend credit to C. Ray Kennedy and Cynthia M. Kennedy, Ramsey-Peele Corporation executed and delivered to Cherrywood Commercial Lending, LLC a certain Guaranty (Payment). A true copy of the Guaranty is appended hereto, identified as "Exhibit 3," and the same is incorporated herein by reference.

6.    Also, on or about September 26, 2017, C. Ray Kennedy and Cynthia M. Kennedy executed and delivered to Chicago Title Company LLC, as Trustee a certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (hereinafter "Deed of Trust"). The Deed of Trust encumbered the real property located at 6025 Clarke Creek Parkway, Charlotte, Mecklenburg County, North Carolina and 16701 Northcross Drive, Charlotte, Mecklenburg County, North Carolina (hereinafter collectively "Real Property"). A true copy of the Deed of Trust is appended hereto, identified as "Exhibit 4," and the same is incorporated herein by reference.

7.    The Deed of Trust was properly filed on September 28, 2017 and recorded in Book 32153 at Page 103 of the Mecklenburg County Public Registry.

8.      Cherrywood Commercial Lending, LLC thereafter sold and assigned the Note, Guaranty and Deed of Trust to Wilmington Savings. Wilmington Savings is the current owner and holder of the Note, Guaranty and Deed of Trust. A true copy of the Assignment is appended hereto, identified as "Exhibit 5," and the same is incorporated herein by reference.

9.      As shown in the Deed of Trust, C. Ray Kennedy and Cynthia M. Kennedy granted and conveyed to the Trustee for the benefit of Cherrywood Commercial Lending, LLC with power of sale the Land, Improvements and the Mortgaged Property. Each item is defined in paragraph 1 of the Deed of Trust under "Defined Terms".

10.     Mortgaged Property is defined as all of C. Ray Kennedy's and Cynthia M. Kennedy's "present and hereafter acquired right, title and interest to all of the following: Personalty; earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan ...."

11.     Personalty is defined to mean all of C. Ray Kennedy's and Cynthia M. Kennedy's "accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty); deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future ...."

12.     Pursuant to paragraph 3(a) of the Deed of Trust, C. Ray Kennedy and Cynthia M. Kennedy unconditionally assigned and transferred to Wilmington Savings all Rents. Rents are defined as "all rents (whether from residential or non-residential space), revenues and other income

from the Land or the Improvements, including subsidy payments received from any sources, including payments under any 'Housing Assistance Payments Contract' or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits."

13.     Wilmington Savings is the current owner and holder of the Note, Agreement, Deed of Trust, and all related loan documents.

14.     C. Ray Kennedy and Cynthia M. Kennedy have defaulted under the Note and Agreement by failing to pay the November 1, 2024 and subsequent monthly payment to Wilmington Savings and as set forth in that certain Order Determining Events of Default, et al. (doc #281) entered by the U.S. Bankruptcy Court filed in the Chapter 11 of C. Ray Kennedy and Cynthia M. Kennedy, case #20-30208, pending in the Western District of North Carolina.

15.     As of February 28, 2025, and after giving C. Ray Kennedy, Cynthia M. Kennedy and Ramsey-Peele Corporation credit for all payments and other off-sets due them, there is presently owing Wilmington Savings by C. Ray Kennedy, Cynthia M. Kennedy and Ramsey-Peele Corporation, jointly and severally, the principal sum of $2,778,221.79 with interest accruing on said sum at the rate of 9.209% per annum from and after February 28, 2025 until paid, for past-due interest in the sum of $106,602.70, for escrow advances in the sum of $15,746.11, for unpaid late charges in the sum of $2,864.69, for default interest in the sum of $103,126.55 through February 28, 2025, for property inspections in the sum of $420.00 and for bankruptcy BPO in the sum of $425.00. These amounts do not include trustee's commission, attorneys' fees or expenses.

16.     Wilmington Savings previously notified C. Ray Kennedy and Cynthia M. Kennedy and their counsel that Wilmington Savings would invoke interest at the default rate. The current

interest rate as set forth in the Note and Agreement was 9.209% and the default rate is calculated by adding 4% to the current rate. Thus, Wilmington Savings asserts that it is entitled to recover default interest since March 1, 2024.

17.     Affiant avers that this loan is not a home loan as defined in G.S. § 45-101(1b) because it is a commercial loan (i.e., it was not made primarily for personal, family or household use). As a result, no pre-foreclosure notice was required to be sent to any party under N.C.G.S. § 53-244.111(22) or N.C.G.S. § 45-102, and N.C.G.S. § 45-21.16C is not applicable.

18.     Due to the defaults described above, all sums due under the Note were declared immediately due and payable and demand has been made for payment of the same. True copies of the demand letter and notice required by N.C.G.S. § 45-21.16(c)(5a) are appended hereto, identified as "Exhibits 6 and 7," and the same are incorporated herein by reference.

19.     The Note and Guaranty contained provisions whereby C. Ray Kennedy, Cynthia M. Kennedy and Ramsey-Peele Corporation agreed to pay reasonable attorneys' fees of Wilmington Savings.

20.     C. Ray Kennedy, Cynthia M. Kennedy and Ramsey-Peele Corporation having failed to pay the foregoing outstanding balance within the time allowed by said statute and after receiving the statutory five (5) day notice, Wilmington Savings is entitled to have and recover of C. Ray Kennedy, Cynthia M. Kennedy and Ramsey-Peele Corporation an additional 15% of the outstanding balance due on the Note as its reasonable attorneys' fees pursuant to N.C.G.S. § 6-21.2.

21.     The holder of said Note has substituted the Trustee under the Deed of Trust and has instructed it to conduct foreclosure proceedings under the terms and provisions of the Deed of

Trust. The aforesaid owner and holder has no knowledge of any defense which would prevent foreclosure of said Deed of Trust.

22.   To the best of Affiant's knowledge this foreclosure proceeding is not affected by the provisions of the Servicemember's Civil Relief Act.

23.   The foregoing is the substance of this Affiant's testimony which would be offered at any hearing of the above-captioned action.

This the 28th day of February , 2025.

Affiant Signature: _____
Print Name:_____Juliana Thurab_____
Title:_____Contract Management Coordinator_____
PHH Mortgage Corporation who is the servicer for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization, this 28 day of February , 2025 by Juliana Thurab Contract Management Coordinator for PHH Mortgage Corporation who is the servicer for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II, who is personally known to me or has produced _____ as identification.

T. P. Raval
Signature of Notary Public
Name of Notary Public:_____Tejal P. Raval_____

TEJAL P RAVAL
Notary Public - State of Florida
Commission # HH 586303
My Comm. Expires Sep 3, 2028
Bonded through National Notary Assn.

Notary Commission Expiration Date: _____

Personally known:_____
OR Produced Identification:_____
Type of Identification Produced:_____



PLAINTIFF'S EXHIBIT

## PHH
### MORTGAGE

PHH Mortgage Services | PO BOX 24738
West Palm Beach FL 33416



C RAY KENNEDY
CYNTHIA M KENNEDY
4324 SATTERWYTHE LN
CHARLOTTE NC 28215-8511

To obtain information about your account:
Website: www.MortgageQuestions.com
Phone: 1-866-672-5706
Hours: Monday through Friday 8:00AM to 9:00PM ET
and Saturday 8:00AM to 5:00PM ET
Email: CustomerCare@Mortgagefamily.com
Fax: 1-856-917-8109

**Monthly mortgage statement dated: October 15, 2025**

| | |
|---|---|
| Account Number | 7129034836 |
| Payment Due Date | 11/1/2025 |
| **Amount Due:** | **$3,197,593.34** |

If payment is received after 11/11/2025, a $1,142.73 late fee may be charged

### Account Information
| | |
|---|---|
| Property Address | 6025 CLARKE CREEK PKWY |
| | CHARLOTTE, NC 28269 |
| Outstanding Balance (not payoff amount) | $2,778,221.79 |
| Current Interest Rate (Until 4/2025) | 9.2890 % |
| Prepayment Penalty | No |
| Escrow Balance | -$534,046.60 |
| Suspense Balance | $0.00 |
| Maturity Date | 10/1/2047 |

### Explanation of Amount Due
| | |
|---|---|
| Total New Fees and Charges | $0.00 |
| Outstanding Unpaid Late Charges, Returned Item Charges, Shortages and Other Fees | $96,477.75 |
| Assessed Expenses | $56,003.44 |
| Total Amount Due as of 10/14/2025 | $520,040.15 |
| Past Due Payment(s) | $387,558.96 |
| Accelerated Amount (not a payoff amount) | $3,197,593.34 |

### Past Payments Breakdown
| | Paid Since Last Statement | Paid Year to Date |
|---|---|---|
| Principal | $0.00 | $0.00 |
| Interest | $0.00 | $0.00 |
| Escrow (Taxes and/or Insurance) | $0.00 | $0.00 |
| Fees | $0.00 | $0.00 |
| Optional Products | $0.00 | $0.00 |
| Partial Payment (Unapplied)* | $0.00 | $0.00 |
| Total | $0.00 | $0.00 |

### Important Messages
- The account is presently due for the 11/1/2024 payment.
- Your last full payment was applied to the payment due 10/81/2024
- *Partial Payments: If the account is presently paid due, any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account. If you pay the balance of a partial payment, the funds will then be applied to your mortgage.
- Please note that this is not the payoff quote and any amount less than the payoff quote will be returned. Please contact us for payoff quote.

### Transaction Activity

| Posted | Effective | Description | Principal ($) | Interest ($) | Escrow ($) | Late Charges, Shortages & Fees ($) | Suspense & Other ($) | Optional Products ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| 9/26 | | Assessed Expense INSPECTION FEE | $0.00 | $0.00 | $0.00 | $0.00 | $35.00 | $0.00 | $0.00 |

**Important Information**

Please note your loan has been referred to an attorney to start foreclosure proceedings. Prior to remitting payment you MUST contact the attorney for the full reinstatement amount as the amount above may have changed. If you need information regarding the attorney assigned to your loan please contact customer service at 866-947-7729.

If you have been approved for a loss mitigation workout program, please refer to your agreement for payment details.

1 of 3

---

Complete this coupon, tear it off and return it with the check. Please write the account number on the check and make it payable to PHH

Mortgage Services

**Account Number : 7129034836**
C RAY KENNEDY
CYNTHIA M KENNEDY

| | |
|---|---|
| Payment Due Date | 11/1/2025 |
| Total New Fees and Charges. | $0.00 |
| Outstanding Unpaid Late Charges, Returned | |
| Item Charges, Shortages and Other Fees | $96,477.75 |
| Assessed Expenses | $56,003.44 |
| Past Due Payments | $387,558.96 |
| Accelerated Amount (not a payoff amount) | $3,197,593.34 |

If you're paying more than the amount due, please tell us where you want us to apply the extra amount. If we do not receive your instructions, we'll apply the extra amount first to unpaid late charges and then to principal.



| | |
|---|---|
| Extra Principal | $ |
| Extra escrow | $ |
| Unpaid late charges | $ |
| Other (specify) | $ |
| Total check enclosed | $ |

PHH Mortgage Services
ATTN: SV 19
PO BOX 24781
WEST PALM BEACH FL 33416-4781

99 954 7129034836 0003231639 0003117366 6





CHECK#:1595

$71,627.85



PLAINTIFF'S
EXHIBIT
11



CHECK#:985033        $30,205.03



STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

FILE NO.   20-CVS-015335

WILMINGTON SAVINGS FUND
SOCIETY FSB
**RESIDENTIAL CREDIT OPPORTUNITIES TRUST II**

**ORDER FOR ADMINISTRATIVE
CLOSURE**

vs.

RAMSEY-PEELE CORP

---

THIS MATTER was commenced on <u>11/12/2020</u>.

THIS MATTER has been    ☒ inactive for over six months.
-OR-

☐ stayed as to the following party or parties:

_____

_____.

THEREFORE, IT IS HEREBY ORDERED that this case shall be removed from the Court's active docket and closed for administrative and statistical purposes only.  This administrative closure is without prejudice to previous orders entered herein and without prejudice to the filing of motions and orders in the future.  Upon the filing of any document by any party including, if applicable, documentation showing that the matter is no longer stayed, the case shall be reopened and restored to the Court's active docket.

Date: 3/31/2023

*Carla Archie*
_____
Carla Archie, Senior Resident Superior Court Judge

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on 3/31/23, a true and correct copy of the foregoing was duly served by depositing the same into the U.S. Mail, postage prepaid and addressed as follows:

*PETTIT, WILLIAM, WALT*
*6230 FAIRVIEW ROAD, SUITE 315*
*CHARLOTTE, NC  28210*

*BUMGARDNER, THOMAS, DONALD*
*13925 BALLANTYNE CORPORATE PLACE, SUITE 280*
*CHARLOTTE, NC  28277*

*Meredith P. Davis*          Date: 3/31/2023
**Case Management Administrator**

PLAINTIFF'S
EXHIBIT
13

———

# COMMERCIAL LEASE

This lease is made between **C. Ray & Cynthia Kennedy,** herein called Lessor (Landlord), and **University Child Development Center,** herein called Lessee (Tenant).

Lessee hereby offers to lease from Lessor the premises situated in the City of Charlotte and Huntersville, County of Mecklenburg, State of North Carolina, described as UCDC Northcross and Highland Creek, upon the following TERMS and CONDITIONS:

1. TERM AND RENT. Lessor demises the above premises for a term of 60 months commencing August 2, 2023 (year), and terminating on September 20, 2028 (year), or sooner as provided herein at the annual rental of four hundred eighty four thousand dollars ($414,000) payable in equal installments in advance on the first day of each month for that month's rental, during the term of this lease. All rental payments shall be made to Lessor, or to Lessor's designated payee.

2. USE. lessee shall use and occupy the premises for Child Care Services. The premises shall be used for no other purpose. Lessor represents that the premises may lawfully be used for such purpose.

3. CARE AND MAINTENANCE OF PREMISES. Lessee acknowledges that the premises are in good order and repair, unless otherwise indicated herein. Lessee shall, at his own expense and at all times, maintain the premises in good and safe condition, including plate glass, electrical wiring, plumbing and heating installations and any other system or equipment upon the premises in good and safe condition, including plate glass, electrical wiring, plumbing and heating installations and any other system or equipment upon the

1

normal wear and tear excepted.  Lessee shall be responsible for all repairs required,
including the roof, exterior walls, structural foundations, and:

which shall be maintained by Lessor  Lessee shall also maintain in good condition such
portions adjacent to the premises, such as sidewalks, driveways, lawns and shrubbery, which
would otherwise be required to be maintained by Lessor.

4.  ALTERATIONS.    Lessee shall not, without first obtaining the written consent of
Lessor, make any alterations, additions, or improvements, in to or about the premises.

5.  ORDINANCES AND STATUTES.  Lessee shall comply with all statutes, ordinances
and requirements of all municipal, state and feral authorities now in force, or which may
hereafter be in force, pertaining to the premises, occasioned by or affecting the use
thereof by Lessee.

6.  ASSIGNMENT and SUBLETTING.  Lessee shall not assign this lease or sublet any
portion of the premises without prior written consent of the Lessor, which shall not be
unreasonably withheld.  Any such assignment or subletting without consent shall be void
and at the option of the Lessor terminate this lease.

7.  UTILITIES.  All applications and connects for necessary utility services on the demised
premises shall be made in the name of Lessee only, and Lessee shall be solely liable for
utility charges as they become due, including those for sewer, water, gas electricity, and
telephone services.

8.  ENTRY AND INSPECTION.  Lessee shall permit Lessor or Lessor's agents to enter
upon the premises at reasonable times and upon reasonable notice, for the purpose of
inspecting the same, and will permit Lessor at any time within **sixty (60) days** prior to the

2

expiration of this lease to place upon the premises any unusual "To Let" or "For

Lease" signs, and permit persons desiring to lease the same to inspect the premises

thereafter.

9.  POSSESSION.  If Lessor is unable to deliver possession of the premises at the

commencement hereof, Lessor shall not be liable for any damage caused thereby, nor

shall this lease be void or voidable, but Lessee shall not be liable for any rent until

possession is delivered.  Lessee may terminate this lease if possession is delivered.

Lessee may terminate this lease if possession is not delivered within 30 days of the

commencement of the term hereof.

10. INDEMNIFICATION OF LESSOR. Lessor shall not be liable for any damage or injury

to Lessee, or any other person, or to any property, occurring on the demised premises or

any part thereof, and Lessee agrees to hold Lessor harmless from any claim for damages,

no matter how caused.

11. INSURANCE.  Lessee, at his expense, shall maintain plate glass and public liability

insurance including bodily injury and property damage insuring Lessee and Lessor with

minimum coverage as follows:

Lessee shall provide Lessor with a Certificate of Insurance showing Lessor as additional

insured.  The Certificate shall provide for a ten-day written notice to Lessor in the event

of cancellation or material change of coverage.  To the maximum extent permitted by

insurance policies which may be owned by Lessor or Lessee, the Lessee and Lessor, for

the benefit of each other, waive any and all rights of subrogation which might otherwise

**exist.**

12. EMINENT DOMAIN. If the premises or any part thereof or any estate therein, or any

other part of the building materially affecting Lessee's use of the premise, shall be taken

3

Scanned by CamScanner



by eminent domain, this lease shall terminate on the date when the title vests pursuant to such taking. The rent and any additional rent, shall be apportioned as the termination date, and any rent paid for any period beyond that date shall be apportioned as the termination date, and any rent paid for any period beyond that date shall be repaid to Lessee. Lessee shall not be entitled to any part of the award for such taking or any payment in lieu thereof, but Lessee may file a claim for any taking of fixtures and improvements owned by Lessee, and for moving expenses.

13. LESSOR'S REMEDIES ON DEFAULT. If Lessee defaults in payment of rent, or any additional rent, or defaults in the performance of any of the other covenants or conditions hereof, Lessor may give Lessee notice of such default and if Lessee does not cure any such default within 90 days, after the giving of such notice (or if such other default is of such nature that it cannot be completely cured within such period, if Lessee does not commence such curing within such 120 days and thereafter proceed with reasonable diligence and in good faith to cure such default), then Lessor may terminate this lease on not less than 30 days' notice to Lessee. On the date specified in such notice the term of this lease shall terminate, and Lessee will then quit and surrender the premises to Lessor, but Lessee, Lessee shall on demand deposit the Lessor the amount so applied so that Lessor shall have the full deposit on hand at all times during the term of this lease.

14. SECURITY DEPOSIT.. Lessee shall deposit with Lessor on the signing of this lease the sum of one hundred dollars ($100) as security deposit for the performance of Lessee's obligations under this lease, including without limitation the surrender of possession of the premises to Lessor as herein provided. If Lessor applies any part of the deposit to cure any default of Lessee, Lessee shall on demand deposit with Lessor the amount so

4

the Lessor shall have the full deposit on hand at all times during this lease.

15. TAX INCREASE  In the event there 1s any increase during any year of the term of this lease in the City  County or    State    real estate taxes over and above the amount of such taxes assessed for the 1ax year during which the term of this lease commences,  whether because of increased tax year during which the term of this lease commences,  whether because of increased rate or valuation, Lessee shall pay to Lessor upon presentation of paid tax bills an amount equal to 100% of the increase in truces upon the land and building in which the leased premises are situated.  In the event that such taxes are assessed for a tax year extending beyond the term of the lease, the obligation of Lessee shall be proportionate to the portion of the lease term included in such year.

16. Attorney's Fees.  In case suit should be brought for recovery of the premises, or for any

um due hereunder, or because of any acts which may arise out of the possession of the

premises, by either party, the prevailing party shall be entitled to all costs incurred in

connection with such action, including a reasonable attorney's fee.

17. WANER.  No failure of Lessor to enforce any term hereof shall be deemed to bea

waiver.

18. NOTICES.  Any notice which either party may, or is required to give, shall be given by

mailing the same, postage prepaid, to Lessee at the premises, or Lessor at the address first

written, or at such other places as may be designated by the parties from time to time.

19. HEIRS, ASSIGNS, SUCCESSORS.  This lease is binding upon and inures to the benefit

of the heirs assigns and successors in interest to the parties.

5

Scanned by CamScanner

20. OPTION TO RENEW. Provided that Lessee is not in default in the performance of this lease, Lessee shall have the option to renew the lease for an additional term of months commencing at the expiration of the initial lease term.

21. SUBORDINATION. This lease shall be subordinated to all existing and future liens and encumbrances against the property.

22. ENTIRE AGREEMENT. The foregoing constitutes the entire agreement between the parties and may be modified only by a \\•riting signed by both parties. The following Exhibits, if any, have been made a part of this lease before the parties' execution hereof:

Signed this 30th  day of September, 2023

By: _____

Lessee (Tenant)

By: _____

Lessor (Landlord)

6

Scanned by CamScanner



PLAINTIFF'S EXHIBIT
14

**OFFER TO PURCHASE AND CONTRACT**

**COUNTY OF MECKLENBURG**

**STATE OF NORTH CAROLINA**

RAY C. KENNEDY AND CYNTHIA M. KENNEDY ("Seller") has this day agreed to sell and GUSTAFSON PARTNERS, LLC or assigns ( who is referred to in the Contract as "Buyer" or "Purchaser") has this day agreed to purchase that certain parcel of property containing approximately 2.830 acres and all improvements being all of Parcel Identification Number 00930105, in the County of Mecklenburg, State of North Carolina per attached Exhibit A (the "Property") at the price of Three Million Seven Hundred Thousand and 00/100 Dollars ($3,700,000.00) (the "Purchase Price") in certified funds from Purchaser to Seller at Closing upon the following terms:

1.  <u>Earnest Money.</u> $25,000.00 shall be paid within seven (7) business days of the full execution and return of this contract (the "Contract") as an earnest money binder ("Earnest Money") to be held in escrow by Purchaser's escrow agent ("Escrow Agent") who shall be Brian J. Schoeck with Johnstone, Allison, and Hord, PLLC, to be applied to the Purchase Price at Closing as defined below, otherwise, to be disbursed in accordance with the terms hereof. The balance of the Purchase Price is to be paid in cash at Closing as defined below. Escrow Agent shall disburse the funds held under this Contract only to the Closing attorney, pursuant to the terms of this Contract or upon consistent written instructions from both Purchaser and Seller or their respective counsel. In the event of a dispute between the parties (or their successors or assigns), Escrow Agent shall have the right, exercisable in its sole discretion, to be discharged by tendering into the registry or custody of any court of competent jurisdiction, the funds held by Escrow Agent, together with any legal pleadings, as it deems appropriate. Escrow Agent shall be indemnified, saved and held harmless by the parties for all of its expenses, costs and reasonable attorney fees incurred in connection with said interpleaded action.

2.  <u>Closing.</u> Closing shall occur within sixty (60) days after the Inspection Period but no later than twelve (12) months from the Contract Date defined below and at a time and place acceptable to Seller and Purchaser (the "Closing"). In the event this offer is not accepted, or in the event that any of the conditions hereto are not satisfied or in the event of a breach of this Contract by Seller, then the Earnest Money shall be returned to Purchaser, but such return shall not affect any other remedies available to Purchaser for such breach.

3.  <u>Remedies.</u> In the event that Purchaser breaches this Contract, Seller may, as its sole and exclusive remedy, recover and retain the Earnest Money as liquidated damages and not as a penalty for Purchaser's default. Seller and Purchaser acknowledge that because of the difficulty, uncertainty, and inconvenience of ascertaining actual damages, the recovery and retention of such Earnest Money as liquidated damages does not constitute a penalty but represents fair, adequate and reasonable compensation to Seller for Purchaser's failure to consummate the purchase of the Property, and shall be Seller's sole and exclusive remedy, and no other damages, rights or remedies shall be collectible, enforceable or available to Seller, including specifically, any right to specific performance.

    In the event that Seller breaches this Contract or fails to consummate the sale of the Property pursuant to this Agreement for any reason other than Purchaser's failure to perform its obligations hereunder, then Purchaser, as its sole and exclusive remedies shall have the right to terminate this Agreement by notifying Seller in which case the Escrow Agent shall return the Earnest Money to the Purchaser and neither party hereto shall have any further rights or obligations hereunder, or alternatively Purchaser may pursue the remedy of specific performance by filing suit against Seller.

4.  <u>Inspection Period and Extended Inspection Period.</u> From the date hereof until the end of the Inspection Period Purchaser and its agents shall have access to the property and shall be entitled to enter upon the Property, during daylight hours, and conduct and complete such investigations as Purchaser may deem advisable its feasibility for Purchaser's intended use. In the event Purchaser shall determine in its sole discretion that the Property is unsuitable for Purchaser's intended use on or before the date which is one hundred eighty (180) days after the date hereof (the "Inspection Period"), then and in any such event Purchaser may so notify Seller in writing prior to the expiration of the Inspection Period and cancel this Contract, in which event the Earnest Money shall promptly be returned to Purchaser. Upon any cancellation of this Contract by Purchaser, the same shall be null and void and have no further force and effect. Notwithstanding the foregoing, provided this Contract is not terminated, Purchaser may, at its sole election, elect to extend the Inspection Period, (the "Extended Inspection Period") for up to one hundred eighty (180) days by delivering to the Escrow Agent Twenty - five Thousand and 00/100 Dollars ($25,000.00) ("the Extension Earnest

Money"). The Extension Earnest Money shall be non-refundable, but applicable to the Purchase Price. The Inspection Period, as extended pursuant to this paragraph 4, is referred to herein as the "the Inspection Period".

5.   <u>Conditions Precedent</u>.   The obligations and liabilities of Purchaser hereunder are in all respects conditioned upon the satisfaction of each of the following conditions precedent and if any one of the following is not timely satisfied as set forth herein and at the Closing, Purchaser may rescind this Contract in its entirety by written notice to Seller and receive a return of the Earnest Money; the conditions precedent being:

   a)   Seller does and shall at Closing own fee title to the Property free of all liens, encumbrances, leases, restrictive covenants or other defects which would affect the marketability of title or the use to which Purchaser intends for the Property.  Also, Seller will not permit or cause to be placed on the Property any lien or encumbrance which affects the marketability of title or the use to which Purchaser intends for the Property.

   b)   Soil composition, compaction, subsurface conditions, drainage, existing surface water conditions and governmental regulations governing all of the above must be suitable for construction upon the Property of improvements proposed by Purchaser.  Purchaser is hereby given the right to enter upon the Property during daylight hours to make such tests and inspections as it may elect, to determine the same prior to the end of the Inspection Period.

   c)   The Property is served by utilities at such location and in such capacities as shall be required by the Purchaser for Purchaser's proposed use of the Property.

   d)   The Property shall be properly zoned and subdivided, and the local government zoning and subdivision authorities shall have approved a final Site Plan acceptable to Purchaser, to permit Purchaser's intended use of the Property.

   e)   The Property shall have access to public right of way on Sam Furr Road and Northcross Drive and the local and state governments shall have approved final plans acceptable to Purchaser.

6.   <u>Representations and Warranties</u>.

Seller represents and warrants the following to Buyer, each of which shall be deemed material:

   a)   Seller represents and warrants without independent investigation that it has no actual knowledge of the following: The Property has not been used as a landfill or dumping ground or for the storage or disposal of toxic or hazardous wastes, that the Property is free of asbestos containing materials, toxic substances, hazardous waste, surface or subterranean waste or storage tanks, drums or containers, or other similar matters; that no toxic or hazardous wastes or other substances have been buried or manufactured on the Property, that no activities have been carried on upon the Property which might result in the contamination of the soil or of the water table under the soil; Purchaser is hereby given the right to enter upon the Property prior to the end of the Inspection Period to determine the presence of hazardous wastes or other toxic substances; it being understood that Seller's representations herein shall survive Closing and shall be repeated in writing by Seller at Closing.

   <u>Definition</u>.  For purposes of this Agreement, "Hazardous Materials" shall be defined to include solid waste (as that term is defined in the Resource Conservation and Recovery Act, 42 U.S.C.A. §6901 et seq., and the regulations adopted pursuant to that Act), hazardous wastes (as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. §9601, et seq., and the regulations adopted pursuant to that Act), oil and other pollutants, including without limitation, any solid, liquid, gaseous or thermal irritant or contaminant, such as smoke, vapor, soot, fumes, acids, alkalis or chemicals.

   <u>Indemnity</u>.  Seller, for itself and successors and assigns, agrees to defend, indemnify and hold harmless Purchaser, its successors and assigns, from and against any and all claims, demands, judgments, damages, actions, causes of actions, injuries, administrative orders, consent agreements and orders, liabilities, penalties, costs, attorneys' fees, consultants' fees, and expenses of any kind whatsoever, including claims arising out of loss of life, injury to persons' property or business, or damage to the environment or natural resources arising out of or in any way caused by the Seller's generation, storage, treatment, disposal, transportation to or from or location of Hazardous Materials in, under, or on the Property.  Seller agrees to provide to Purchaser all environmental reports on the Property in its possession, or which it can cause to be in its possession, and such reports shall be returned to Seller in the event that Purchaser does not close on the Property.

b)  Seller has good and marketable fee simple title to the Property, and there are no mechanic's or similar liens affecting such title.

c)  There are no tenants or other persons or entities on the Property which will have a right of possession following Closing.

d)  Seller is authorized to execute and perform this Contract, and the execution and performance of this Contract will not violate any judicial order or judgment or result in a breach of any agreement to which the Seller is bound.

Buyer represents and warrants the following to Buyer, each of which shall be deemed material:

a)  This Contract constitutes a valid and binding obligation of the Buyer and is enforceable against the Buyer in accordance with its terms.

b)  The execution and delivery of all documents and instruments required hereunder to be obtained or authorized by the Buyer in order to consummate this transaction have been or will be obtained and authorized or as required.

c)  Buyer is a limited liability corporation duly organized, validly existing and in good standing under the laws of the state of North Carolina.

d)  Consummation of the transactions contemplated by this Contract will not result in a breach of any term or provision of the Articles of organization or Operating Agreement of Buyer nor result in a breach by Buyer or any term or provision of any agreement, instrument, mortgage, lease or other restriction of any kind or character, or any judgment or decree binding on Buyer.

e)  At any time during the term of this contract Buyer or its agents or representatives enter onto the Property, they shall do so at Buyer's expense and with notice to Seller and shall enter at reasonable times during daylight hours. They may enter onto the Property for the purpose of inspecting, examining, performing environmental and soil tests and surveying the Property. Buyer assumes all responsibility for the acts of itself and its agents or representatives in exercising its rights under this Contract and agrees to indemnify and hold Seller harmless from and any damages resulting therefrom. Buyer shall leave the Property in the same condition as it was prior to such inspections

f)  Buyer shall give to Seller copies of all Inspection reports it receives on the Property.

All representations and warranties of Seller and Buyer/Purchaser shall be true at Closing, and if such representations and warranties are not true when made and as of the date of Closing, Purchaser and Seller may consider same a breach of this Contract entitling Purchaser or Seller to exercise the remedies provided hereby.

7.  <u>Assignment</u>.  Purchaser may assign its rights under this Contract.  The terms and agreements contained in this Contract shall bind and inure to the benefit of the Purchaser and the Seller, and their respective heirs, successors and assigns.

8.  <u>Maintenance of Property</u>.  Seller shall maintain the Property in its present state from the date hereof through Closing, and will not make, permit or cause to be made, any changes to the character, condition or nature of the Property.

9.  <u>Brokerage</u>.  Purchaser and Seller represent that neither are working with a broker and hereby covenant and agree to fully indemnify the other against all claims for brokerage commissions by brokers, finders or sales persons claim by or through such party except for those agreed to in this paragraph.   Notwithstanding the above, Seller acknowledges and recognizes Purchaser as a licensed real estate broker in the State of North Carolina.

10.  <u>Offer</u>.  This offer shall be null, void, and of no further force and effect if not executed and returned to Purchaser on or before November 13th at 5:00 p.m. Eastern Standard Time.

11. <u>Notices</u>. Any notice required to be given hereunder shall be in writing and delivered either personally or by depositing the same, postage prepaid, in the United States mail, addressed to the party to whom the same is directed at the following address:

If to Seller:

RAY C. KENNEDY AND CYNTHIA M. KENNEDY
16701 Northcross Drive
Huntersville, NC 28078

If to Escrow Agent:

Johnstone, Allison, and Hord , PLLC
1065 East Morehead Street
Charlotte, NC 28204
Attn: Brian J. Schoeck

If to Purchaser:

GUSTAFSON PARTNERS, LLC
P. O. Box 12170
Charlotte, North Carolina 28220
Attn: Trent G. Gustafson

12. <u>Transfer Matters</u>. Seller will pay all transfer stamps, and warrants that Seller is seized of title to the Property and has full right to enter this Contract.

13. <u>Contract Date</u>. References to "the date of this Contract" or "the date hereof" shall mean the date the last party signing this Contract (Seller or Purchaser) executes the same.

14. <u>Title</u>. It is understood that the Property will be conveyed subject only to matters acceptable to Purchaser permitted by this Contract, which matter shall be agreed to before the end of the Inspection Period or deemed waived if not disclosed prior to the end of the Inspection Period and that Seller will execute and deliver to Purchaser at Closing a special warranty deed conveying an indefeasible fee simple title to the Property, other than utility easements of record over the Property, taxes not yet due and payable, road right of ways and other reservations, restrictions and easements of record.

15. <u>Costs</u>. Seller maintains insurance on the Property. The taxes for year of Closing will be prorated at Closing on a calendar year basis. Possession shall be delivered at Closing. Deed shall be prepared by the Buyer at the expense of the Seller. Buyer shall pay all recording costs, costs of title search, title insurance, survey, its attorney fees and all costs customarily the responsibility of Buyer.

16. <u>Tax-Deferred Exchange</u>. In the event Purchaser or Seller desires to effect a tax-deferred exchange in connection with the conveyance of the Property, Purchaser and Seller agree to cooperate in effecting such exchange; provided, however, that the exchanging party shall be responsible for all additional costs associated with such exchange, and provided further, that a non-exchanging party shall not assume any additional liability with respect to such tax-deferred exchange. Seller and Purchaser shall execute such additional documents, at no cost to the non-exchanging party, as shall be required to give effect to this provision.

17. <u>Confidentiality</u>. Purchaser and Seller agree to keep the existence of this Contract confidential except for those parties who need to be involved with the due diligence done by Purchaser in order to close on the Property.

18. <u>Time of Essence</u>. TIME IS OF THE ESSENCE for all dates and times of this Contract.

19.   Entire Agreement. This contract constitutes the sole and entire agreement among the parties hereto and no modification shall be binding unless in writing and signed by all parties thereto.

SELLER:  RAY C. KENNEDY AND CYNTHIA M. KENNEDY

Date of Acceptance: _____
Witness as to Seller:

By: _____          By: _____

                                          Ray C. Kennedy

By: _____          By: _____

                                          Cynthia M. Kennedy

Date of Acceptance: _11. 01. 25_          PURCHASER:  GUSTAFSON PARTNERS, LLC
Witness as to Purchaser:

By: _____          By: _____

                                          Trenton G. Gustafson, Manager

*EXHIBIT A*

Mecklenburg County – Property Record Card Property Search

PARCEL ID: 00930105
16701 NORTHCROSS DR HUNTERSVILLE
NC

KENNEDY C RAY,KENNEDY CYNTHIA M
16701 NORTHCROSS DR
HUNTERSVILLE NC 28078

Total Appraised Value
$3,636,600

## KEY INFORMATION

| Land Use Code | C700 | Neighborhood | OF10 |
|---|---|---|---|
| Land Use Desc | COMMERCIAL | Land | 123274.80 SQUARE FEET |
| Exemption / Deferment | - | Municipality | HUNTERSVILLE |
| Last Sale Date | 07/02/1993 | Fire District | HUNTERSVILLE |
| Last Sale Price | $0 | Special District | FIRE SERVICE D |
| Legal Description | L1 M25-422 | | |

## ASSESSMENT DETAILS

| 2025 Real Estate Assessed Value | |
|---|---|
| Land Value | $2,508,700 |
| Building Value | $1,114,900 |
| Features | $13,000 |
| Total | $3,636,600 |

## LAND

| USE | UNITS | TYPE | NEIGHBORHOOD | ASSESSMENT |
|---|---|---|---|---|
| C700 | 123274.79688 | SQUARE FEET | OF10 | $2,508,700 |

## BUILDING

BUILDING (1)

| Finished Area | 10,237 |
|---|---|
| Year Built | 1993 |
| Built Use / Style | DAYCARE |
| Grade | GOOD |
| Story | 1 STORY |
| Heat | FORCED AIR - DUCTED |
| Fuel | ELECTRIC |
| Foundation | SLAB-COMMMERCIAL |
| External Wall | FACE BRICK |
| Fireplace(s) | 0 |
| Full Bath(s) | 0 |
| Half Bath(s) | 0 |
| Bedroom(s) | 0 |
| Total (SqFt) | 10,237 |



FEATURES

| YEAR BUILT | TYPE | QUANTITY | UNITS | VALUE |
|---|---|---|---|---|
| 1993 | ASPH PAVING | 1 | 8260 | $13,000 |

RECENT SALES HISTORY

The sales history includes only qualified sales made since January 1, 2016. A sale is qualified when it has been verified, by the appraiser, as an arm's length transaction for fair market value. Only qualified sales are considered in the appraisal process. For a complete history of sales and other transfers, please visit Polaris. The Register of Deeds records, indexes, and stores all real estate related documents that are presented for registration.

No data to display

## VALUE CHANGES

The value change history shows only changes in appraised value; it does not show exemptions, exclusions or deferrals that could reduce a property's taxable value. If any of these are in effect for a particular tax year, it will be shown on the property tax bill for that year.  It is also possible that some previous value changes might be missing from this list or listed in the wrong order.  If you have any questions, please call the County Assessor's Office at 980-314-4226.

| DATE OF VALUE CHANGE | EFFECTIVE FOR TAX YEAR | REASON FOR CHANGE | NEW VALUE |
|---|---|---|---|
| 03/26/2023 | 2023 | COUNTYWIDE REVALUATION | $3,636,600 |
| 01/14/2019 | 2019 | COUNTYWIDE REVALUATION | $2,979,300 |
| 04/07/2015 | 2015 | REVISED NOTICE | $1,899,000 |
| 01/10/2015 | 2011 | REVALUATION REVIEW - PEARSON | $1,899,000 |
| 03/17/2011 | 2011 | COUNTYWIDE REVALUATION | $2,083,900 |
| 03/15/2003 | 2003 | COUNTYWIDE REVALUATION | $1,094,300 |

## PERMITS

For information on building, electrical, mechanical or plumbing permits issued for this property in the last six years, please visit Mecklenburg County Code Enforcement's searchable permit site.









**KENNEDY FUNDING**

---

## LETTER OF INTEREST

November 7, 2025

Mr. Cy Kennedy
University Childcare Center ("Borrower")
025 Clarke Creek Pkwy
Charlotte, NC

Via Email: CyKennedy@valinnovationtech.com

Re:   $3,250,000 ("Financing Request")
Secured by a first lien on
1)   6025 Clarke Creek Pkwy Charlotte, NC
2)   16701 Northcross drive, Charlotte, NC:
("Collateral")

Dear Mr. Kennedy:

Pursuant to our discussion regarding the above loan request, I am pleased to submit the following Letter of Interest. In no way should this be considered a firm loan commitment. Outlined below are the general terms and conditions required by Kennedy Funding Inc. (Lender). These terms are only general guidelines, and only upon issuance of a firm commitment can exact terms of the loan commitment be determined.

This Letter of Interest shall expire one (1) week from issuance.

TERMS:

1.  Lender would make a loan of fifty percent (50%) of the market value of the real estate Collateral used as security for the Loan. If Borrower were to dispute the value as determined by Lender, Borrower would have the right to have a third-party appraiser hired, approved by Lender, and Lender would offer a Loan of fifty percent (50%) of the "as is" market value as determined by said appraiser or return the paid portion of the commitment fee. The market value would be based on a twelve (12) month sale to a cash buyer.

2.  The loan would be for three years interest only with no prepayment penalty.

3.  The interest rate for the first year of the loan shall be nine percent (9%) per annum paid monthly at three quarters percent (3/4%) per month.

    The interest rate for the second and third year of the loan shall be fifteen percent (15%) per annum paid monthly at one and one quarter percent (1 1/4%) per month.

---

Page Two
November 7, 2025

4.  Upon receipt of a $10,000 wire transfer or certified check, which would be applied toward the commitment fee, Lender would provide you with a draft of a loan commitment containing the terms and conditions to be reviewed by you and your counsel. This amount is fully refundable for any reason if you do not execute a loan commitment with Lender and you request in writing within thirty (30) days of the date of this letter the return of the $10,000.

5.  Upon signing of the loan commitment, a commitment fee equal to four percent (4%) of the Financing Request is due; half would be payable at the signing, and the remainder would be payable from the loan proceeds at closing. This fee would be fully refundable if Lender does not perform its obligations under the loan commitment. If the loan is repaid on time with no prior defaults, Borrower would receive a credit upon repayment of one percent (1%) of the loan amount.

6.  The loan must be closed pursuant to the terms and conditions of the loan commitment.

7.  Closing could occur in as quickly as three (3) to five (5) days after completion of our due diligence and receipt of title and all required documents. Our due diligence would commence within 24 hours after Lender receives an executed loan commitment from you.

8.  Notwithstanding anything to the contrary contained herein, in no event shall the interest rate contracted for, charged, or received exceed the maximum rate allowed by law.

**THIS IS NOT A LOAN COMMITMENT.**

Very truly yours,

KENNEDY FUNDING INC.

Mark Falzone
Executive Loan Officer

cc: Amir Moore, moore@theroyalcapital.com

I hereby acknowledge and agree to the above terms.

_____

Cy Kennedy
University Childcare Center

AD/loi/Kennedy.University

b.

# STATE OF NORTH CAROLINA

_____Mecklenburg_____ County

File No.
**25CV060201-590**

In The General Court Of Justice
☐ District  ☒ Superior Court Division

Name Of Plaintiff
C. Ray Kennedy; Cynthia M. Kennedy; and Ramsey-Peele

Address
Corporation

City, State, Zip

## CIVIL SUMMONS
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

### VERSUS

Name Of Defendant(s)
WILLIAM F. KIRK, in his capacity as Substitute Trustee;

SUBSTITUTE TRUSTEE SERVICES, INC. et al.

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

**To Each Of The Defendant(s) Named Below:**

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Wilmington Savings Fund Society, FSB, d/b/a Christina Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II | PHH Mortgage Corporation c/o Registered Agent Corporation Service Company 2626 Glenwood Avenue, Suite 550 Raleigh         NC      27608 |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**

**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued 11/10/2025 | Time 4:38:27 pm ☐ AM ☒ PM |
|---|---|---|
| Thomas D. Bumgardner 13925 Ballantyne Corporate Place Suite 280 Charlotte          NC      28277 | Signature /s/ Harvey Frison | |
| | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Date Of Endorsement | Time ☐ AM ☐ PM |
|---|---|---|
| | Signature | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

C.

# STATE OF NORTH CAROLINA

_____Mecklenburg_____ County

File No.

**25CV060201-590**

In The General Court Of Justice
☐ District   ☒ Superior Court Division

*Name Of Plaintiff*
C. Ray Kennedy; Cynthia M. Kennedy; and Ramsey-Peele

*Address*
Corporation

*City, State, Zip*

**CIVIL SUMMONS**
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

### VERSUS

*Name Of Defendant(s)*
WILLIAM F. KIRK, in his capacity as Substitute Trustee;

SUBSTITUTE TRUSTEE SERVICES, INC. et al.

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| William F. Kirk, in his capacity as Substitute Trustee | Substitute Trustee Services, Inc. |
| 3430 Toringdon Way, Suite 101 | c/o Registered Agent C.L. Leader |
| Charlotte, North Carolina 28277 | 201 S. McPherson Church Road, Suite 201 |
| | Fayetteville                    NC      28303 |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* 11/10/2025 | *Time* 4:38:27 pm ☐ AM ☒ PM |
|---|---|---|
| Thomas D. Bumgardner | | |
| 13925 Ballantyne Corporate Place | *Signature* /s/ Harvey Frison | |
| Suite 280 | | |
| Charlotte                          NC      28277 | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)** | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Signature* | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration and, if so, what procedure is to be followed.*

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service.
Summons and complaint received by: ☐ Defendant 1.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service.
Summons and complaint received by: ☐ Defendant 2.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

d.

Mecklenburg County Clerk of Superior Court

| STATE OF NORTH CAROLINA | File No. 25CV060201-590 |
|---|---|

MECKLENBURG _____ County

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| Name And Address Of Plaintiff 1 | |
|---|---|

C. RAY KENNEDY
c/o Thomas D. Bumgardner
13925 Ballantyne Corporate Place, Suite 280
Charlotte                              NC      28277

Name And Address Of Plaintiff 2
CYNTHIA M. KENNEDY
c/o Thomas D. Bumgardner
13925 Ballantyne Corporate Place, Suite 280
Charlotte                              NC      28277

**GENERAL
CIVIL ACTION COVER SHEET**

☒ INITIAL FILING        ☐ SUBSEQUENT FILING

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

**VERSUS**

Name And Address Of Defendant 1
William F. Kirk, in his capacity as Substitute Trustee
3430 Toringdon Way
Suite 101
Charlotte                              NC      28277

Summons Submitted    ☒ Yes   ☐ No

Name And Address Of Defendant 2
Substitute Trustee Services, Inc.
201 S. McPherson Church Road, Suite 201
Fayetteville, North Carolina 28303

Summons Submitted    ☒ Yes   ☐ No

Name And Address Of Attorney Or Party, If Not Represented
(complete for initial appearance or change of address)
Thomas D. Bumgardner
13925 Ballantyne Corporate Place
Suite 280
Charlotte                              NC      28277

| Telephone No. 704-887-8-4981 | Cellular Telephone No. 704-813-4263 |
|---|---|
| NC Attorney Bar No. 38064 | Attorney Email Address Thomas@ballantynelegal.com |

☒ Initial Appearance in Case    ☐ Change of Address

| Name Of Firm Law Office of Thomas D. Bumgardner | Fax No. 704-496-2280 |
|---|---|

Counsel For
☒ All Plaintiffs   ☐ All Defendants   ☐ Only: (list party(ies) represented)

☐ Jury Demanded In Pleading    ☐ Complex Litigation    ☐ Stipulate to Arbitration

**TYPE OF PLEADING**

(check all that apply)

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) (see Note)
☐ Change Venue (CHVN)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) Assess Court Costs
☐ Crossclaim (list on back) (CRSS) Assess Court Costs
☐ Dismiss (DISM) Assess Court Costs
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint (list Third Party Defendants on back) (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other (specify and list each separately)

**NOTE:** All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.

(Over)

AOC-CV-751, Rev. 3/19, © 2019 Administrative Office of the Courts

## CLAIMS FOR RELIEF

☐ Administrative Appeal (ADMA)
☐ Appointment Of Receiver (APRC)
☐ Attachment/Garnishment (ATTC)
☐ Claim And Delivery (CLMD)
☐ Collection On Account (ACCT)
☐ Condemnation (CNDM)
☐ Contract (CNTR)
☐ Discovery Scheduling Order (DSCH)
☒ Injunction (INJU)

☐ Limited Driving Privilege - Out-Of-State Convictions (PLDP)
☐ Medical Malpractice (MDML)
☐ Minor Settlement (MSTL)
☐ Money Owed (MNYO)
☐ Negligence - Motor Vehicle (MVNG)
☐ Negligence - Other (NEGO)
☐ Motor Vehicle Lien G.S. Chapter 44A (MVLN)
☐ Possession Of Personal Property (POPP)

☐ Product Liability (PROD)
☐ Real Property (RLPR)
☐ Specific Performance (SPPR)
☒ Other *(specify and list each separately)*
Temporary Restraining Order
Preliminary Injunction
Declaratory Judgment
Accounting

| Date | Signature Of Attorney/Party |
|---|---|
| 11/10/2025 | |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) |
|---|---|
| | |
| | |
| | |
| | |
| | |

| No. | ☒ Additional Defendant(s)   ☐ Third Party Defendant(s) | Summons Submitted |
|---|---|---|
| | Wilmington Savings Fund Society | ☒ Yes  ☐ No |
| | PHH Mortgage Corporation | ☒ Yes  ☐ No |
| | | ☐ Yes  ☐ No |
| | | ☐ Yes  ☐ No |
| | | ☐ Yes  ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

AOC-CV-751, Side Two, Rev. 3/19
© 2019 Administrative Office of the Courts

e.

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION;

Defendants.

**TEMPORARY RESTRAINING ORDER**

FILED
DATE: November 14, 2025
TIME: 3:22:39 PM
MECKLENBURG COUNTY
CLERK OF SUPERIOR COURT
BY: P. West

THIS CAUSE coming on to be heard and being heard by the Honorable David Strickland, Judge
presiding over the 13 November 2025 civil session of Mecklenburg County Superior Court. Upon
Plaintiffs' verified complaint and *ex parte* motion for a temporary restraining order, the Court finds
as follows:

## FINDINGS OF FACT

1.  Plaintiff C. Ray Kennedy is a citizen of North Carolina and resides in Mecklenburg County.

2.  Plaintiff Cynthia M. Kennedy is a citizen of North Carolina and resides in Mecklenburg
    County.

3.  Plaintiff Ramsey-Peele Corporation is a domestic corporation organized and existing under
    the laws of the State of North Carolina and maintains a principal place of business in
    Mecklenburg County.

4.  Defendant William F. Kirk (hereinafter "Substitute Trustee") is a citizen of North Carolina
    and resident of Mecklenburg County. This action is brought against Kirk in his capacity
    as Substitute Trustee for the deed of trust dated September 28, 2017 and recorded in Book
    32153 at Page 103 of the Mecklenburg County Registry.

5.  Defendant Substitute Trustee Services, Inc. is a domestic corporation organized and
    existing under the laws of the State of North Carolina.

6. Defendant Wilmington Savings Fund Society, FSB, d/b/a Christina Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II (hereinafter "Wilmington Savings") is a federal savings bank organized and existing under the laws of the United States with a principal place of business in Seal Beach, California.

7. Defendant PHH Mortgage Corporation is a foreign corporation organized under the laws of the State of New Jersey.

8. C. Ray Kennedy and Cynthia M. Kennedy (hereinafter Mr. and Mrs. Kennedy) are the present record owners of two tracts of real property and two commercial buildings located at 16701 Northcross Drive, Charlotte, North Carolina (hereinafter "Northcross Property") and 6025 Clark Creek Parkway, Charlotte, North Carolina (hereinafter "Clark Creek Property").

The Northcross Property is more fully described as follows:

Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat thereof recorded in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

9. The Clark Creek Property is more fully described as follows:

Lying and being situated in Mecklenburg County, NC and being more particularly described as follows:

Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), accordingly to the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deeds of Mecklenburg County, NC.

10. On 6 January 2025, the Substitute Trustee filed a special proceedings action and sought foreclosure by power of sale in in Mecklenburg County Superior Court, case number 25-SP-000031-590 (hereinafter "Foreclosure Proceeding").

11. The Substitute Trustee alleged Mr. and Mrs. Kennedy had committed a number of defaults with respect to a security agreement, promissory note, and deed of trust dated September 26, 2017 executed in favor of Cherrywood Commercial Lending, LLC that secured the Northcross and Clark Creek Properties.

12. The Substitute Trustee also alleged Defendant Wilmington Savings was the holder of the note and deed of trust securing the Northcross Property and the Clark Creek Property. The Substitute Trustee further alleged Defendant PHH Mortgage Corporation was the servicer of the indebtedness alleged owned by Defendant Wilmington Savings.

2

13. On July 10, 2025, the Honorable Jessica Davis, Assistant Clerk of Mecklenburg County Superior Court, entered an order denying Substitute Trustee's petition for foreclosure by power of sale.

14. On July 11, 2025, the Substitute Trustee filed a notice of appeal to the Mecklenburg County Superior Court.

15. On October 8, 2025, the Honorable Nathanial Poovey entered an order authorizing Substitute Trustee's petition for foreclosure by power of sale under N.C. Gen. Stat. § 45-21.16.

16. On October 14, 2025, Mr. and Mrs. Kennedy filed a notice of appeal to the North Carolina Court of Appeals.

17. Defendants have noticed the foreclosure by power of sale for the Northcross Property and Clark Creek Property to occur on November 18, 2025 at 10:00am.

18. Plaintiffs have filed a motion to stay the foreclosure by power of sale in the Foreclosure Proceeding. However, the matter cannot be heard until December 2, 2025.

19. Plaintiffs have alleged that throughout the course of the dealings between Plaintiffs and Defendants, Defendants have demanded payment of certain sums, which Plaintiffs allege and believe are incorrect. Plaintiffs dispute the amounts owed to Defendants under the note, the amount of Plaintiffs' alleged default and indebtedness, and the amount of other charges.

20. On August 15, 2024, Plaintiffs, through counsel and pursuant to N.C. Gen. Stat. § 45-36.4, requested the full payoff amount on the loan as of August 25, 2024.

21. On August 26, 2024, Defendants, through counsel, provided a payoff statement that was provided, Defendants demanded total compensation in the amount of $2,927,555.80.

22. Plaintiffs alleged, in the Foreclosure Proceeding, however, Defendants claimed a different amount due from what was provided in the payoff demand.

23. Plaintiffs alleged the account statement dated November 1, 2025, shows further accounting discrepancies from the indebtedness identified in the Foreclosure Proceeding.

24. Plaintiffs alleged Defendants failed to account for payments made by the Plaintiffs in the payoff demand, Affidavit of Indebtedness, and the account statement, including $71,627.85 paid by Plaintiffs on March 19, 2024 and $30,205.03 paid by Plaintiffs on December 3, 2024

25. Ramsey-Peele Corporation currently occupies the Northcross Property and Clark Creek Property pursuant to a lease agreement.

26. In accordance with the lease, Ramsey-Peele Corporation operates a daycare out of the properties. The daycare business uses the assumed business name University Child Development Center. Ramsey-Peele has approximately 465 children currently enrolled with University Child Development Center.

27. Plaintiffs have alleged Defendants' foreclosure by power of sale will cause Ramsey-Peele Corporation to suspend its business operations and deprive 465 children of day care services, which will, in turn, create additional hardships for those families.

28. On November 1, 2025, Plaintiffs entered into a contract for the sale of the property with Gustafson Properties, LLC.

29. On November 7, 2025, Plaintiffs obtained a letter of interest from Kennedy Funding (no relationship to Plaintiffs) to refinance the loan on the Northcross Property and Clark Creek Property.

30. Given the offer to purchase and contract and potential refinance of the Northcross Property and Clark Creek Property, there is good cause to believe that the dispute between the Plaintiffs and Defendants will be resolved without the need for foreclosure.

31. Plaintiffs have brought claims for equitable relief to enjoin the Foreclosure Proceeding and for declaratory relief to accurately determine all amounts owed to Defendants under the applicable mortgage documents.

32. To allow Defendants to proceed with foreclosure as scheduled for November 18, 2025 would cause immediate and irreparable harm to Plaintiffs.

33. The *status quo* should be maintained prior to a hearing on the merits of Plaintiffs' claim for a preliminary injunction.

34. Balancing the equities, this Court finds a temporary restraining order pending a hearing on Plaintiffs' claim for a preliminary injunction is equitable and appropriate.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter of this case.

2. To allow Defendants to proceed with foreclosure by power of sale scheduled for November 18, 2025 would cause immediate and irreparable harm to Plaintiffs.

3. The *status quo* should be maintained prior to a hearing on the merits of Plaintiffs' claim for a preliminary injunction.

4. Plaintiffs do not otherwise have an adequate remedy at law.

4

5. Balancing the equities, this Court finds a temporary restraining order pending a hearing on Plaintiffs' claim for a preliminary injunction is equitable and appropriate.

THEREFORE, based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. Plaintiffs' motion for a temporary restraining order under Rule 65(b) of the North Carolina Rules of Civil Procedure and N.C. Gen. Stat. § 45-21.34 is allowed.

2. Defendants, including their agents and employees, are hereby restrained and enjoined from conducting the foreclosure by power of sale for the Northcross Property and Clark Creek Property.

3. This temporary restraining order shall remain in force and effect for ten days after entry.

4. In the Court's discretion, no bond is required of the Plaintiffs.

5. Plaintiffs' counsel shall coordinate scheduling of the hearing for Plaintiffs' motion for preliminary injunction with the Mecklenburg County Superior Court Trial Court Administrator's Office. The matter shall be set within a reasonable time following entry of this Temporary Restraining Order.

This is the 13th day of November 2025.

11/14/2025 3:10:42 PM

Honorable David Strickland
Superior Court Judge Presiding

5

f.

Mecklenburg County Clerk of Superior Court

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBERG

IN THE GENERAL COURT OF JUSTICE
SUPEROR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST,
not in its individual capacity but solely as the
Owner Trustee of Residential Credit Opportunities
Trust II; and PHH MORTGAGE
CORPORATION;

Defendants.

**AFFIDAVIT OF SERVICE**

THOMAS D. BUMGARDNER, being first duly sworn, deposes and says as follows:

1. I am an attorney, licensed to practice law in the State of North Carolina, having been so licensed in 2008. I represent the Plaintiff's C.Ray Kennedy; Cynthia M. Kennedy; and Ramsey-Peele Corporation in this action.

2. On November 14, 2025 I deposited a filed copy of the summons and complaint with the Federal Express. Federal Express is a designated delivery service authorized pursuant to 26 U.S.C. § 7502(f)(2), and served upon the Defendant as follows:

   PHH Mortgage Corporation
   c/o Registered Agent: Corporation Service Company
   2626 Glenwood Avenue
   Suite 550
   Raleigh, North Carolina 27608

3. Service was, in fact, made upon the Defendant on November 17, 2025, as evidenced by the attached proof of delivery receipt.

This is the 17 day of November 2025.

_____
Thomas D. Bumgardner

Sworn to and subscribed before me,
This is the 17 day of November 2025.
_Jennifer White_ (Seal)
Notary Public
My Commission Expires: *October 23, 2030*

---

**JENNIFER WHITE**
NOTARY PUBLIC
UNION County
North Carolina

---



November 17, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 886063691437

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Shipping/Receiving |
| Signed for by: | M.Hughes | Delivery Location: | 2626 Glenwood Ave |
| Service type: | FedEx First Overnight | | |
| Special Handling: | Deliver Weekday | | RALEIGH, NC, 27608 |
| | | Delivery date: | Nov 17, 2025 06:50 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 886063691437 | Ship Date: | Nov 14, 2025 |
| | | Weight: | 0.5 LB/0.23 KG |

**Recipient:**
Corporation Service Company, PHH Mortgage Corporation
2626 Glenwood Avenue
550
RALEIGH, NC, US, 27608

**Shipper:**
Thomas Bumgardner,
13925 Ballantyne Corporate Pl.
Suite 280
Charlotte, NC, US, 28277

Signature Proof of Delivery is not currently available for this Tracking Number. Availability of signature
images may take up to 5 days after delivery date. Please try later, or contact Customer Service at
1.800.Go.FedEx(R) 800.463.3339.

Thank you for choosing FedEx

g.

Mecklenburg County Clerk of Superior Court

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBERG

IN THE GENERAL COURT OF JUSTICE
SUPEROR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST,
not in its individual capacity but solely as the
Owner Trustee of Residential Credit Opportunities
Trust    II;    and    PHH    MORTGAGE
CORPORATION;

Defendants.

**AFFIDAVIT OF SERVICE**

THOMAS D. BUMGARDNER, being first duly sworn, deposes and says as follows:

1. I am an attorney, licensed to practice law in the State of North Carolina, having been so licensed in 2008. I represent the Plaintiff's C.Ray Kennedy; Cynthia M. Kennedy; and Ramsey-Peele Corporation in this action.

2. On November 14, 2025 I deposited a filed copy of the summons and complaint with the Federal Express. Federal Express is a designated delivery service authorized pursuant to 26 U.S.C. § 7502(f)(2), and served upon the Defendant as follows:

   William Kirk
   3405 High Hamptons Drive
   Charlotte, North Carolina 28210

3. Service was, in fact, made upon the Defendant on November 15, 2025, as evidenced by the attached proof of delivery receipt.

4. On November 14, 2025 I deposited a filed copy of the summons and complaint with the Federal Express. Federal Express is a designated delivery service authorized pursuant to 26 U.S.C. § 7502(f)(2), and served upon the Defendant as follows:

   William Kirk
   3430 Toringdon Way
   Suite 101
   Charlotte, North Carolina 28277

5. Service was, in fact, made upon the Defendant on November 17, 2025, as evidenced by the attached proof of delivery receipt.

This is the _17_ day of November 2025.

_____
Thomas D. Bumgardner

Sworn to and subscribed before me,
This is the _17_ day of November 2025.

_Jennifer White_ (Seal)
Notary Public
My Commission Expires: _October 23, 2030_

JENNIFER WHITE
NOTARY PUBLIC
UNION County
North Carolina



November 17, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 886063418130

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Residence |
| Signed for by: | A.Kirk | Delivery Location: | 3405 HIGH HAMPTONS DR |
| Service type: | FedEx First Overnight | | |
| Special Handling: | Saturday Delivery; Residential Delivery; Indirect Signature Required | | Charlotte, NC, 28210 |
| | | Delivery date: | Nov 15, 2025 08:03 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 886063418130 | Ship Date: | Nov 14, 2025 |
| | | Weight: | 0.5 LB/0.23 KG |

Recipient:
William Kirk,
3405 High Hamptons Drive
CHARLOTTE, NC, US, 28210

Shipper:
Thomas Bumgardner,
13925 Ballantyne Corporate Pl,
Suite 280
Charlotte, NC, US, 28277



Thank you for choosing FedEx



November 17, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 886063360793

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Shipping/Receiving |
| Signed for by: | S.Shane | Delivery Location: | 3430 TORINGDON WAYSTE 101 |
| Service type: | FedEx First Overnight | | |
| Special Handling: | Deliver Weekday | | Charlotte, NC, 28277 |
| | | Delivery date: | Nov 17, 2025 07:52 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 886063360793 | Ship Date: | Nov 14, 2025 |
| | | Weight: | 0.5 LB/0.23 KG |

**Recipient:**
William Kirk, Regent Law
3430 Toringdon Way
Suite 101
CHARLOTTE, NC, US, 28277

**Shipper:**
Thomas Bumgardner,
13925 Ballantyne Corporate Pl.
Suite 280
Charlotte, NC, US, 28277



Thank you for choosing FedEx

h.

Mecklenburg County Clerk of Superior Court

---

# STATE OF NORTH CAROLINA

_____MECKLENBURG_____ County

In The General Court Of Justice
☐ District   ☒ Superior Court Division

| Name Of Case |
|---|
| C. RAY KENNEDY; CYNTHIA M. KENNEDY; and RAMSEY-PEELE CORP. v. WILMINGTON SAVINGS FUND SOCIETY, FSB D/B/A CHRISTIANA TRUST et al. |

| Case File No. |
|---|
| 25CV060201-590 |

| Date Of Proceeding(s) |
|---|
| November 13, 2025 at 9:30 AM |

## REQUEST FOR DUPLICATE COPY OF VERBATIM AUDIO COURT RECORD
## (NON-CONFIDENTIAL)

| Name Of Presiding Judge Or Clerk |
|---|
| Hon. David H. Strickland |

| Courtroom Where Hearing Held |
|---|
| 6310 (via WebEx) |

### REQUEST

I, the undersigned, request a duplicate copy of the case named above, which was a non-confidential hearing that was electronically recorded. I understand I may have this record transcribed by anyone I wish.

**NOTE TO PERSON MAKING REQUEST:** _The clerk may provide electronic recordings via (1) LiquidFiles, which sends an email to the requester with a time-limited link to download the attached files, or (2) blank media (e.g., CD). There is a fee for the cost of any blank media (e.g., CD) used to share the recording. Payment must be made by cash, certified check, or money order, payable to the Clerk of Superior Court. Personal checks will not be accepted. Clerks use WebEx or DCR software to record proceedings. Most modern media players will play WebEx recordings. To play back DCR recordings, download the free player software here: https://bisdigital.com/software. Court reporters use a variety of software, which may require compatible, proprietary software to play back a recording._

**NOTE: Record On Appeal Information**

For preparation of a record of a case on appeal, follow the requirements set out in the Rules of Appellate Procedure, promulgated by the Supreme Court of North Carolina. These Rules describe what is required in the preparation of the record on appeal and the transcript format to be followed.   Please e-mail to darlene.snee@hutchenslawfirm.com (Atty. Pettit's Paralegal)

| Date Of Request | Name Of Person Making Request (type or print) | Signature Of Person Making Request | Telephone No. Of Person Making Request |
|---|---|---|---|
| 11/18/2025 | W. Walt Pettit, Esq. | _[signature]_ | 704.362.9255 x 2313 |

### RECEIPT

I have received a duplicate of the recording as requested above.

| Date Received | Signature |
|---|---|
| | |

**NOTE:** _This form shall not be used for any juvenile proceedings or any other confidential hearing._

**NOTE:** _Audio recordings of superior court proceedings created by court reporters are not public records as defined by G.S. 132-1 and shall be disclosed to the parties and public only to the extent allowed by an order of a court of competent jurisdiction for good cause shown after notice to all parties. Original stenomask audio files, audio files of digital recording technicians, and recordings by the clerk in non-confidential case types are public records under G.S. 132-1 and subject to disclosure without a court order (G.S. 7A-95(c)). Audio recordings of district court proceedings remain public records that must be disclosed to the public upon request, unless they relate to a confidential proceeding or are sealed._

Original - File

AOC-G-114, Rev. 11/25
© 2025 Administrative Office of the Courts

i.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

Plaintiff,

v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

Defendants.

---

## NOTICE OF APPEARANCE

NOW COME, William Walt Pettit and Jeffrey A. Bunda, attorneys duly licensed in the State of North Carolina, hereby enter an appearance as counsel of record for Defendants Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation. The undersigned counsel respectfully requests that all future pleadings, motions, documents or certificates be served upon the undersigned attorneys in this action.

This the 19th day of November, 2025.

HUTCHENS LAW FIRM LLP

By: /s/ William Walt Pettit
    William Walt Pettit
    N.C. Bar No. 9407
    6230 Fairview Road, Suite 315
    Charlotte, NC 28210
    Telephone: (704) 362-9255
    Email: walt.pettit@hutchenslawfirm.com
    *Attorneys for Defendants Wilmington*
    *Savings Fund Society, FSB, d/b/a*

HUTCHENS LAW FIRM LLP

By: /s/ Jeffrey A. Bunda
    Jeffrey A. Bunda
    N.C. Bar No. 34432
    6230 Fairview Road, Suite 315
    Charlotte, NC 28210
    Telephone: (704) 362-9255
    Email: jeff.bunda@hutchenslawfirm.com
    *Attorneys for Defendants Wilmington*
    *Savings Fund Society, FSB, d/b/a Christiana*

U:\WWP Files\PHH\Kennedy, Calvin\CVS\Notice of Appearance.docx

*Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation*

*Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation*

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

                    Plaintiff,

        v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

                    Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

---

## CERTIFICATE OF SERVICE

I, as attorney of record for Defendants Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation, hereby certify that on the 19th day of November, 2025, I served a copy of the Notice of Appearance by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

Thomas D. Bumgardner, Esq.
13925 Ballantyne Corporate Place, Suite 280
Charlotte, NC 28277

HUTCHENS LAW FIRM LLP

By: /s/ William Walt Pettit
    William Walt Pettit
    N.C. Bar No. 9407
    6230 Fairview Road, Suite 315
    Charlotte, NC 28210
    Telephone: (704) 362-9255
    Email: walt.pettit@hutchenslawfirm.com

HUTCHENS LAW FIRM LLP

By: /s/ Jeffrey A. Bunda
    Jeffrey A. Bunda
    N.C. Bar No. 34432
    6230 Fairview Road, Suite 315
    Charlotte, NC 28210
    Telephone: (704) 362-9255
    Email: jeff.bunda@hutchenslawfirm.com

U:\WWP Files\PHH\Kennedy, Calvin\CVS\Notice of Appearance.docx

*Attorneys for Defendants Wilmington
Savings Fund Society, FSB, d/b/a
Christiana Trust, not in its individual
capacity but solely as the Owner Trustee of
Residential Credit Opportunities Trust II
and PHH Mortgage Corporation*

*Attorneys for Defendants Wilmington
Savings Fund Society, FSB, d/b/a
Christiana Trust, not in its individual
capacity but solely as the Owner Trustee of
Residential Credit Opportunities Trust II
and PHH Mortgage Corporation*

j.

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION;

Defendants.

**NOTICE OF HEARING**

PLEASE TAKE NOTICE that Plaintiffs will bring their motion for preliminary injunction on for
hearing on 4 December 2025 at 2:00pm in Courtroom 6310 of the Mecklenburg County
Courthouse, which is located at 832 E. Fourth Street, Charlotte, North Carolina, or as soon
thereafter as the matter may be heard.

This is the 24 day of November 2025.

_____
Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing Notice of Hearing upon all parties to this action by eCourts File and Serve, and first-class United States Mail, postage prepaid and addressed as follows:

Walt Pettit
Hutchens Law Firm
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Walt.pettit@hutchenslawfirm.com
*Attorney for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation*

William Kirk
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277
will@regentlawnc.com
*Attorney for Substitute Trustee Services, Inc.*

PHH Mortgage Corporation
2626 Glenwood Avenue
Suite 550
Raleigh, North Carolina 27608

Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation
Attn: Legal Department
500 Delaware Avenue
Wilmington, DE 19801

This is the 24 day of November 2025.

_____
Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Plaintiffs*

k.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

                Plaintiff,

    v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

                Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

## BRIEF IN SUPPORT OF DEFENDANT WILMINGTON SAVINGS FUND SOCIETY, FSB D/B/A CHRISTIANA TRUST, NOT IN ITS INDIVIDUAL CAPACITY BY SOLELY AS OWNER TRUSTEE OF RESIDENTIAL CREDIT OPPORTUNITIES TRUST II' BOND DETERMINATION

NOW COMES Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its

individual capacity by solely as Owner Trustee of Residential Credit Opportunities Trust II

(hereinafter "Wilmington Savings"), by and through counsel, hereby submits its Brief in Support

of Defendant Wilmington Savings' Bond Determination.

## REVELANT FACUTAL ALLEGATIONS

On or about September 26, 2017, C. Ray Kennedy and Cynthina M. Kennedy (hereinafter

collectively known as the "Borrower Plaintiffs") executed and delivered to Cherrywood

Commercial Lending, LLC (hereinafter "Cherrywood") a certain Promissory Note (hereinafter

1

U:\WWP Files\PHH\Kennedy, Calvin\CVS\Brief re Bond Determination.docx

"Note") in the sum of $3,000,000.00 and a Loan and Security Agreement (hereinafter "Agreement").

Furthermore, on or about September 26, 2017, the Borrower Plaintiffs executed and delivered to Chicago Title Company LLC, as Trustee, a certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (hereinafter "Deed of Trust"). The Deed of Trust encumbered the real property located at 6025 Clarke Creek Parkway, Charlotte, Mecklenburg County, North Carolina and 16701 Northcross Drive, Huntersville, Mecklenburg County, North Carolina (hereinafter collectively "Real Property"). Said Deed of Trust was properly filed on September 28, 2017 and recorded in Book 32153 at Page 103 of the Mecklenburg County Public Registry. Thereafter, Cherrywood sold and assigned the Note and Deed of Trust to Cherrywood Commercial Holdings, LLC, who then endorsed the original Note in blank. Wilmington Savings is the current holder of the original Note endorsed in blank and Deed of Trust and has possession of the same. Later, the Real Property was leased to Ramsey-Peele Corporation, an affiliated entity.

On February 19, 2020, the Borrower Plaintiffs filed a Voluntary Petition for Chapter 11 bankruptcy, case no. 20-30208, in the United States Bankruptcy Court for the Western District of North Carolina (hereinafter the "Bankruptcy Case"). On April 9, 2020, Wilmington Savings filed a Proof of Claim, asserting that it was a valid lien on the Real Property in the Bankruptcy Case. The Proof of Claim was allowed as filed. Upon the Borrower Plaintiffs' default in payments, the substitute trustee began the instant foreclosure proceeding by filing a Notice of Hearing on January 6, 2025. On July 10, 2025, the Clerk of Superior Court of Mecklenburg County entered an order denying foreclosure. Thereafter, on October 8, 2025, the Honorable Nathaniel J. Poovey entered an order granting foreclosure, thereby reversing the previous order.

2

## ARGUMENT

### I.     LEGAL STANDARD

The amount to stay a real property judgment depends on whether a Chapter 45 foreclosure was appealed from the Clerk of Superior Court or from the trial court. For appeals stemming from the Clerk's order, N.C. GEN. STAT. § 45-21.16(d) governs the bond amount. However, when a party appeals the trial court's decision, the bond amount is governed by N.C. GEN. STAT. § 1-292. *In re Simon*, 36 N.C. App. 51, 57, 243 S.E.2d 163, 167 (1978). The measure of damages under the bond is waste on the real property plus the value of the use and occupation of the property. *Id.*, 36 N.C. App. at 58, 243 S.E.2d at 167. The bond amount should be sufficient to protect the interests of Wilmington Savings during the appeal, which is greater than 16 months. A party can recover on the bond in the same action by showing that he was damaged by the restraint. *Id.*, 36 N.C. App. at 56, 243 S.E.2d at 166.

### II.    WILMINGTON SAVINGS IS ENTITLED TO A BOND AMOUNT OF EITHER THE RENTS PAID BY THE RAMSEY-PEELE CORPORATION OR THE DAILY INTEREST ACCRUAL ALONG WITH THE 2025 AD VALOREM TAXES AND INSURANCE ON THE IMPROVEMENTS, WHICHEVER IS GREATER.

#### A.    *Ramsey-Peele Corporation Rents*

Wilmington Savings is entitled to a bond encompassing the rents paid by Ramsey-Peele Corporation because without the rents, there would be waste. Upon Judge Pooley's determination that Wilmington Savings is entitled to foreclose on the Real Property, the Borrower Plaintiffs, as mortgagors, were no longer in possession of the Real Property as there was a breach of condition. *Brannock v. Fletcher*, 271 N.C. 65, 155 S.E.2d 532 (1967) ("the mortgagor is entitled to remain in the possession of the property at least until breach of condition"). Since Wilmington Savings is in possession of the Real Property, it is now chargeable on accounting for the rents and profits that

3

the Real Property produces. *Id.* With the rents from Ramsey-Peele Corporation, Wilmington Savings can apply those amounts to the indebtedness. Moreover, under paragraph 3(c) of the Deed of Trust, the Borrower Plaintiffs are entitled to any rents generated from the Real Property; however, in the Event of Default, the Lender is "entitled to all Rents as they become due and payable." Wilmington Savings later invoked this right in a letter/notice to the Borrower Plaintiffs and the President of Ramsey-Peele Corporation dated November 21, 2025. (See Affidavit of William Walt Pettit). As such, denying Wilmington Savings the right to collect rent from the tenant, to use such rents to diminish the indebtedness, and allowing the Borrower Plaintiffs to remain entitled to the rents is waste. As shown in the instant civil action, the Borrower Plaintiffs receive annual rent of $414,000.00 or $34,500.00 a month.

    B.    *2025 Ad Valorem Taxes, Daily Accrued Interest, and Improvement Insurance*

In the alternative, Wilmington Savings is entitled to a bond encompassing the daily accrued interest on the indebtedness, along with the *ad valorem* taxes and the insurance for the improvements. The amounts discussed below are verified in Wilmington Savings' Affidavit.

    1.    Daily Accrued Interest

Wilmington Savings is entitled to a bond that includes the interest accruing on the debt. In *Gruber v. Ewbanks*, the North Carolina Supreme Court determined that accrued interest is an acceptable measure of damages where the bond protected the other party against damages the party sustained by reason of the injunction. *Gruber v. Ewbanks*, 199 N.C. 335, 339, 154 S.E. 318, 321 (1930); see also *First Nat'l Bank v. Hicks*, 207 N.C. 157, 176 S.E. 249 (1934). Moreover, *In re Simon* permits the use of interest on the indebtedness as a measure of damages is permitted because the bond protected the petitioner from "any probable loss by reason of delay." *In re Simon*, 36 N.C. App. at 58, 243 S.E.2d at 167. Here, Wilmington Savings will experience loss since interest would

4

accrue and could cause the foreclosure sale to end with a deficiency from the growing interest. Including the interest on the indebtedness prevents Wilmington Savings' interest from being further impaired by the delay. Accordingly, Wilmington Savings previously notified the Borrower Plaintiffs that it would invoke a default rate of interest effective March 1, 2024. Thus, the interest is presently accruing at the rate of 12.4360% per annum, resulting in an interest accrual of $959.72 per day. Therefore, such amounts should be included as part of the bond amount.

<u>2.</u>   <u>2025 Ad Valorem Taxes</u>

Because the Borrower Plaintiffs defaulted in their tax obligation, Wilmington Savings is entitled to a credit for taxes paid on the mortgaged property. While the Borrower Plaintiffs are legally responsible for the taxes on the Real Property, they defaulted on their tax obligations, giving way for Wilmington Savings to pay said taxes in their place despite not having a duty to the same. *See* N.C. GEN. STAT. § 105-386; *Charlotte v. Little-McMahan Props., Inc.*, 52 N.C. App. 464, 279 S.E.2d 104 (1981). If the taxes were not paid, then Wilmington Savings' secured interest in the Real Property would have been impaired and could be threatened by possible tax foreclosure. However, since Wilmington Savings is not under obligation to pay the taxes and this is of pure benefit to the Borrower Plaintiffs, Wilmington Savings is entitled to a credit for the amount paid in taxes.

On November 5, 2025, Wilmington Savings caused the 2025 *ad valorem* taxes to be paid for each property. The amount of *ad valorem* taxes paid to the City of Charlotte/Conty of Mecklenburg was the sum of $15,522.34 for the 6025 Clarke Creek property and the sum of $26,190.80 for the 16701 Northcross Drive property. Therefore, such amounts should be included in the bond to stay the execution of the foreclosure sale.

5

3.    Insurance on the Improvements

Lastly, Wilmington Savings is entitled to have the cost of the force-placed insurance added to the bond. The Deed of Trust includes a provision that authorizes Wilmington Savings to obtain insurance for the Real Property and be reimbursed for the costs. In the Bankruptcy Case, it was determined that that the Real Property was not adequately protected without proper insurance. Here, the casualty and liability insurance that insured the improvements on the Real Property expired and was cancelled on October 7, 2025. Without this insurance in place, Wilmington Savings' interest in the Real Property is not adequately protected and thus impaired. Therefore, the Borrower Plaintiffs would have committed waste by not adequately insuring the property, since the value of the property would depreciate in the event of a disaster. As such, the annual cost of insurance, $10,448.00, should be included in the bond amount to stay the foreclosure.

## CONCLUSION

For the reasons described above, the bond amount to stay the execution of the foreclosure sale should encompass the rents obtained from Ramsey-Peele Corporation or in the alternative daily accrued interest, the 2025 *ad valorem* taxes, and the costs of insurance for the improvements.

Respectfully submitted this the 25th day of November, 2025.

HUTCHENS LAW FIRM LLP
Attorneys for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II

William Walt Pettit
N.C. Bar No. 9407
6230 Fairview Road, Suite 315
Charlotte, NC 28210

6

U:\WWP Files\PHH\Kennedy, Calvin\CVS\Brief re Bond Determination.docx

Telephone: (704) 362-9255
Fax: (704) 362-9268
Email: walt.pettit@hutchenslawfirm.com

7

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

                    Plaintiff,

        v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

                    Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

---

## CERTIFICATE OF SERVICE

I, as attorney of record for the undersigned, hereby certify that on the 25th day of November, 2025, I served a copy of the Brief in Support of Defendant Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity by solely as Owner Trustee of Residential Credit Opportunities Trust II' Bond Determination by electronic notice pursuant to the local rules and by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

James H. Henderson, Esq.
The Henderson Law Firm
2030 South Tryon St., Ste. 3H
Charlotte, NC 28203

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, NC 28277
*Attorneys for Borrower Plaintiffs-Appellants C.
Ray Kennedy and Cynthia Kennedy*

HUTCHENS LAW FIRM, LLP
Counsel for Wilmington Savings Fund Society, FSB, d/b/a

8

Christiana Trust, not in its individual capacity but solely as
Owner Trustee of Residential Credit Opportunities Trust II

William Walt Pettit
N.C. Bar No.: 9407
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Telephone: (704) 362-9255

9

1.

Mecklenburg County Clerk of Superior Court

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

          Plaintiff,

    v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

---

## AFFIDAVIT

William Walt Pettit (hereinafter "Affiant"), after being first duly sworn, according to law,

deposes and states as follows:

    1.    Affiant is a citizen and resident of Mecklenburg County, North Carolina and is a

partner with the law firm of Hutchens Law Firm LLP. Furthermore, this Affidavit is based upon

the personal knowledge of Affiant who avers his competency to testify as a sworn witness to the

matters contained herein.

    2.    Hutchens Law Firm LLP and Affiant were retained by Wilmington Savings Fund

Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of

Residential Credit Opportunities Trust (hereinafter "Wilmington Savings") to protect its interest

under their Note and Deed of Trust executed by the Debtors in this proceeding.

3.      On November 21, 2025, Affiant caused to be served by Federal Express Overnight Service, Signature Required and by U.S. First Class Mail to Calvin Ray Kennedy and Cynthia M. Kennedy as landlord and Ramsey-Peele Corporation as tenant a certain letter/notice, a true copy of which is appended hereto, identified as "Exhibit 1," and the same is incorporated herein by reference.

4.      Also on November 21, 2025, Affiant prepared and send an email to counsel for Calvin Ray Kennedy, Cynthia M. Kennedy and Ramsey-Peele Corporation and attached the letter (notice (Exhibit 1)) to the same. A true copy of the email and attachment are appended hereto, collectively identified as "Exhibit 2," and the same are incorporated herein by reference.

5.      The envelopes containing the letter/notice that were mailed by U.S. First Class Mail have not been returned.

6.      The foregoing is the substance of this Affiant's testimony which would be offered at any hearing in this matter.

This the 25 day of November, 2025.

_____
William Walt Pettit

Sworn to and subscribed before me
this 25th day of November, 2025.

_____
Notary Public
My Commission Expires: 9·20·2029

DARLENE R. SNEE
NOTARY PUBLIC
Mecklenburg County, North Carolina
My Commission Expires 9·20·2029





## HIGH PERFORMANCE LAW™

William Walt Pettit | Managing Partner, Attorney at Law
Phone: 704-362-9255
Fax: 704-362-9268
Email: walt.pettit@hutchenslawfirm.com
https://HutchensLawFirm.com

Offices In:
FAYETTEVILLE, CHARLOTTE, NC | COLUMBIA, SC

6230 Fairview Road, Suite 315
Charlotte, NC 28210-3253

### VIA U.S. FIRST CLASS MAIL AND OVERNIGHT DELIVERY

November 21, 2025

C. Ray Kennedy, President
Ramsey-Peele Corporation
222 South Church Street, Suite 326M
Charlotte, NC 28202

Calvin Ray Kennedy
4324 Satterwythe Lane
Charlotte, NC 28215

Cynthia M. Kennedy, Vice President
Ramsey-Peele Corporation
4324 Satterwythe Lane
Charlotte, NC 28215

Cynthia M. Kennedy
4324 Satterwythe Lane
Charlotte, NC 28215

RE:  Notice to Ramsey-Peele Corporation, Tenant in 6025 Clarke Creek, Charlotte, NC 28269 and 16701 Northcross Drive, Charlotte, NC 28269 (Real Property)

Dear Sir/Madam:

Please note that we have been retained to represent the interests of Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II (Wilmington Savings). Wilmington Savings is the beneficiary under a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Deed of Trust) which encumbers the Real Property. The Deed of Trust contains provisions which entitle Wilmington Savings to recover the rents and profits derived from leasing the Real Property should a default occur.

Notice is hereby given that: (1) a default has occurred under the Promissory Note and Deed of Trust, and (2) Wilmington Savings Bank hereby notifies the tenant and C. Ray Kennedy and Cynthia M. Kennedy as Landlord that all further rent or similar obligations of Ramsey-Peele Corporation or any tenant should be made payable to Wilmington Savings and forwarded directly to Hutchens Law Firm, LLP. This notice is provided under the terms of the Deed of Trust and pursuant to N.C.G.S. § 47-20.

All further payments for rent and similar obligations should be forwarded to Wilmington Savings at the following address:

Hutchens Law Firm, LLP
6230 Fairview Road, Suite 315
Charlotte, NC 28211
Attn: William Walt Pettit

Should you fail to honor this notice, notice is further given that you will continue to be liable for all rents and similar obligations paid after you receive this notice. Please be governed accordingly.

Very truly yours,
HUTCHENS LAW FIRM, LLP

William Walt Pettit

WWP/drs
cc: James H. Henderson, Esq. (by email)
    Thomas Bumgardner, Esq. (by email)

**Walt Pettit**

| | |
|---|---|
| **From:** | Walt Pettit |
| **Sent:** | Friday, November 21, 2025 3:13 PM |
| **To:** | Jim Henderson (henderson@title11.com) |
| **Cc:** | Thomas Bumgardner |
| **Subject:** | FW: Calvin Kennedy |
| **Attachments:** | Tenant - rent payment ltr.pdf |



Jim and Tom – I am sending the notice as allowed by statute to recover all rents and profits.  Please ask the Kennedys, should they receive any funds as rent from Ramsey-Peele Corp. or any other tenant, to forward the rent checks to me.  Thanks.



## HIGH PERFORMANCE LAW™

William Walt Pettit | Managing Partner, Attorney at Law
Phone: 704-362-9255
Fax: 704-362-9268
Email: walt.pettit@hutchenslawfirm.com
https://HutchensLawFirm.com

Offices In:
FAYETTEVILLE, CHARLOTTE, NC | COLUMBIA, SC

6230 Fairview Road, Suite 315
Charlotte, NC 28210-3253

<u>**VIA U.S. FIRST CLASS MAIL AND OVERNIGHT DELIVERY**</u>

November 21, 2025

C. Ray Kennedy, President
Ramsey-Peele Corporation
222 South Church Street, Suite 326M
Charlotte, NC 28202

Calvin Ray Kennedy
4324 Satterwythe Lane
Charlotte, NC 28215

Cynthia M. Kennedy, Vice President
Ramsey-Peele Corporation
4324 Satterwythe Lane
Charlotte, NC 28215

Cynthia M. Kennedy
4324 Satterwythe Lane
Charlotte, NC 28215

RE:  Notice to Ramsey-Peele Corporation, Tenant in 6025 Clarke Creek, Charlotte, NC 28269 and 16701 Northcross Drive, Charlotte, NC 28269 (Real Property)

Dear Sir/Madam:

Please note that we have been retained to represent the interests of Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II (Wilmington Savings).  Wilmington Savings is the beneficiary under a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Deed of Trust) which encumbers the Real Property.  The Deed of Trust contains provisions which entitle Wilmington Savings to recover the rents and profits derived from leasing the Real Property should a default occur.

Notice is hereby given that: (1) a default has occurred under the Promissory Note and Deed of Trust, and (2) Wilmington Savings Bank hereby notifies the tenant and C. Ray Kennedy and Cynthia M. Kennedy as Landlord that all further rent or similar obligations of Ramsey-Peele Corporation or any tenant should be made payable to Wilmington Savings and forwarded directly to Hutchens Law Firm, LLP.  This notice is provided under the terms of the Deed of Trust and pursuant to N.C.G.S. § 47-20.

U:\WWP Files\PHH\Kennedy, Calvin\Tenant - rent payment ltr.docx

All further payments for rent and similar obligations should be forwarded to Wilmington Savings at the following address:

Hutchens Law Firm, LLP
6230 Fairview Road, Suite 315
Charlotte, NC 28211
Attn: William Walt Pettit

Should you fail to honor this notice, notice is further given that you will continue to be liable for all rents and similar obligations paid after you receive this notice. Please be governed accordingly.

Very truly yours,
HUTCHENS LAW FIRM, LLP

William Walt Pettit

WWP/drs
cc: James H. Henderson, Esq. (by email)
    Thomas Bumgardner, Esq. (by email)

Mecklenburg County Clerk of Superior Court

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

              Plaintiff,

    v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST, not
in its individual capacity but solely as the Owner
Trustee of Residential Credit Opportunities Trust II;
and PHH MORTGAGE CORPORATION,

              Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

## CERTIFICATE OF SERVICE

    I, as attorney of record for Defendants Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation, hereby certify that on the 15th day of November, 2025, I served a copy of the Affidavit *of William Walt Pettit* by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

Thomas D. Bumgardner, Esq.
13925 Ballantyne Corporate Place, Suite 280
Charlotte, NC 28277

              HUTCHENS LAW FIRM LLP
              Attorneys for Defendants Wilmington Savings Fund
              Society, FSB, d/b/a Christiana Trust, not in its individual
              capacity but solely as the Owner Trustee of Residential
              Credit Opportunities Trust II and PHH Mortgage
              Corporation

              By: _____
                 William Walt Pettit
                 N.C. Bar No. 9407
                 6230 Fairview Road, Suite 315
                 Charlotte, NC 28210
                 Telephone: (704) 362-9255
                 Email: walt.pettit@hutchenslawfirm.com

m.

Mecklenburg County Clerk of Superior Court

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

               Plaintiff,

     v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

               Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

---

## REQUEST TO TAKE JUDICIAL NOTICE

Pursuant to N.C.G.S. § 8C-1, Rule 201(b) and (d) of the North Carolina Rules of Evidence,

Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely

as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation,

hereby request that the Court take judicial notice of the pleadings filed in the In The Matter Of The

Foreclosure by Substitute Trustee Services, Inc., Substitute Trustee, of a Deed of Trust, Assignment of

Leases and Rents, Security Agreement and Fixture Filing executed by C. Ray Kennedy and Cynthia M.

Kennedy foreclosure proceeding, case no. 25SP000031-590, pending before the Clerk of the Superior

Court of Mecklenburg County, North Carolina.

Respectfully submitted this the 25 day of November, 2025.

HUTCHENS LAW FIRM LLP
Attorneys for Wilmington Savings Fund Society, FSB,
d/b/a Christiana Trust, not in its individual capacity but
solely as the Owner Trustee of Residential Credit
Opportunities Trust II and PHH Mortgage Corporation

By: _____
William Walt Pettit
N.C. Bar No. 9407
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Telephone: (704) 362-9255
Telecopier: (704) 362-9268
Email: walt.pettit@hutchenslawfirm.com

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

                Plaintiff,

    v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

                Defendants.

## CERTIFICATE OF SERVICE

    I, as attorney of record for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation, hereby certify that on the _25_ day of November, 2025, I served a copy of the Request to Take Judicial Notice by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

Thomas D. Bumgardner, Esq.
13925 Ballantyne Corporate Place, Suite 280
Charlotte, NC 28277

                    HUTCHENS LAW FIRM LLP
                    Attorneys for Wilmington Savings Fund Society, FSB, d/b/a
                    Christiana Trust, not in its individual capacity but solely as the
                    Owner Trustee of Residential Credit Opportunities Trust II and
                    PHH Mortgage Corporation

                    By:_____
                          William Walt Pettit
                          N.C. Bar No. 9407
                          6230 Fairview Road, Suite 315
                          Charlotte, NC 28210

n.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

              Plaintiff,

      v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

              Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

---

## AFFIDAVIT

     Juliana Thurab (hereinafter "Affiant"), after being first duly sworn, according to law, deposes and states as follows:

     1.    At all times mentioned herein, Contract Management Coordinator was the Contract Management Coordinator of PHH Mortgage Corporation and that as such, is authorized to execute this Affidavit. PHH Mortgage Corporation acts as servicing agent for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II (hereinafter "Wilmington Savings").

     2.    This Affidavit is based upon the personal knowledge of Affiant who avers his/her competency to testify as a sworn witness to the matters contained herein. The personal knowledge was acquired as a result of Affiant reviewing the books and records of PHH Mortgage Corporation. Accordingly, Affiant represents that he/she has personal knowledge of and familiar with the types

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

Plaintiff,

v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

## AFFIDAVIT

Juliana Thurab (hereinafter "Affiant"), after being first duly sworn, according to

law, deposes and states as follows:

1.      At all times mentioned herein, Management Coordinator was the Contract Management

Coordinator of PHH Mortgage Corporation and that as such, is authorized to execute this Affidavit.

PHH Mortgage Corporation acts as servicing agent for Wilmington Savings Fund Society, FSB,

d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential

Credit Opportunities Trust II (hereinafter "Wilmington Savings").

2.      This Affidavit is based upon the personal knowledge of Affiant who avers his/her

competency to testify as a sworn witness to the matters contained herein. The personal knowledge

was acquired as a result of Affiant reviewing the books and records of PHH Mortgage Corporation.

Accordingly, Affiant represents that he/she has personal knowledge of and familiar with the types

of records maintained regarding this loan and the procedures for creating those records. Finally, Affiant has access to and has reviewed the books and records of PHH Mortgage Corporation regarding the matters set forth herein.

　　3.　　Affiant is familiar with the books and records of PHH Mortgage Corporation acting as servicing agent for Wilmington Savings. These books and records were kept in the ordinary course of business of PHH Mortgage Corporation acting as servicing agent for Wilmington Savings at all times mentioned herein. Also, to the personal knowledge of Affiant, all events and transactions noted herein were recorded at or near the time of that particular event or transaction.

　　4.　　On or about September 26, 2017, C. Ray Kennedy and Cynthia M. Kennedy executed and delivered to Cherrywood Commercial Lending, LLC a certain Promissory Note (hereinafter "Note") in the sum of $3,000,000.00 and a Loan and Security Agreement (hereinafter "Agreement"). True copies of the Note and Agreement are appended hereto, identified as "Exhibits 1 and 2," and the same are incorporated herein by reference.

　　5.　　Contemporaneously with the execution of the Note and to induce Cherrywood Commercial Lending, LLC to extend credit to C. Ray Kennedy and Cynthia M. Kennedy, Ramsey-Peele Corporation executed and delivered to Cherrywood Commercial Lending, LLC a certain Guaranty (Payment). A true copy of the Guaranty is appended hereto, identified as "Exhibit 3," and the same is incorporated herein by reference.

　　6.　　Also, on or about September 26, 2017, C. Ray Kennedy and Cynthia M. Kennedy executed and delivered to Chicago Title as Trustee a certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (hereinafter "Deed of Trust"). The Deed of Trust encumbered the real property located at 6025 Clarke Creek, Charlotte, Mecklenburg County, North Carolina and 16701 Northcross Drive, Charlotte, Mecklenburg County, North Carolina (hereinafter collectively "Real Property"). A true copy of the Deed of Trust is appended hereto, identified as "Exhibit 4," and the same is incorporated herein by reference.

7.     The Deed of Trust was properly filed on September 28, 2017 and recorded in Book 32153 at Page 103 of the Mecklenburg County Public Registry.

8.     Wilmington Savings is the current holder of the Note, Agreement and Deed of Trust.

9.     As shown in the Affidavit of Indebtedness filed on March 3, 2025, C. Ray Kennedy and Cynthia M. Kennedy defaulted under the Note and Agreement by failing to pay the November 1, 2024 and subsequent monthly payments to Wilmington Savings and as set forth in that certain Order Determining Events of Default, et al. (doc #281) entered by the U.S. Bankruptcy Court in the Chapter 11 proceeding of C. Ray Kennedy and Cynthia M. Kennedy, case #20-30208, pending in the Western District Court of North Carolina.

10.    Wilmington Savings has previously notified C. Ray Kennedy and Cynthia M. Kennedy that it would invoke the default rate of interest effective March 1, 2024. Accordingly, interest is presently accruing at the rate of 12.4360% per annum and this results in interest accruing at the rate of $959.72 per day.

11.    The casualty and liability insurance which insures the improvements to the Real Property described in the Deed of Trust expired and was cancelled on October 7, 2025. The annual costs of this insurance is $10,448.00. Pursuant to the terms of the Loan Agreement and Deed of Trust, C. Ray Kennedy and Cynthia M. Kennedy are required to obtain the required insurance in their names with Wilmington Savings noted as a first mortgagee under each policy subject only to ad valorem taxes.

12.    Wilmington Savings caused the 2025 ad valorem taxes to be paid for each property on November 5, 2025. The amount of ad valorem taxes paid to the City of Charlotte/County of Mecklenburg was the sum of $15,522.34 for the 6025 Clarke Creek property and the sum of $26,190.80 for the 16701 Northcross Drive property.

13.     The improvements to the Real Property described in the Deed of Trust are leased

to an affiliated entity of C. Ray Kennedy and Cynthia M. Kennedy or Ramsey-Peele Corporation.

Furthermore, Ramsey-Peele Corporation remits regular lease payments to Mr. and Mrs. Kennedy.

Pursuant to the terms of the Deed of Trust, Wilmington Savings has a lien on the rents and profits

and is entitled to recover all lease payments upon default and notice. Wilmington Savings through

counsel previously provided notice to the tenant or Ramsey-Peele Corporation to remit all

payments to Wilmington Savings.

14.     The foregoing is the substance of this Affiant's testimony which would be offered

at any hearing of the above-captioned action.

This the 25 day of November, 2025.

Affiant Signature: _Juliana Thurab_
Print Name: _Juliana Thurab_
Title: _Contract Management Coordinator_
PHH Mortgage Corporation who is the servicer for
Wilmington Savings Fund Society, FSB, d/b/a
Christiana Trust, not in its individual capacity but
solely as Owner Trustee of Residential Credit
Opportunities Trust II

STATE OF _FLORIDA_
COUNTY OF _PALM BEACH_

The foregoing instrument was sworn to (or affirmed) and subscribed before me by means of [X]
physical presence or [ ] online notarization, this 25 day of _November_, 2025,
by _Juliana Thurab_ as _Contract Management Coordinator_ for PHH Mortgage
Corporation, who is the servicer for Wilmington Savings Fund Society, FSB, d/b/a Christiana
Trust, not individually but solely as Owner Trustee of Residential Credit Opportunities Trust II,
who is personally known to me or who has produced _____ as identification.

_____
Signature of Notary Public

Claribel Lopez

Name of Notary Public: _____
Notary Commission Expiration Date: _____
Personally known: _____
OR Produced Identification: _____
Type of Identification Produced: _____

CLARIBEL LOPEZ
Notary Public · State of Florida
Commission # HH 196880
My Comm. Expires Dec 22, 2025
Bonded through National Notary Assn.

## PROMISSORY NOTE

US $3,000,000.00                                                September 26, 2017

FOR VALUE RECEIVED, C. Ray Kennedy & Cynthia M. Kennedy ("Borrower") promises to pay to the order of CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("Lender"), the principal amount of Three Million and 00/100 Dollars ($3,000,000.00) (the "Mortgage Loan"), together with interest thereon accruing at the Interest Rate on the unpaid principal balance from the date the Mortgage Loan proceeds are disbursed until fully paid in accordance with the terms hereof and of that certain Loan and Security Agreement dated as of the date hereof, by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement").

1.      Defined Terms.

        Capitalized terms used and not specifically defined in this Promissory Note (this "Note") have the meanings given to such terms in the Loan Agreement.

2.      Repayment.

        Borrower agrees to pay the principal amount of the Mortgage Loan and interest on the principal amount of the Mortgage Loan from time to time outstanding at the Interest Rate or such other rate or rates and at the times specified in the Loan Agreement, together with all other amounts due to Lender under the Loan Documents. The outstanding balance of the Mortgage Loan and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date, together with all other amounts due to Lender under the Loan Documents.

3.      Security

        The Mortgage Loan evidenced by this Note, together with all other Indebtedness is secured by, among other things, the Security Instrument, the Loan Agreement and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.



EXHIBIT

1

Promissory Note                                                                Page 1 of 5

4.      Acceleration

In accordance with the Loan Agreement, if an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any accrued and unpaid interest, including interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other amounts payable under this Note, the Loan Agreement and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower, unless applicable law requires otherwise (and in such case, after satisfactory notice has been given).

5.      Personal Liability.

The provisions of Article 3 (Personal Liability) of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

6.      Governing Law.

This Note shall be governed in accordance with the terms and provisions of Section 15.01 (Governing Law; Consent to Jurisdiction and Venue) of the Loan Agreement.

7.      Waivers.

Presentment, demand for payment, notice of nonpayment and dishonor, protest and notice of protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace and diligence in collecting the Indebtedness are waived by Borrower, for and on behalf of itself, Guarantor and Key Principal, and all endorsers and guarantors of this Note and all other third party obligors or others who may become liable for the payment of all or any part of the Indebtedness.

8.      Commercial Purpose.

Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise or activity, and not for agricultural, personal, family or household purposes.

9.      Construction; Joint and Several (or Solidary, as applicable) Liability.

(a)      Section 15.08 (Construction) of the Loan Agreement is hereby incorporated herein as if fully set forth in the body of this Note.

(b)    If more than one Person executes this Note as Borrower, the obligations of such Person shall be joint and several (solidary instead for purposes of Louisiana law).

10.    Notices.

All Notices required or permitted to be given by Lender to Borrower pursuant to this Note shall be given in accordance with Section 15.02 (Notice) of the Loan Agreement.

11.    Time is of the Essence.

Borrower agrees that, with respect to each and every obligation and covenant contained in this Note, time is of the essence.

12.    Loan Charges Savings Clause.

. Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Mortgage Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Mortgage Loan, or on acceleration of the maturity of the Mortgage Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Mortgage Loan without the payment of any prepayment premium (or, if the Mortgage Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents. For the purpose of determining whether any applicable law

limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Mortgage Loan. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Mortgage Loan.

13.      WAIVER OF TRIAL BY JURY.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT   THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

14.      Receipt of Loan Documents.

Borrower acknowledges receipt of a copy of each of the Loan Documents.

15.      Incorporation of Schedules.

The schedules, if any, attached to this Note are incorporated fully into this Note by this reference and each constitutes a substantive part of this Note.

ATTACHED SCHEDULE. The following Schedule is attached to this Note:

NONE

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered under seal (where applicable) by its duly authorized representative.   Where applicable law so provides, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.

_____
C. Ray Kennedy

_____
Cynthia M. Kennedy

Pay to the order of
Cherrywood Commercial Holdings, LLC
Without Recourse

Cherrywood Commercial Lending, LLC

By_____
Jorge Ramos, EVP

Pay to the order of

_____
Without Recourse

Cherrywood Commercial Holdings, LLC

By_____
Jorge Ramos, EVP



LOAN AND SECURITY AGREEMENT

BY AND BETWEEN

C. Ray Kennedy & Cynthia M. Kennedy

AND

CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company

DATED AS OF SEPTEMBER 26, 2017

ARTICLE 1 – DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS _____ 1
    SECTION 1.01    DEFINED TERMS _____ 1
    SECTION 1.02    SCHEDULES, EXHIBITS, AND ATTACHMENTS INCORPORATED _____ 1
ARTICLE 2 – GENERAL MORTGAGE LOAN TERMS _____ 1
    SECTION 2.01    MORTGAGE LOAN ORIGINATION AND SECURITY _____ 1
    (b)    Making of Mortgage Loan _____ 1
    (c)    Security for Mortgage Loan _____ 1
    (d)    Protective Advances _____ 1
    SECTION 2.02    PAYMENTS ON MORTGAGE LOAN _____ 1
    (a)    Debt Service Payments _____ 1
    (b)    Capitalization of Accrued But Unpaid Interest _____ 2
    (c)    Late Charges _____ 2
    (d)    Default Rate _____ 2
    (e)    Address for Payments _____ 3
    (f)    Application of Payments _____ 3
    SECTION 2.03    PREPAYMENT _____ 3
    (a)    Prepayment; Prepayment Premium; Voluntary Prepayment in Part _____ 3
    (b)    Voluntary Prepayment in Full _____ 3
    (c)    Acceleration of Mortgage Loan _____ 3
    (d)    Application of Collateral _____ 4
    (e)    Casualty and Condemnation _____ 4
    (f)    No Effect on Payment Obligations _____ 4
    (g)    Loss Resulting from Prepayment _____ 4
ARTICLE 3    PERSONAL LIABILITY _____ 4
    SECTION 3.01    BORROWER PERSONALLY LIABLE _____ 4
    SECTION 3.02    [INTENTIONALLY DELETED.] _____ 4
    SECTION 3.03    PERSONAL LIABILITY FOR INDEMNITY OBLIGATIONS _____ 4
    SECTION 3.04    LENDER'S RIGHT TO FOREGO RIGHTS AGAINST MORTGAGED PROPERTY ___ 4
ARTICLE 4    BORROWER STATUS _____ 4
    SECTION 4.01    REPRESENTATIONS AND WARRANTIES _____ 4
    (a)    Due Organization and Qualification _____ 4
    (b)    Location _____ 4
    (c)    Power and Authority _____ 5
    (d)    Due Authorization _____ 5
    (e)    Valid and Binding Obligations _____ 5
    (f)    Effect of Mortgage Loan on Borrower's Financial Condition _____ 5
    (g)    Economic Sanctions, Anti-Money Laundering, and Anti-Corruption _____ 5
    (h)    Borrower Status _____ 5
    (i)    No Bankruptcies or Judgments _____ 6
    (j)    No Litigation _____ 6
    (k)    Payment of Taxes, Assessments, and Other Charges _____ 6
    (l)    Not a Foreign Person _____ 7

Page ii

(m)   ERISA _____ 7

(n)   Default Under Other Obligations _____ 7

(o)   Prohibited Person _____ 7

(p)   No Contravention _____ 7

(q)   Lockbox Arrangement _____ 7

SECTION 4.02    COVENANTS _____ 7

(a)   Maintenance of Existence; Organizational Documents _____ 7

(b)   Economic Sanctions, Anti-Money Laundering, and Anti-Corruption _____ 7

(c)   Payment of Taxes, Assessments, and Other Charges _____ 8

(d)   Borrower Status _____ 8

(e)   ERISA _____ 8

(f)   Notice of Litigation or Insolvency _____ 9

(g)   Payment of Costs, Fees, and Expenses _____ 9

(h)   Restrictions on Distributions _____ 9

(i)   Lockbox Arrangement _____ 9

ARTICLE 5    THE MORTGAGE LOAN _____ 9

SECTION 5.01    REPRESENTATIONS AND WARRANTIES _____ 9

(a)   Receipt and Review of Loan Documents _____ 9

(b)   No Default _____ 9

(c)   No Defenses _____ 9

(d)   Loan Document Taxes _____ 9

SECTION 5.02    COVENANTS _____ 9

(a)   Ratification of Covenants; Estoppels; Certifications _____ 9

(b)   Further Assurances _____ 10

(c)   Sale of Mortgage Loan _____ 10

(d)   Limitations on Further Acts of Borrower. _____ 10

(e)   Financing Statements; Record Searches _____ 10

(f)   Loan Document Taxes _____ 11

ARTICLE 6    PROPERTY USE, PRESERVATION, AND MAINTENANCE _____ 11

SECTION 6.01    REPRESENTATIONS AND WARRANTIES _____ 11

(a)   Compliance with Law; Permits and Licenses _____ 11

(b)   Property Characteristics _____ 11

(c)   Property Ownership _____ 11

(d)   Condition of the Mortgaged Property. _____ 11

(e)   Personal Property _____ 12

SECTION 6.02    COVENANTS _____ 12

(a)   Use of Property _____ 12

(b)   Property Maintenance _____ 12

(c)   Property Preservation _____ 13

(d)   Property Inspections _____ 13

(e)   Compliance with Laws _____ 13

SECTION 6.03    MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING THE PROPERTY _ 13

(a)      Property Management _____ 13
(b)      Subordination of Fees to Affiliated Property Managers _____ 13
(c)      Physical Needs Assessment _____ 14
ARTICLE 7      LEASES AND RENTS _____ 14
   SECTION 7.01      REPRESENTATIONS AND WARRANTIES _____ 14
(a)      Prior Assignment of Rents _____ 14
(b)      Prepaid Rents _____ 14
(c)      Rent Rolls _____ 14
   SECTION 7.02      COVENANTS _____ 14
(a)      Leases _____ 14
(b)      [Intentionally Deleted] _____ 15
(c)      Payment of Rents _____ 15
(d)      Assignment of Rents _____ 15
(e)      Further Assignments of Leases and Rents _____ 15
(f)      Options to Purchase by Tenants _____ 15
   SECTION 7.03      MORTGAGE LOAN ADMINISTRATION REGARDING LEASES AND RENTS ____ 15
(a)      Lease Requirements _____ 15
(b)      Rent Schedule _____ 16
ARTICLE 8      BOOKS AND RECORDS; FINANCIAL REPORTING _____ 16
   SECTION 8.01      REPRESENTATIONS AND WARRANTIES _____ 16
(a)      Financial Information _____ 16
(b)      No Change in Facts or Circumstances _____ 16
   SECTION 8.02      COVENANTS _____ 16
(a)      Obligation to Maintain Accurate Books and Records _____ 16
(b)      Items to Furnish to Lender _____ 16
(c)      Audited Financials _____ 17
(d)      Delivery of Books and Records _____ 17
   SECTION 8.03      MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING BOOKS AND 17
(a)      Lender's Right to Obtain Audited Books and Records _____ 17
(b)      Credit Reports; Credit Score _____ 18
ARTICLE 9      INSURANCE _____ 18
   SECTION 9.01      REPRESENTATIONS AND WARRANTIES _____ 18
(a)      Compliance with Insurance Requirements _____ 18
(b)      Property Condition _____ 18
   SECTION 9.02      COVENANTS _____ 18
(a)      Insurance Requirements _____ 18
(b)      Delivery of Policies, Renewals, Notices, and Proceeds _____ 18
   SECTION 9.03      MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING INSURANCE ____ 18
(a)      Lender's Ongoing Insurance Requirements _____ 18
(b)      Application of Proceeds on Event of Loss _____ 19
(c)      Payment Obligations Unaffected _____ 19
(d)      Foreclosure Sale _____ 20

(e)      Appointment of Lender as Attorney-In-Fact. _____ 20
ARTICLE 10        CONDEMNATION _____ 20
  SECTION 10.01      REPRESENTATIONS AND WARRANTIES _____ 20
    (a)      Prior Condemnation Action. _____ 20
    (b)      Pending Condemnation Actions _____ 20
  SECTION 10.02      COVENANTS _____ 20
    (a)      Notice of Condemnation _____ 20
    (b)      Condemnation Proceeds _____ 20
  SECTION 10.03      MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING ___ 20
    (a)      Application of Condemnation Awards _____ 20
    (b)      Payment Obligations Unaffected _____ 20
    (c)      Appointment of Lender as Attorney-In-Fact_____ 20
    (d)      Preservation of Mortgaged Property _____ 20
    (e)      REMIC Trust _____ 20
ARTICLE 11        LIENS, TRANSFERS, AND ASSUMPTIONS _____ 21
  SECTION 11.01      REPRESENTATIONS AND WARRANTIES _____ 21
    (a)      No Labor or Materialmen's Claims _____ 21
    (b)      No Other Interests _____ 21
  SECTION 11.02      COVENANTS _____ 21
    (a)      Liens; Encumbrances _____ 21
    (b)      Transfers _____ 21
    (c)      No Other Indebtedness and Mezzanine Financing. _____ 22
  SECTION 11.03      MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING LIENS, 22
    (a)      Assumption of Mortgage Loan _____ 22
    (b)      Acceleration or "Due on Sale" provision _____ 23
    (c)      [Intentionally Deleted.] _____ 23
    (d)      [Intentionally Deleted.] _____ 23
    (e)      [Intentionally Deleted.] _____ 23
    (f)      Death of Borrower, Key Principal, or Guarantor _____ 23
    (g)      [Intentionally Deleted.] _____ 23
    (h)      Further Conditions to Transfers and Assumption. _____ 23
ARTICLE 12        IMPOSITIONS _____ 24
  SECTION 12.01      REPRESENTATIONS AND WARRANTIES _____ 24
    (a)      Payment of Taxes, Assessments, and Other Charges _____ 24
  SECTION 12.02      COVENANTS _____ 24
    (a)      Imposition Deposits, Taxes, and Other Charges _____ 24
  SECTION 12.03      REPRESENTATIONS AND WARRANTIES _____ 24
    (a)      Maintenance of Records by Lender _____ 24
    (b)      Imposition Accounts _____ 24
    (c)      Payment of Impositions; Sufficiency of Imposition Deposits _____ 24
    (d)      Imposition Deposits Upon Event of Default. _____ 25
    (e)      Contesting Impositions _____ 25

(f)        Release to Borrower _____ 25
ARTICLE 13        INTENTIONLLY OMITTED _____ 25
ARTICLE 14        DEFAULTS/REMEDIES _____ 25
    SECTION 14.01        EVENTS OF DEFAULT _____ 25
        (a)        Automatic Events of Default _____ 25
        (b)        Events of Default Subject to a Specified Cure Period _____ 26
        (c)        Events of Default Subject to Extended Cure Period _____ 26
    SECTION 14.02        REMEDIES _____ 26
        (a)        Acceleration; Foreclosure _____ 26
        (b)        Loss of Right to Disbursements from Collateral Accounts _____ 26
        (c)        Remedies Cumulative _____ 27
    SECTION 14.03        ADDITIONAL LENDER RIGHTS; FORBEARANCE _____ 27
        (a)        No Effect Upon Obligations _____ 27
        (b)        No Waiver of Rights or Remedies _____ 27
        (c)        Appointment of Lender as Attorney-In-Fact _____ 27
        (d)        Borrower Waivers _____ 28
    SECTION 14.04        WAIVER OF MARSHALING _____ 28
ARTICLE 15        MISCELLANEOUS _____ 28
    SECTION 15.01        GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE _____ 28
        (a)        Governing Law _____ 28
        (b)        Venue _____ 28
    SECTION 15.02        NOTICE _____ 28
        (a)        Process of Serving Notice _____ 28
        (b)        Change of Address _____ 29
        (c)        Default Method of Notice _____ 29
        (d)        Receipt of Notices _____ 29
    SECTION 15.03        SUCCESSORS AND ASSIGNS BOUND; SALE OF MORTGAGE LOAN _____ 29
        (a)        Binding Agreement _____ 29
        (b)        Sale of Mortgage Loan; Change of Loan Servicer _____ 29
    SECTION 15.04        COUNTERPARTS _____ 29
    SECTION 15.05        JOINT AND SEVERAL (OR SOLIDARY) LIABILITY _____ 29
    SECTION 15.06        RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY _____ 29
        (a)        Solely Creditor and Debtor _____ 29
        (b)        No Third Party Beneficiaries _____ 29
    SECTION 15.07        SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS _____ 29
    SECTION 15.08        CONSTRUCTION _____ 29
    SECTION 15.09        MORTGAGE LOAN SERVICING _____ 30
    SECTION 15.10        DISCLOSURE OF INFORMATION _____ 30
    SECTION 15.11        WAIVER; CONFLICT _____ 30
    SECTION 15.12        NO RELIANCE _____ 30
    SECTION 15.13        SUBROGATION _____ 30
    SECTION 15.14        COUNTING OF DAYS _____ 30

SECTION 15.15    REVIVAL AND REINSTATEMENT OF INDEBTEDNESS _____ 31
SECTION 15.16    TIME IS OF THE ESSENCE _____ 31
SECTION 15.17    FINAL AGREEMENT _____ 31
SECTION 15.18    WAIVER OF TRIAL BY JURY _____ 31

## <u>SCHEDULES & EXHIBITS</u>

<u>Schedules</u>
Schedule 1        Definitions Schedule
Schedule 2        Summary of Loan Terms
Schedule 3        Interest Rate Type Provisions (required)
Schedule 4        Prepayment Premium Schedule
Schedule 5        Insurance Requirements

### LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Agreement") is made as of the Effective Date (as hereinafter defined) by and between C. Ray Kennedy & Cynthia M. Kennedy ("Borrower"), and CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("Lender").

### RECITALS:

WHEREAS, Borrower desires to obtain the Mortgage Loan (as hereinafter defined) from Lender to be secured by the Mortgaged Property (as hereinafter defined); and

WHEREAS, Lender is willing to make the Mortgage Loan on the terms and conditions contained in this Loan Agreement and in the other Loan Documents (as hereinafter defined);

NOW, THEREFORE, in consideration of the making of the Mortgage Loan by Lender and other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereby covenant, agree, represent, and warrant as follows

### AGREEMENTS:

### ARTICLE 1- DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS:

**Section 1.01      Defined Terms**

Capitalized terms not otherwise defined in the body of this Loan Agreement shall have the meanings set forth in the Definitions Schedule attached as Schedule 1 to this Loan Agreement.

**Section 1.02      Schedules, Exhibits, and Attachments Incorporated.**

The schedules, exhibits, and any other addenda or attachments are incorporated fully into this Loan Agreement by this reference and each constitutes a substantive part of this Loan Agreement. Any failure of Borrower to initial or sign a schedule or Exhibit shall not affect the enforceability of such Schedule or Exhibit or Borrower's obligation to comply with such Schedule and/or Exhibit.

### ARTICLE 2 – GENERAL MORTGAGE LOAN TERMS

**Section 2.01      Mortgage Loan Origination and Security.**

(a)      Making of Mortgage Loan.

Subject to the terms and conditions of this Loan Agreement and the other Loan Documents, Lender hereby makes the Mortgage Loan to Borrower, and Borrower hereby accepts the Mortgage Loan from Lender.  Borrower covenants and agrees that it shall:

(1)      pay the Indebtedness, including the Prepayment Premium, if any (whether in connection with any voluntary prepayment or in connection with an acceleration by Lender of the Indebtedness), in accordance with the terms of this Loan Agreement and the other Loan Documents; and

(2)      perform, observe, and comply with this Loan Agreement and all other provisions of the other Loan Documents.

(b)      Security for Mortgage Loan.

The Mortgage Loan is made pursuant to this Loan Agreement, is evidenced by the Note, and is secured by the Security Instrument, this Loan Agreement, and the other Loan Documents that are expressly stated to be security for the Mortgage Loan.

(c)      Protective Advances.

Page 1 of 45

As provided in the Security Instrument, Lender, its successors or assigns or the Loan Servicer may take such actions or disburse such funds as Lender reasonably deems necessary to perform the obligations of Borrower under this Loan Agreement and the other Loan Documents and to protect Lender's interest in the Mortgaged Property. Such funds disbursed by the Lender or Loan Servicer shall be advances for which, unless reimbursed by the Borrower to the Lender, its successors or assigns or the Loan Servicer, shall become added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid.

**Section 2.02**     **Payments on Mortgage Loan.**

    (a)     Debt Service Payments.

       (1)     Short Month Interest.

If the date the Mortgage Loan proceeds are disbursed is any day other than the first day of the month, interest for the period beginning on the disbursement date and ending on and including the last day of the month in which the disbursement occurs shall be payable by, or credited to, Borrower as set forth in the Summary of Loan Terms.

       (2)     Interest Accrual and Computation.

Except as provided in Section 2.02(a)(1), interest shall be paid in arrears. Interest shall accrue as provided in the Schedule of Interest Rate Type Provisions attached as Schedule 3 to this Loan Agreement and shall be computed in accordance with the Interest Accrual Method. If the Interest Accrual Method is "Actual/360," Borrower acknowledges and agrees that the amount allocated to interest for each month will vary depending on the actual number of calendar days during such month.

       (3)     Monthly Debt Service Payments.

Consecutive monthly debt service installments, each in the amount of the applicable Monthly Debt Service Payment, shall be due and payable on the First Payment Date, and on each Payment Date thereafter until the Maturity Date, at which time all Indebtedness shall be due. Any regularly scheduled Monthly Debt Service Payment that is received by Lender before the applicable Payment Date shall be deemed to have been received on such Payment Date solely for the purpose of calculating interest due. All payments made by Borrower under this Loan Agreement shall be made without set-off, counterclaim, or other defense.

       (4)     Payment at Maturity.

The unpaid principal balance of the Mortgage Loan, any Accrued Interest thereon, any unreimbursed servicing advances, and all other Indebtedness shall be due and payable on the Maturity Date.

       (5)     Interest Rate Type.

See the Schedule of Interest Rate Type Provisions for additional provisions, if any, specific to the Interest Rate Type.

    (b)     Capitalization of Accrued But Unpaid Interest.

Any accrued and unpaid interest on the Mortgage Loan remaining past due for thirty (30) days or more may, at Lender's election, be added to and become part of the unpaid principal balance of the Mortgage Loan.

    (c)     Late Charges.

       (1)     If any Monthly Debt Service Payment due hereunder is not received by Lender within ten (10) days after the applicable Payment Date, or any amount payable under this Loan Agreement (other than the payment due on the Maturity Date for repayment of the Mortgage Loan in full) or any other Loan Document is not received by Lender within ten (10) days after the date such amount is due, inclusive of the date on which such amount is due, Borrower shall pay to Lender, immediately without demand by Lender, the Late Charge.

The Late Charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Section 2.02(d).

       (2)     Borrower acknowledges and agrees that:

          (A)     its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan;

          (B)     it is extremely difficult and impractical to determine those additional expenses;

          (C)     Lender is entitled to be compensated for such additional expenses; and

          (D)     the Late Charge represents a fair and reasonable estimate, taking into account all circumstances existing on the date hereof, of the additional expenses Lender will incur by reason of any such late payment.

    (d)     Default Rate.

(1)     Default interest shall be paid as follows:

    (A)    If any amount due in respect of the Mortgage Loan (other than amounts due on the Maturity Date) remains past due for thirty (30) days or more, interest on such unpaid amount(s) shall accrue from the date payment is due at the Default Rate and shall be payable upon demand by Lender.

    (B)    If any Indebtedness due is not paid in full on the Maturity Date, then interest shall accrue at the Default Rate on all such unpaid amounts from the Maturity Date until fully paid and shall be payable upon demand by Lender.

Absent a demand by Lender, any such amounts shall be payable by Borrower in the same manner as provided for the payment of Monthly Debt Service Payments. To the extent permitted by applicable law, interest shall also accrue at the Default Rate on any judgment obtained by Lender against Borrower in connection with the Mortgage Loan. To the extent Borrower or any other Person is vested with a right of redemption, interest shall continue to accrue at the Default Rate during any redemption period until such time as the Mortgaged Property has been redeemed.

(2)     Borrower acknowledges and agrees that:

    (A)    its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan; and

    (B)    in connection with any failure to timely pay all amounts due in respect of the Mortgage Loan on the Maturity Date, or during the time that any amount due in respect of the Mortgage Loan is delinquent for more than thirty (30) days:

        (i)    Lender's risk of nonpayment of the Mortgage Loan will be materially increased;

        (ii)    Lender's ability to meet its other obligations and to take advantage of other investment opportunities will be adversely impacted;

        (iii)    Lender will incur additional costs and expenses arising from its loss of the use of the amounts due;

        (iv)    it is extremely difficult and impractical to determine such additional costs and expenses;

        (v)    Lender is entitled to be compensated for such additional risks, costs, and expenses; and

        (vi)    the increase from the Interest Rate to the Default Rate represents a fair and reasonable estimate of the additional risks, costs, and expenses Lender will incur by reason of Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquency on the Mortgage Loan (taking into account all circumstances existing on the Effective Date).

(e)    Address for Payments.

All payments due pursuant to the Loan Documents shall be payable at Lender's Payment Address, as set forth in Schedule 2 to this Loan Agreement, or such other place and in such manner as may be designated from time to time by written notice to Borrower by Lender.

(f)    Application of Payments.

If at any time Lender receives, from Borrower or otherwise, any amount in respect of the Indebtedness that is less than all amounts due and payable at such time, then Lender may apply such payment to amounts then due and payable in any manner and in any order determined by Lender or hold in suspense and not apply such amount at Lender's election. Neither Lender's acceptance of an amount that is less than all amounts then due and payable, nor Lender's application of, or suspension of the application of, such payment, shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Loan Agreement and the other Loan Documents shall remain unchanged.

Section 2.03    Prepayment.

(a)    Prepayment; Prepayment Premium; Voluntary Prepayment in Part.

(1)    Except as expressly provided in this Loan Agreement (including as provided in the Prepayment Premium Schedule), a Prepayment Premium calculated in accordance with the Prepayment Premium Schedule shall be payable in connection with any prepayment of the Mortgage Loan. Borrower may voluntarily prepay the Mortgage Loan in part on any Permitted Payment Date. In connection with any voluntary prepayment in part, Borrower acknowledges and agrees that the Prepayment Premium due on such prepaid amount shall be immediately due and payable and may be netted out of the principal portion of such prepayment.

(b)    Voluntary Prepayment in Full.

Borrower may voluntarily prepay the Mortgage Loan in full on a Permitted Prepayment Date so long as:

      (1)      Borrower delivers to Lender a Prepayment Notice specifying the Intended Prepayment Date not more than sixty (60) days, but not less than thirty (30) days (if given via U.S. Postal Service) or twenty (20) days (if given via facsimile, e-mail, or overnight courier) prior to such Intended Prepayment Date; and

      (2)      Borrower pays to Lender an amount equal to the sum of:

          (A)      the entire unpaid principal balance of the Mortgage Loan; plus

          (B)      all Accrued Interest (calculated through the last day of the month in which the prepayment occurs); plus

          (C)      the Prepayment Premium; plus

          (D)      all other Indebtedness.

In connection with any such voluntary prepayment, Borrower acknowledges and agrees that interest shall always be calculated and paid through the last day of the month in which the prepayment occurs (even if the Permitted Prepayment Date for such month is not the last day of such month, or if Lender approves prepayment on an Intended Prepayment Date that is not a Permitted Prepayment Date). Borrower further acknowledges that Lender is not required to accept a voluntary prepayment of the Mortgage Loan on any day other than a Permitted Prepayment Date. However, if Lender does approve an Intended Prepayment Date that is not a Permitted Prepayment Date and accepts a prepayment on such Intended Prepayment Date, such prepayment shall be deemed to be received on the immediately following Permitted Prepayment Date. If Borrower fails to prepay the Mortgage Loan on the Intended Prepayment Date for any reason (including on any Intended Prepayment Date that is approved by Lender) and such failure either continues for five (5) Business Days, or into the following month, Lender shall have the right to recalculate the payoff amount. If Borrower prepays the Mortgage Loan either in the following month or more than five (5) Business Days after the Intended Prepayment Date that was approved by Lender, Lender shall also have the right to recalculate the payoff amount based upon the amount of such payment and the date such payment was received by Lender. Borrower shall immediately pay to Lender any additional amounts required by any such recalculation.

      (c)      Acceleration of Mortgage Loan.

      Upon acceleration of the Mortgage Loan, Borrower shall pay to Lender:

      (1)      the entire unpaid principal balance of the Mortgage Loan; plus

      (2)      all Accrued Interest (calculated through the last day of the month in which the acceleration occurs); plus

      (3)      the Prepayment Premium; plus

      (4)      all other Indebtedness.

      (d)      Application of Collateral.

Any application by Lender of any collateral or other security to the repayment of all or any portion of the unpaid principal balance of the Mortgage Loan prior to the Maturity Date in accordance with the Loan Documents shall be deemed to be a prepayment by Borrower. Any such prepayment shall require the payment to Lender by Borrower of the Prepayment Premium calculated on the amount being prepaid in accordance with this Loan Agreement.

      (e)      Casualty and Condemnation.

Notwithstanding any provision of this Loan Agreement to the contrary, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any insurance proceeds or amounts received in connection with a Condemnation Action in accordance with this Loan Agreement.

      (f)      No Effect on Payment Obligations.

Unless otherwise expressly provided in this Loan Agreement, any prepayment required by any Loan Document of less than the entire unpaid principal balance of the Mortgage Loan shall not extend or postpone the due date of any subsequent Monthly Debt Service Payments or other payment, or change the amount of any such payments or deposits.

      (g)      Loss Resulting from Prepayment.

In any circumstance in which a Prepayment Premium is due under this Loan Agreement, Borrower acknowledges that:

      (1)      any prepayment of the unpaid principal balance of the Mortgage Loan, whether voluntary or involuntary, or following the occurrence of an Event of Default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional risk, expense, and frustration or impairment of Lender's ability to meet its commitments to third parties;

      (2)      it is extremely difficult and impractical to ascertain the extent of such losses, risks, and damages;

      (3)      the formula for calculating the Prepayment Premium represents a reasonable estimate of the losses, risks, and damages Lender will incur as a result of a prepayment; and

(4)    the provisions regarding the Prepayment Premium contained in this Loan Agreement are a material part of the consideration for the Mortgage Loan, and that the terms of the Mortgage Loan are in other respects more favorable to Borrower as a result of Borrower's voluntary agreement to such prepayment provisions.

## ARTICLE 3 - PERSONAL LIABILITY

**Section 3.01    Borrower Personally Liable.**

The Mortgage Loan is a full recourse loan and Borrower is personally liable for all obligations hereunder, including payment of the Indebtedness.

**Section 3.02    [Intentionally Deleted.]**

**Section 3.03    Personal Liability for Indemnity Obligations.**

Borrower shall be personally and fully liable to Lender for Borrower's indemnity obligations under the Required Repairs Agreement, the Environmental Indemnity Agreement, and any other express indemnity obligations provided by Borrower under any Loan Document. Borrower's liability for such indemnity obligations shall not be limited by the amount of the Indebtedness, the repayment of the Indebtedness, or otherwise, provided that Borrower's liability for such indemnities shall not include any loss caused by the gross negligence or willful misconduct of Lender as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

**Section 3.04    Lender's Right to Forego Rights Against Mortgaged Property.**

Lender may exercise its rights against Borrower personally to the fullest extent permitted by applicable law without regard to whether Lender has exercised any rights against the Mortgaged Property, the UCC Collateral, or any other security, or pursued any rights against Guarantor, or pursued any other rights available to Lender under this Loan Agreement, any other Loan Document, or applicable law. To the fullest extent permitted by applicable law, in any action to enforce Borrower's personal liability under this Article 3, Borrower waives any right to set off the value of the Mortgaged Property against such personal liability.

## ARTICLE 4 - BORROWER STATUS

**Section 4.01    Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 4.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)    Due Organization and Qualification.

If Borrower is not an individual, Borrower is validly existing and qualified to transact business and is in good standing in the state in which it is formed or organized, the Property Jurisdiction, and in each other jurisdiction that qualification or good standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to be so qualified or in good standing would adversely affect Borrower's operation of the Mortgaged Property or the validity, enforceability or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document.

(b)    Intentionally Deleted

(c)    Power and Authority.

Borrower has the requisite power and authority:

(1)    to own the Mortgaged Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of its obligations under this Loan Agreement and under the other Loan Documents to which it is a party; and

(2)    to execute and deliver this Loan Agreement and the other Loan Documents to which it is a party, and to carry out the transactions contemplated by this Loan Agreement and the other Loan Documents to which it is a party.

(d)    Due Authorization.

The execution, delivery, and performance of this Loan Agreement and the other Loan Documents to which it is a party have been duly authorized by all necessary action and proceedings by or on behalf of Borrower, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of Borrower as a condition to the valid execution, delivery, and performance by Borrower of this Loan Agreement or any of the other Loan Documents to which it is a party, except filings required to perfect and maintain the liens to be granted under the Loan Documents and, if the Borrower is not an individual, routine filings to maintain good standing and its existence.

(e)        Valid and Binding Obligations.

This Loan Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by Borrower and constitute the legal, valid, and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforceability may be limited by applicable Insolvency Laws or by the exercise of discretion by any court.

(f)        Effect of Mortgage Loan on Borrower's Financial Condition.

Borrower is not presently Insolvent, and the Mortgage Loan will not render Borrower Insolvent.  Borrower has sufficient working capital, including proceeds from the Mortgage Loan, cash flow from the Mortgaged Property, or other sources, not only to adequately maintain the Mortgaged Property, but also to pay all of Borrower's outstanding debts as they come due, including all Debt Service Amounts.  In connection with the execution and delivery of this Loan Agreement and the other Loan Documents (and the delivery to, or for the benefit of, Lender of any collateral contemplated thereunder), and the incurrence by Borrower of the obligations under this Loan Agreement and the other Loan Documents, Borrower did not receive less than reasonably equivalent value in exchange for the incurrence of the obligations of Borrower under this Loan Agreement and the other Loan Documents.

(g).       Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.

(1)        None of Borrower, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is in violation of:

(A)        any applicable anti-money laundering laws, including those contained in the Bank Secrecy Act and USA Patriot Act of 2001; and

(B)        any applicable anti-drug trafficking, anti-terrorism, or anti-corruption laws, civil or criminal.

(2)        None of Borrower, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is a Person:

(A)        that is charged with, or has received actual notice that he, she, or it is under investigation for, any violation of any laws described in Section 4.01(g)(1);

(B)        that has been convicted of any violation of, has been subject to civil penalties pursuant to, or had any of its property seized or forfeited under, any laws described in Section 4.01(g)(1); or

(C)        with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other applicable law.

(3)        None of Borrower, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is in violation of any obligation to maintain appropriate internal controls as required by the governing laws of the jurisdiction of such Person as are necessary to ensure compliance with the economic sanctions, anti-money laundering, and anti-corruption laws of the United States and the jurisdiction where the Person resides, is domiciled, or has its principal place of business.

(4)        Borrower, Guarantor, and Key Principal are in compliance with all applicable economic sanctions laws administered by OFAC, the United States Department of State, or the United States Department of Commerce.

(h)        Borrower Status.

Borrower:

(1)        does not own or lease any real property, personal property or assets other than the Mortgaged Property, unless Borrower is an individual;

(2)        does not own, operate or participate in any business other than the leasing, ownership, management, operation and maintenance of the Mortgaged Property, unless Borrower is an individual;

(3)        has no material financial obligation under or secured by any indenture, mortgage, deed of trust, deed to secure debt, loan agreement or other agreement or instrument to which the Borrower is a party, or by which Borrower is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)        unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property, provided that any trade payables (i) are not evidenced by a promissory note, and (ii) are paid within sixty (60) days of the due date of such trade payable;

Page 6 of 45

(B)      if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate;

(C)      obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents;

(D)      if Borrower is an individual, obligations that do not subject, pledged or otherwise encumber the Mortgaged Property.

(4)      has accurately maintained its financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's assets have been included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(5)      has not commingled its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(6)      has been adequately capitalized in light of its contemplated and actual business operations;

(7)      has not assumed, guaranteed, or pledged the Mortgaged Property or if Borrower is not an individual, any of its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument), or held out its credit as being available to satisfy the obligations of any other Person;

(8)      if Borrower is not an individual, has not made loans or advances to any other Person; and

(9)      has not entered into, and is not a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's length transaction with an unrelated third party.

(i)      No Bankruptcies or Judgments.

None of Borrower, Guarantor, or Key Principal, nor to Borrower's Knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is currently:

(1)      the subject of or a party to any completed or pending bankruptcy, reorganization, including any receivership or other insolvency proceeding;

(2)      preparing or intending to be the subject of a Bankruptcy Event; or

(3)      the subject of any judgment unsatisfied of record or docketed in any court; or

(4)      Insolvent.

(j)      No Litigation.

(1)      There are no claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceedings) by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Borrower or the Mortgaged Property not otherwise covered by insurance (except for claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be disclosed); and

(2)      there are no claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceedings) by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Guarantor or Key Principal, which claims, actions, suits, or proceedings, if adversely determined (individually or in the aggregate) would reasonably be expected to materially adversely affect the financial condition or business of Borrower, Guarantor, or Key Principal or the condition, operation, or ownership of the Mortgaged Property (except for claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

(k)      Payment of Taxes, Assessments, and Other Charges.

Borrower confirms that:

(1)      it has filed all federal, state, county, and municipal tax returns and reports required to have been filed by Borrower;

(2)      it has paid, before any fine, penalty, interest, lien, or costs may be added thereto, all taxes, governmental charges, and assessments due and payable with respect to such returns and reports;

(3)      there is no controversy or objection pending, or to the knowledge of Borrower, threatened in respect of any tax returns of Borrower; and

Page 7 of 45

       (4)    it has made adequate reserves on its books and records for all taxes that have accrued but which are not yet due and payable.

       (l)    Not a Foreign Person.

Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

       (m)    ERISA.

Borrower represents and warrants that:

       (1)    Borrower is not an Employee Benefit Plan;

       (2)    no asset of Borrower constitutes "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

       (3)    no asset of Borrower is subject to any laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

       (4)    neither Borrower nor any ERISA Affiliate is subject to any obligation or liability with respect to any ERISA Plan.

       (n)    Default Under Other Obligations.

       (1)    The execution, delivery, and performance of the obligations imposed on Borrower under this Loan Agreement and the Loan Documents to which it is a party will not cause Borrower to be in default under the provisions of any agreement, judgment, or order to which Borrower is a party or by which Borrower is bound or results in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated by the provisions of the Loan Documents.

       (2)    None of Borrower, Guarantor, or Key Principal is in default under any obligation to Lender.

       (o)    Prohibited Person.

None of Borrower, Guarantor or Key Principal is a Prohibited Person nor, to Borrower's Knowledge is any of the following Persons a Prohibited Person:

       (1)    a Person controlling Borrower, Guarantor, or Key Principal; or

       (2)    a Person controlled by and having a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal a Prohibited Person.

       (p)    No Contravention.

Neither the execution and delivery of this Loan Agreement and the other Loan Documents to which Borrower is a party, nor the fulfillment of or compliance with the terms and conditions of this Loan Agreement and the other Loan Documents to which Borrower is a party, nor the performance of the obligations of Borrower under this Loan Agreement and the other Loan Documents does or will conflict with or result in any breach or violation of, or constitute a default under, any of the terms, conditions, or provisions of Borrower's organizational documents, or any indenture, existing agreement, or other instrument to which Borrower is a party or to which Borrower, the Mortgaged Property, or other assets of Borrower are subject.

       (q)    Lockbox Arrangement.

Neither Borrower nor the direct or indirect owners of Borrower is party to any type of lockbox agreement or other similar cash management arrangement with any direct or indirect owner of Borrower that has not been approved by Lender in writing. In the event that Lender has approved any such arrangement, Borrower has, at Lender's option, entered into a lockbox agreement or other similar cash management agreement with Lender in form and substance acceptable to Lender.

Section 4.02    Covenants.

       (a)    Maintenance of Existence; Organizational Documents.

Borrower shall maintain its existence, its entity status, franchises, rights, and privileges under the laws of the state of its formation or organization. Borrower shall continue to be duly qualified and in good standing to transact business in each jurisdiction in which qualification or standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to do so would adversely affect Borrower's operation of the Mortgaged Property or the validity, enforceability, or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document. Neither Borrower nor any partner, member, manager, officer, or director of Borrower shall:

       (1)    make or allow any material change to the organizational documents or organizational structure of Borrower, including changes relating to the Control of Borrower, or

       (2)    file any action, complaint, petition, or other claim to:

          (A)    divide, partition, or otherwise compel the sale of the Mortgaged Property, or

          (B)    otherwise change the Control of Borrower.

The foregoing covenants in this Section 4.02(a), other than that set forth in clause (a)(2)(A), shall not apply if Borrower is an individual.

    (b)    Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.

        (1)    Borrower shall at all times remain, and shall cause Guarantor, Key Principal, and any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them to remain, in compliance with:

            (A)    any applicable anti-money laundering laws, including those contained in the Bank Secrecy Act; and

            (B)    any applicable anti-drug trafficking, anti-terrorism, or anti-corruption laws, civil or criminal.

        (2)    At no time shall Borrower, Guarantor, or Key Principal, or any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, be a Person:

            (A)    that is charged with, or has received actual notice that he, she, or it is under investigation for, any violation of any laws described in Section 4.02(b)(1);

            (B)    that has been convicted of any violation of, has been subject to civil penalties pursuant to, or had any of its property seized or forfeited under, any laws described in Section 4.02(b)(1); or

            (C)    with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other applicable law.

        (3)    At no time shall Borrower, Guarantor, or Key Principal, or any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, be a Person in violation of any obligation to maintain appropriate internal controls as required by the governing laws of the jurisdiction of such Person as are necessary to ensure compliance with the economic sanctions, anti-money laundering, and anti-corruption laws of the United States and the jurisdiction where the Person resides, is domiciled or has its principal place of business.

        (4)    Borrower shall at all times remain, and shall cause Guarantor and Key Principal to remain, in compliance with any applicable economic sanctions laws administered by OFAC, the United States Department of State, or the United States Department of Commerce.

    (c)    Payment of Taxes, Assessments, and Other Charges.

Borrower shall file all federal, state, county, and municipal tax returns and reports required to be filed by Borrower and shall pay, before any fine, penalty, interest, or cost may be added thereto, all taxes payable with respect to such returns and reports.

    (d)    Borrower Status.

Until the Indebtedness is fully paid, Borrower:

        (1)    unless Borrower is an individual, shall not acquire or lease any real property, personal property or other assets other than the Mortgaged Property, unless Borrower is an individual;

        (2)    unless Borrower is an individual, shall not acquire, own, operate, or participate in any business other than the leasing, ownership, management, operation and maintenance, of the Mortgaged Property, unless Borrower is an individual;

        (3)    shall not commingle its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

        (4)    shall accurately maintain its financial statements, accounting records, and other partnership, real-estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's assets are included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

        (5)    shall have no material financial obligation under or secured by any indenture, mortgage, deed of trust, deed to secure debt, loan agreement or other agreement or instrument to which the Borrower is a party, or by which Borrower is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

            (A)    unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property, provided that any trade payables (i) are not evidenced by a promissory note, and (ii) are paid within sixty (60) days of the due date of such trade payable;

(B)       if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate; and

(C)       obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents;

(D)       If Borrower is an individual, obligations that do not subject, pledge or otherwise encumber the Mortgaged Property.

(6)       shall not assume, guaranty, or pledge the Mortgaged Property nor, unless Borrower is an individual, any of its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument) or hold out its credit as being available to satisfy the obligations of any other Person;

(7)       shall not make loans or advances to any other Person; or

(8)       shall not enter into, or become a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

(e)       ERISA.

Borrower covenants that:

(1)       no asset of Borrower shall constitute "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

(2)       no asset of Borrower shall be subject to the laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

(3)       neither Borrower nor any ERISA Affiliate shall incur any obligation or liability with respect to any ERISA Plan.

(f)       Notice of Litigation or Insolvency.

Borrower shall give immediate written notice to Lender of any claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceeding) by or before any Governmental Authority pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor, Key Principal, or the Mortgaged Property, which claims, actions, suits, or proceedings, if adversely determined reasonably could be expected to materially adversely affect the financial condition or business of Borrower, Guarantor, or Key Principal, or the condition, operation, or ownership of the Mortgaged Property (including any claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

(g)       Payment of Costs, Fees, and Expenses.

In addition to the payments specified in this Loan Agreement, Borrower shall pay, on demand, all of Lender's out-of-pocket fees, costs, charges, or expenses (including the reasonable fees and expenses of attorneys, accountants, and other experts) incurred by Lender in connection with:

(1)       any amendment to, or consent, or waiver required under, this Loan Agreement or any of the Loan Documents (whether or not any such amendments, consents, or waivers are entered into);

(2)       defending or participating in any litigation arising from actions by third parties and brought against or involving Lender with respect to:

(A)       the Mortgaged Property;

(B)       any event, act, condition, or circumstance in connection with the Mortgaged Property; or

(C)       the relationship between Lender, Borrower, Key Principal, and Guarantor in connection with this Loan Agreement or any of the transactions contemplated by this Loan Agreement;

(3)       the administration or enforcement of, or preservation of rights or remedies under, this Loan Agreement or any other Loan Documents including, or in connection with, any litigation or appeals, any Foreclosure Event or other disposition of any collateral granted pursuant to the Loan Documents; and

(4)       any Bankruptcy Event or Guarantor Bankruptcy Event.

(h)       Restrictions on Distributions.

Borrower shall not declare or make any distributions or dividends of any nature to any Person having an ownership interest in Borrower if an Event of Default has occurred and is continuing.

(i)       Lockbox Arrangement.

Page 10 of 45

Neither Borrower nor the direct or indirect owners of Borrower shall enter into any type of lockbox agreement or other similar cash management arrangement with any direct or indirect owner of Borrower without the prior written consent of Lender. In the event that Lender issues such consent, Borrower shall, at Lender's option, be required to enter into a lockbox agreement or other similar cash management agreement with Lender in form and substance acceptable to Lender.

## ARTICLE 5 - THE MORTGAGE LOAN

**Section 5.01        Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 5.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)        Receipt and Review of Loan Documents.

Borrower has received and reviewed this Loan Agreement and all of the other Loan Documents. All information, documentation and data provided by, or on behalf of the Borrower to Lender is complete, true and correct in all material respects as of the date furnished and the date hereof.

(b)        No Default.

No Event of Default exists under any of the Loan Documents, and the execution, delivery, and performance of the obligations imposed on Borrower under the Loan Documents will not cause Borrower to be in default under the provisions of any agreement, judgment, or order to which Borrower is a party or by which Borrower is bound.

(c)        No Defenses.

The Loan Documents are not currently subject to any right of rescission, set-off, counterclaim, or defense by either Borrower or Guarantor, including the defense of usury, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim, or defense with respect thereto.

(d)        Loan Document Taxes.

All mortgage, mortgage recording, stamp, intangible, or any other similar taxes required to be paid by any Person under applicable law currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents, including the Security Instrument, have been paid or will be paid by Borrower in the ordinary course of the closing of the Mortgage Loan.

**Section 5.02        Covenants**

(a)        Ratification of Covenants; Estoppels; Certifications.

Borrower shall:

(1)        promptly notify Lender in writing upon any violation of any covenant set forth in any Loan Document of which Borrower has notice or knowledge; provided, however, any such written notice by Borrower to Lender shall not relieve Borrower of, or result in a waiver of, any obligation under this Loan Agreement or any other Loan Document; and

(2)        within ten (10) days after a request from Lender, provide a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement:

(A)        that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications);

(B)        the unpaid principal balance of the Mortgage Loan;

(C)        the date to which interest on the Mortgage Loan has been paid;

(D)        that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail);

(E)        whether or not there are then-existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and

(F)        any additional facts reasonably requested in writing by Lender.

(b)        Further Assurances.

(1)        Other Documents As Lender May Require.

Page 11 of 45

Within ten (10) days after request by Lender, Borrower shall, subject to Section 5.02(d) below, execute, acknowledge, and deliver, at its cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, and assurances as Lender may reasonably require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Loan Agreement and the other Loan Documents.

(2)      Corrective Actions.

Within ten (10) days after request by Lender, Borrower shall provide, or cause to be provided, to Lender, at Borrower's cost and expense, such further documentation or information reasonably deemed necessary or appropriate by Lender in the exercise of its rights under the Loan Documents or to correct patent mistakes in the Loan Documents, the Title Policy, or the funding of the Mortgage Loan.

(c)      Sale of Mortgage Loan.

Borrower shall, subject to Section 5.02(d) below:

(1)      comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days of the request, at Borrower's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

(A)      Lender to sell the Mortgage Loan to such Investor;

(B)      Lender to obtain a refund of any commitment fee from any such Investor; or

(C)      any such Investor to further sell or securitize the Mortgage Loan;

(2)      ratify and affirm in writing the representations and warranties set forth in any Loan Document as of such date specified by Lender, modified as necessary to reflect changes that have occurred subsequent to the Effective Date;

(3)      confirm that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail); and

(4)      execute and deliver to Lender and/or any Investor such other documentation, including any amendments, corrections, deletions, or additions to this Loan Agreement or other Loan Document(s) as is reasonably required by Lender or such Investor.

(d)      Limitations on Further Acts of Borrower.

Nothing in Section 5.02(b) and Section 5.02(c) shall require Borrower to do any further act that has the effect of:

(1)      materially changing the economic terms of the Mortgage Loan set forth in the Summary of Loan Terms to this Loan Agreement;

(2)      imposing on Borrower or Guarantor greater personal liability under the Loan Documents ; or

(3)      materially changing the rights and obligations of Borrower or Guarantor than those set forth under the Loan Documents.

(e)      Financing Statements; Record Searches.

(1)      Borrower shall pay all costs and expenses associated with:

(A)      any filing or recording of any financing statements, including all continuation statements, termination statements, and amendments or any other filings related to security interests in or liens on collateral; and

(B)      any record searches for financing statements that Lender may require.

(2)      Borrower hereby authorizes Lender to file any financing statements, continuation statements, termination statements, and amendments (including an "all assets" or "all personal property" collateral description or words of similar import) in form and substance as Lender may require in order to protect and preserve Lender's lien priority and security interest in the Mortgaged Property (and to the extent Lender has filed any such financing statements, continuation statements, or amendments prior to the Effective Date, such filings by Lender are hereby authorized and ratified by Borrower).

(f)      Loan Document Taxes.

Borrower shall pay, on demand, any transfer taxes, documentary taxes, assessments, or charges made by any Governmental Authority in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents or the Mortgage Loan.

ARTICLE 6 – PROPERTY USE, PRESERVATION, AND MAINTENANCE

Section 6.01      Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 6.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)      Compliance with Law; Permits and Licenses.

(1)      To Borrower's knowledge, all improvements to the Land and the use of the Mortgaged Property comply with all applicable laws, ordinances, statutes, rules, and regulations, including all applicable statutes, rules, and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, rent control, and environmental protection, and Borrower has no knowledge of any action or proceeding (or threatened action or proceeding) regarding noncompliance or nonconformity with any of the foregoing.

(2)      To Borrower's knowledge, there is no evidence of any illegal activities on the Mortgaged Property.

(3)      All required permits, licenses, and certificates to comply with all zoning and land use statutes, laws, ordinances, rules, and regulations, and all applicable health, fire, safety, and building codes, and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent, have been obtained and are in full force and effect.

(4)      No portion of the Mortgaged Property has been purchased with the proceeds of any illegal activity.

(b)      Property Characteristics.

(1)      No part of the Land is included or assessed under or as part of another tax lot or parcel, and no part of any other property is included or assessed under or as part of the tax lot or parcels for the Land.

(2)      The Mortgaged Property is located on or adjacent to a public road and has direct legal access to such road, or has access via an irrevocable easement or irrevocable right of way permitting ingress and egress to/from a public road.

(3)      The Mortgaged Property is served by or has uninhibited access rights to public or private water and sewer (or well and septic) and all required utilities, all of which are appropriate for the current use of the Mortgaged Property.

(4)      All material Improvements that were included for the purpose of determining the appraised value of the related Mortgaged Property as of the date hereof and the Effective Date are within the boundaries of the related Mortgaged Property, except encroachments that do not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements were obtained under the Title Policy. No Improvements on adjoining parcels encroach onto the related Mortgaged Property except for encroachments that do not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements were obtained under the Title Policy. No Improvements encroach upon any easements except for encroachments, the removal of, which would not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements obtained with respect to the Title Policy.

(c)      Property Ownership.

Borrower is sole owner or ground lessee of the Mortgaged Property.

(d)      Condition of the Mortgaged Property.

(1)      Borrower has not made any claims, and to the knowledge of Borrower no claims have been made, against any contractor, engineer, architect, or other party with respect to the construction or condition of the Mortgaged Property or the existence of any structural or other material defect therein; and

(2)      neither the Land nor the Improvements has sustained any damage other than damage which has been fully repaired, or is fully insured and is being repaired in the ordinary course of business.

(e)      Personal Property.

Borrower owns (or, to the extent disclosed in writing to, and acknowledged in writing by, Lender leases) all of the Personal Property that is material to and is used in connection with the management, ownership, and operation of the Mortgaged Property.

Section 6.02      Covenants

(a)      Use of Property.

From and after the Effective Date, Borrower shall not, unless required by applicable law or Governmental Authority:

(1)      allow changes in the use of all or any part of the Mortgaged Property;

Page 13 of 45

(2)    convert any individual residential dwelling units or common areas to commercial use;

(3)    initiate or acquiesce in a change in the zoning classification of the Land;

(4)    establish any condominium or cooperative regime with respect to the Mortgaged Property;

(5)    subdivide the Land; or

(6)    suffer, permit, or initiate the joint assessment of any Mortgaged Property with any other real property constituting a tax lot separate from such Mortgaged Property which could cause the part of the Land to be included or assessed under or as part of another tax lot or parcel, or any part of any other property to be included or assessed under or as part of the tax lot or parcels for the Land.

(b)    Property Maintenance.

Borrower shall:

(1)    pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, repairs, and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added;

(2)    keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) (including the replacement of Personalty and Fixtures with items of equal or better function and quality) and subject to Section 9.03(b)(3) and Section 10.03(d) restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition or condition immediately prior to the damage (if improved after the Effective Date), whether or not insurance proceeds are or any condemnation award is available to cover any costs of such restoration or repair and in accordance with all applicable laws, ordinance, rules, and regulations of any Governmental Authority, including applicable building codes, special use permits and environmental regulations.

(3)    commence, make, construct, install, diligently perform, and complete all Replacements and Repairs as required by Lender or the Required Repairs Agreement, if any.

(4)    if required by Lender as set forth in the Summary of Loan Terms and subject to the terms of Section 6.03(a), provide for professional management of the Mortgaged Property by the property manager named in the Summary of Loan Terms or another property manager satisfactory to Lender under a contract approved by Lender in writing;

(5)    give written notice to Lender of, and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security for the Mortgage Loan, or Lender's rights under this Loan Agreement; and

(6)    upon Lender's written request, submit to Lender any contracts or work orders related to the maintenance or repair of the Mortgaged Property.

(C)    Property Preservation.

Borrower shall:

(1)    not commit waste or abandon or (ordinary wear and tear excepted) permit impairment or deterioration of the Mortgaged Property;

(2)    except as otherwise permitted herein in connection with Repairs and Replacements, not remove, demolish, or alter the Mortgaged Property or any part of the Mortgaged Property (or permit any tenant or any other person to do the same) except in connection with the replacement of tangible Personalty or Fixtures (provided such Personalty and Fixtures are replaced with items of equal or better function and quality);

(3)    not engage in or knowingly permit, and shall take appropriate measures to prevent and abate or cease and desist, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Land or otherwise materially impair the lien created by the Security Instrument or Lender's interest in the Mortgaged Property;

(4)    not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage required by this Loan Agreement; or

(5)    not subject the Mortgaged Property to any voluntary, elective, or non-compulsory tax lien or assessment (or opt in to any voluntary, elective, or non-compulsory special tax district or similar regime).

(d)    Property Inspections.

Borrower shall:

Page 14 of 45

(1)  permit Lender, its agents, representatives, and designees to enter upon and inspect the Mortgaged Property (including in connection with any Replacement or Repair, or to conduct any Environmental Inspection pursuant to the Environmental Indemnity Agreement), and shall cooperate and provide access to all areas of the Mortgaged Property (subject to the rights of tenants under the Leases);

(A)  during normal business hours;

(B)  at such other reasonable time upon reasonable notice of not less than one (1) Business Day;

(C)  at any time when exigent circumstances exist; or

(D)  at any time after an Event of Default has occurred and is continuing; and

(2)  pay for reasonable costs or expenses incurred by Lender or its agents in connection with any such inspections.

(e)  Compliance with Laws.

Borrower shall:

(1)  comply with all laws, ordinances, statutes, rules, and regulations of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, statutes, rules and regulations, and covenants pertaining to construction of improvements on the Land, fair housing, and requirements for equal opportunity, anti-discrimination, environmental protection, and Leases;

(2)  maintain all required permits, licenses, and certificates necessary to comply with all zoning and land use statutes, laws, ordinances, rules and regulations, and all applicable health, fire, safety, and building codes and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent;

(3)  comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits;

(4)  at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6.02(e); and

(5)  promptly after receipt or notification thereof, provide Lender copies of any building code or zoning violation from any Governmental Authority with respect to the Mortgaged Property.

Section 6.03    Mortgage Loan Administration Matters Regarding the Property.

(a)  Property Management.

From and after the Effective Date, each property manager (including the Borrower or a Guarantor) and each property management agreement must be approved by Lender. The Mortgaged Property shall be managed by the Borrower, a Guarantor or a professional manager satisfactory to Lender, and if a professional manager, under a contract approved by Lender in writing. If, in connection with the making of the Mortgage Loan, or at any later date, Lender waives in writing this requirement that Borrower enter into a written contract for management of the Mortgaged Property, and Borrower later elects to enter into a written contract or change the management of the Mortgaged Property, such new property manager or the property management agreement must be approved by Lender. As a condition to any approval by Lender, Lender may require that Borrower and such new property manager enter into a collateral assignment of the property management agreement on a form approved by Lender.

(b)  Subordination of Fees to Affiliated Property Managers.

Any property manager that is a Borrower Affiliate and to whom fees are payable for the management of the Mortgaged Property must enter into an assignment of management agreement or other agreement with Lender, in a form approved by Lender, providing for subordination of those fees and such other provisions as Lender may require.

(c)  Physical Needs Assessment.

If, in connection with any inspection of the Mortgaged Property, Lender determines that the condition of the Mortgaged Property has deteriorated (ordinary wear and tear excepted) since the Effective Date, Lender may obtain, at Borrower's expense, a physical needs assessment of the Mortgaged Property.  Lender's right to obtain a physical needs assessment pursuant to this Section 6.03(c) shall be in addition to any other rights available to Lender under this Loan Agreement in connection with any such deterioration.  Any such inspection or physical needs assessment may result in Lender requiring Additional Lender Repairs or Additional Lender Replacements.

### ARTICLE 7 - LEASES AND RENTS

Section 7.01    Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 7.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)    **Prior Assignment of Rents.**

Borrower has not executed any:

(1)    prior assignment of Rents (other than an assignment of Rents securing prior indebtedness that has been paid off and discharged or will be paid off and discharged with the proceeds of the Mortgage Loan); or

(2)    instrument which would prevent Lender from exercising its rights under this Loan Agreement or the Security Instrument.

(b)    **Prepaid Rents.**

Borrower has not accepted, and does not expect to receive prepayment of, any Rents for more than two (2) months prior to the due dates of such Rents.

(c)    **Rent Rolls**

(1)    Borrower has delivered to Lender a true, correct and complete schedule of all Leases affecting the Mortgaged Property (a "Rent Roll") as of the date hereof, certified by Borrower as being true and correct, which Rent Roll accurately and completely sets forth in all material respects for each such Lease, the following: the name of the tenant, the space occupied, the square footage of the space occupied, the Lease start date, the Lease expiration date, extension and renewal provisions, the base rent payable, any other monthly charges or other amounts owed, the security deposit held thereunder, the rent payable for the current month, the date through which rent has been paid, any other material provisions of such Lease, and any related information requested by Lender.

(2)    Each Lease constitutes the legal, valid and binding obligation of Borrower and, to the best of Borrower's knowledge and belief, is enforceable against the tenant thereof. No default exists, or with the passing of time or the giving of notice or both would exist, under any Lease which would, in the aggregate, have a material adverse effect on Borrower or the Mortgaged Property.

(3)    All work to be performed by Borrower under the Leases has been substantially performed, all contributions to be made by Borrower to the tenants thereunder have been made and all other conditions precedent to each such tenant's obligations thereunder have been satisfied.

(4)    Each tenant under a Lease has entered into occupancy of the demised premises.

(5)    If required by Lender, Borrower has delivered to Lender true, correct and complete copies of all Leases described in the Rent Roll.

(6)    To the best of Borrower's knowledge and belief, each Tenant is free from bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors.

(7)    No Lease provides any party with the right to obtain a lien or encumbrance upon the Mortgaged Property superior to the lien of the Security Instrument.

(8)    No person or entity has any possessory interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of the Leases.

(9)    As of the date hereof and as of the Effective Date, (i) Borrower is the owner and holder of the landlord's interest under each Lease; (ii) each Lease is in full force and effect; (iii) neither Borrower nor any tenant under any Lease is in default under any of the terms, covenants or provisions of any Lease, and Borrower knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under any Lease; and (iv) there are no offsets or defenses to the payment of any portion of the Rents.

**Section 7.02    Covenants**

(a)    **Leases.**

Borrower shall:

(1)    comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits;

(2)    surrender possession of the Mortgaged Property, including all Leases and all security deposits and prepaid Rents, immediately upon appointment of a receiver or Lender's entry upon and taking of possession and control of the Mortgaged Property, as applicable;

(3)    not modify the terms of, extend, or terminate any Material Lease (including any lease replacing a Material Lease in existence on the Effective Date) without the prior written consent of Lender;

(4)    not permit any Lease to contain an option to purchase or right of first refusal to purchase or right of first offer to purchase (except when such option or right is required by applicable law);

Page 16 of 45

(5)     promptly provide Lender a copy of any Lease upon Lender's written request and promptly provide Lender with a copy of any non-residential lease of the Mortgaged Property at the time such lease is executed (subject to the Lender's consent rights if such lease is a Material Lease);

(6)     not enter into any Lease that materially alters the use and type of operation of the premises subject to the Lease in effect as of the Effective Date or reduces the number or size of units at the Mortgaged Property; or

(7)     not modify the terms of any Lease (including any Lease in existence on the Effective Date) in any way that materially alters the use and type of operation of the premises subject to such Lease in effect as of the Effective Date, or reduces the number or size of units at the Mortgaged Property;

(8)     cause the tenant under each lease to provide within ten (10) days after request by Lender, a certificate of estoppel, or if not provided by tenant within such ten (10) day period, Borrower shall provide such certificate of estoppel, certifying:

    (A)     that such Lease is unmodified and in full force and effect (or if there have been modifications, that such Lease is in full force and effect as modified and stating the modifications);

    (B)     the term of the Lease including any extensions thereto;

    (C)     the dates to which the Rent and any other charges hereunder have been paid by tenant;

    (D)     the amount of any security deposit delivered to Borrower as landlord;

    (E)     whether or not Borrower or tenant is in default (or whether any event or condition exists which, with the passage of time, would constitute an event of default) under such Lease;

    (F)     the address to which notices to tenant should be sent; and

    (G)     any other information as may be reasonably required by Lender.

(b)     [Intentionally Deleted].

(c)     Payment of Rents.

Borrower shall:

(1)     pay to Lender upon demand all Rents after an Event of Default has occurred and is continuing;

(2)     cooperate with Lender's efforts in connection with the assignment of Rents set forth in the Security Instrument; and

(3)     not accept Rent under any Lease (whether residential or non-residential) for more than two (2) months in advance.

(d)     Assignment of Rents.

Borrower shall not:

(1)     perform any acts and shall not execute any instrument that would prevent Lender from exercising its rights under the assignment of Rents granted in the Security Instrument or in any other Loan Document; or

(2)     interfere with Lender's collection of such Rents.

(e)     Further Assignments of Leases and Rents.

Borrower shall execute and deliver any further assignments of Leases and Rents as Lender may reasonably require.

(f)     Options to Purchase by Tenants.

No Lease shall contain an option to purchase, right of first refusal to purchase or right of first offer to purchase, except as required by applicable law.

Section 7.03     Mortgage Loan Administration Regarding Leases and Rents.

(a)     Lease Requirements.

Each Lease, including any renewal or extension of any Lease in existence as of the Effective Date, shall provide, directly or pursuant to a subordination, non-disturbance and attornment agreement approved by Lender, that:

(1)     the tenant shall, upon written notice from Lender after the occurrence of an Event of Default, pay all Rents payable under such Lease to Lender;

(2)     such Lease and all rights of the tenant thereby are expressly subordinate to the lien of the Security Instrument;

(3)     the tenant shall attorn to Lender and any purchaser at a Foreclosure Event (such attornment to be self-executing and effective upon acquisition of title to the Mortgaged Property by any purchaser at a Foreclosure Event or by Lender in any manner);

Page 17 of 45

(4)       the tenant agrees to execute such further evidences of attornment as Lender or any purchaser at a Foreclosure Event may from time to time request; and

(5)       such Lease shall not terminate as a result of a Foreclosure Event unless Lender or any other purchaser at such Foreclosure Event affirmatively elects to terminate such Lease pursuant to the terms of the subordination, non-disturbance and attornment agreement.

(b)       Rent Schedule.

Borrower shall furnish to Lender, within ten (10) days after a request by Lender to do so, a true, correct, complete and current schedule of all Leases affecting the Mortgaged Property, certified by Borrower as being true and correct, which accurately and completely sets forth in all material respects for each such lease, the following: the name of the tenant, the space occupied, the square footage of the space occupied, the Lease start date, the Lease expiration date, extension and renewal provisions, the base rent payable, any other monthly charges or other amounts owed, the security deposit held thereunder, the rent payable for the current month, the date through which rent has been paid, any other material provisions of such Lease, and any related information requested by Lender.  Borrower (i) shall not do or suffer to be done any act, or omit to take any action, that might result in a default by the landlord, lessor or licensor under any such Lease or allow the tenant thereunder to withhold payment of rent or cancel or terminate same; (ii) shall not further assign any such Lease or the Rents; (iii) shall enforce, short of termination, the performance and observance of each and every condition and covenant of each of the parties under such Leases; and (iv) shall not consent to any assignment of or subletting under any Lease not in accordance with its terms.

### ARTICLE 8 – BOOKS AND RECORDS; FINANCIAL REPORTING

Section 8.01       Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 8.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)       Financial Information.

All financial statements and data, including statements of cash flow and income and operating expenses that have been delivered to Lender in respect of the Mortgaged Property:

(1)       are true, complete, and correct in all material respects; and

(2)       accurately represent the financial condition of the Mortgaged Property as of such date.

(b)       No Change in Facts or Circumstances.

All information in the Loan Application and in all financial statements, rent rolls, reports, certificates, and other documents submitted in connection with the Loan Application are complete and accurate in all material respects.  There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

Section 8.02       Covenants.

(a)       Obligation to Maintain Accurate Books and Records.

Borrower shall keep and maintain at all times at the Mortgaged Property or the property management agent's offices or Borrower's business address and, upon Lender's written request, shall make available at the Land:

(1)       complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property; and

(2)       copies of all written contracts, Leases, and other instruments that affect Borrower or the Mortgaged Property.

(b)       Items to Furnish to Lender.

Borrower shall furnish to Lender the following, certified as true, complete, and accurate in all material respects, by an individual having authority to bind Borrower (or Guarantor, as applicable), in such form and with such detail as Lender reasonably requires:

(1)       upon Lender's request, a statement of income and expenses and a statement of cash flow for Borrower on a year-to-date basis as of the end of the most recently ended calendar quarter;

(2)       within one hundred twenty (120) days after the end of each calendar year:

(A)       for any Borrower and any Guarantor that is an entity, a statement of income and expenses and a statement of cash flows for such calendar year;

(B)       for any Borrower and any Guarantor that is an individual, or a trust established for estate-planning purposes, a personal financial statement for such calendar year;

(C)       when requested in writing by Lender, balance sheet(s) showing all assets and liabilities of Borrower and Guarantor and a statement of all contingent liabilities as of the end of such calendar year;

(D)    a written certification ratifying and affirming that:

(i)    Borrower has taken no action in violation of Section 4.02(d) regarding its single asset status;

(ii)    Borrower has received no notice of any building code violation, or if Borrower has received such notice, evidence of remediation;

(iii)    Borrower has made no application for rezoning nor received any notice that the Mortgaged Property has been or is being rezoned; and

(iv)    Borrower has taken no action and has no knowledge of any action that would violate the provisions of Section 11.02(b) regarding liens encumbering the Mortgaged Property;

(E)    when requested in writing by Lender, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts; and

(F)    when requested in writing by Lender, written confirmation of:

(i)    any changes occurring since the Effective Date (or that no such changes have occurred since the Effective Date) in (1) the direct owners of Borrower, (2) the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), or (3) the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), and their respective interests;

(ii)    the names of all officers and directors of (1) any Borrower which is a corporation, (2) any corporation which is a general partner of any Borrower which is a partnership, or (3) any corporation which is the managing member or non-member manager of any Borrower which is a limited liability company; and

(iii)    the names of all managers who are not members of (1) any Borrower which is a limited liability company, (2) any limited liability company which is a general partner of any Borrower which is a partnership, or (3) any limited liability company which is the managing member or non-member manager of any Borrower which is a limited liability company; and

(3)    within one hundred twenty (120) days after the end of each calendar year, and at any other time upon Lender's written request, a true, correct, complete and current Rent Roll as of the last day of such calendar year, or the date of such request, as applicable;

(4)    upon Lender's written request (but, absent an Event of Default, no more frequently than once in any six (6) month period):

(A)    any item described in Section 8.02(b)(1) or Section 8.02(b)(2) for Borrower, certified as true, complete and accurate by an individual having authority to bind Borrower;

(B)    a property management or leasing report for the Mortgaged Property, showing the number of rental applications received from tenants or prospective tenants and deposits received from tenants or prospective tenants, and any other information requested by Lender;

(C)    a statement of income and expenses for Borrower's operation of the Mortgaged Property on a year-to-date basis as of the end of each month for such period as requested by Lender, which statement shall be delivered within thirty (30) days after the end of such month requested by Lender;

(D)    a statement of real estate owned directly or indirectly by Borrower and Guarantor for such period as requested by Lender, which statement(s) shall be delivered within thirty (30) days after the end of such month requested by Lender; and

(E)    a statement that identifies:

(iv)    the direct owners of Borrower and their respective interests;

(v)    the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests; and

(vi)    the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests.

(c)    Audited Financials.

In the event Borrower or Guarantor receives or obtains any audited financial statements and financial statements are required to be delivered to Lender under Section 8.02(b), Borrower shall deliver or cause to be delivered to Lender the audited versions of such financial statements.

    (d)    Delivery of Books and Records.

If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender, upon written demand, all books and records relating to the Mortgaged Property or its operation.

Section 8.03    Mortgage Loan Administration Matters Regarding Books and Records and Financial Reporting.

    (a)    Lender's Right to Obtain Audited Books and Records.

Lender may require that Borrower's or Guarantor's books and records be audited, at Borrower's expense, by an independent certified public accountant selected by Lender in order to produce or audit any statements, schedules, and reports of Borrower, Guarantor, or the Mortgaged Property required by Section 8.02, if:

    (1)    [Intentionally Deleted.]

    (2)    the statements, schedules, and reports submitted to Lender pursuant to Section 8.02 are not full, complete, and accurate in all material respects as determined by Lender; or

    (3)    an Event of Default has occurred and is continuing.

Notwithstanding the foregoing, the ability of Lender to require the delivery of audited financial statements shall be limited to not more than once per Borrower's fiscal year so long as no Event of Default has occurred during such fiscal year (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing). Borrower shall cooperate with Lender in order to satisfy the provisions of this Section 8.03(a). All related costs and expenses of Lender shall become immediately due and payable within ten (10) Business Days after demand therefor.

    (b)    Credit Reports; Credit Score.

Lender is authorized at any time during which the Mortgage Loan is outstanding to obtain a credit report (if applicable) and a Credit Score on Borrower or Guarantor, the cost of which report shall be paid by Borrower.

## ARTICLE 9 – INSURANCE

Section 9.01    Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 9.01 are made as of the date hereof and the Effective Date and are true and correct.

    (a)    Compliance with Insurance Requirements.

Borrower is in compliance with Lender's insurance requirements set forth in Schedule 5 to this Loan Agreement (or has obtained a written waiver from Lender for any non-compliant coverage) and has timely paid all premiums on all required insurance policies.

    (b)    Property Condition.

    (1)    The Mortgaged Property has not been damaged by fire, water, wind, or other cause of loss; or

    (2)    if previously damaged, any previous damage to the Mortgaged Property has been repaired and the Mortgaged Property has been fully restored.

Section 9.02    Covenants

    (a)    Insurance Requirements.

Until the Indebtedness is paid in full, Borrower shall keep the Improvements and Mortgaged Property insured at all times in accordance with Lender's insurance requirements set forth in Schedule 5 of this Loan Agreement as may be modified from time to time.

    (b)    Delivery of Policies, Renewals, Notices, and Proceeds.

Borrower shall:

    (1)    cause all insurance policies (including any policies not otherwise required by Lender) which can be endorsed with standard non-contributing, non-reporting mortgagee clauses making loss payable to Lender (or Lender's assigns) to be so endorsed;

    (2)    promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums;

(3)      deliver evidence, in form and content acceptable to Lender, that each required insurance policy under this Article 9 has been renewed not less than fifteen (15) days prior to the applicable expiration date, and (if such evidence is other than an original or duplicate original of a renewal policy) deliver the original or duplicate original of each renewal policy (or such other evidence of insurance as may be required by or acceptable to Lender) in form and content acceptable to Lender within ninety (90) days after the applicable expiration date of the original insurance policy;

(4)      provide immediate written notice to the insurance company and to Lender of any event of loss;

(5)      execute such further evidence of assignment of any insurance proceeds as Lender may require; and

(6)      provide immediate written notice to Lender of Borrower's receipt of any insurance proceeds under any insurance policy required by Section 9.02(a)(1)(A) above and, if requested by Lender, deliver to Lender all of such proceeds received by Borrower to be applied by Lender in accordance with this Article 9.

Section 9.03      Mortgage Loan Administration Matters Regarding Insurance

(a)      Lender's Ongoing Insurance Requirements.

Borrower acknowledges that Lender's insurance requirements may change from time to time. All insurance policies and renewals of insurance policies required by this Loan Agreement shall be:

(1)      in the form and with the terms required by Lender;

(2)      in such amounts, with such maximum deductibles and for such periods required by Lender; and

(3)      issued by insurance companies satisfactory to Lender.

BORROWER ACKNOWLEDGES THAT ANY FAILURE OF BORROWER TO COMPLY WITH THE REQUIREMENTS SET FORTH IN SECTION 9.02(a) OR SECTION 9.02(b)(3) ABOVE SHALL PERMIT LENDER TO PURCHASE THE APPLICABLE INSURANCE AT BORROWER'S COST. SUCH INSURANCE MAY, BUT NEED NOT, PROTECT BORROWER'S INTERESTS. THE COVERAGE THAT LENDER PURCHASES MAY NOT PAY ANY CLAIM THAT BORROWER MAKES OR ANY CLAIM THAT IS MADE AGAINST BORROWER IN CONNECTION WITH THE MORTGAGED PROPERTY. IF LENDER PURCHASES INSURANCE FOR THE MORTGAGED PROPERTY AS PERMITTED HEREUNDER, BORROWER WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AT THE DEFAULT RATE AND ANY OTHER CHARGES LENDER MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR THE EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE SHALL BE ADDED TO BORROWER'S TOTAL OUTSTANDING BALANCE OR OBLIGATION AND SHALL CONSTITUTE ADDITIONAL INDEBTEDNESS. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE BORROWER MAY BE ABLE TO OBTAIN ON ITS OWN. BORROWER MAY LATER CANCEL ANY INSURANCE PURCHASED BY LENDER, BUT ONLY AFTER PROVIDING EVIDENCE THAT BORROWER HAS OBTAINED INSURANCE AS REQUIRED BY THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)      Application of Proceeds on Event of Loss.

(1)      Upon an event of loss, Lender may, at Lender's option:

(A)      hold such proceeds to be applied to reimburse Borrower for the cost of Restoration (in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties); or

(B)      apply such proceeds to the payment of the Indebtedness, whether or not then due;

(2)      Notwithstanding the foregoing, if any loss is estimated to be in an amount equal to or less than $10,000, Lender shall not exercise its rights and remedies as power-of-attorney herein and shall allow Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such policies of property damage insurance, and to collect and receive the proceeds of property damage insurance; provided that each of the following conditions shall be satisfied:

(A)      Borrower shall immediately notify Lender of the casualty giving rise to the claim;

(B)      no Event of Default has occurred and is continuing (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing);

(C)      the Restoration will be completed before the earlier of (i) one year before the stated Maturity Date, or (ii) one year after the date of the loss or casualty;

(D)      Lender determines that the combination of insurance proceeds and amounts provided by Borrower will be sufficient funds to complete the Restoration;

(E)      all proceeds of property damage insurance shall be issued in the form of joint checks to Borrower and Lender;

(F)      all proceeds of property damage insurance shall be applied to the Restoration;

(G)      Borrower shall deliver to Lender evidence satisfactory to Lender of completion of the Restoration and obtainment of all lien releases;

(H)      Borrower shall have complied to Lender's satisfaction with the foregoing requirements on any prior claims subject to this provision, if any; and

(I)      Lender shall have the right to inspect the Mortgaged Property (subject to the rights of tenants under the Leases).

(3)      If Lender elects to apply insurance proceeds to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property. Rather, Borrower shall restrict access to the damaged portion of the Mortgaged Property and, at its expense and regardless of whether such costs are covered by insurance, clean up any debris resulting from the casualty event, and, if required or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition. Nothing in this Section 9.03(b) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

(c)      Payment Obligations Unaffected.

The application of any insurance proceeds to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment or any other installments referred to in this Loan Agreement or in any other Loan Document. In the event any such insurance proceeds shall be used to reduce the Indebtedness, Lender shall apply any such sums received by it first to the payment of all of its costs and expenses (including, but not limited to, reasonable legal fees and disbursements) incurred in obtaining those sums.

(d)      Foreclosure Sale.

If the Mortgaged Property is transferred pursuant to a Foreclosure Event or Lender otherwise acquires title to the Mortgaged Property, Borrower acknowledges that Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums applicable to the Mortgaged Property and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such Foreclosure Event or such acquisition.

(e)      Appointment of Lender as Attorney-In-Fact.

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

## ARTICLE 10 – CONDEMNATION

Section 10.01      Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 10.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)      Prior Condemnation Action.

No part of the Mortgaged Property has been taken in connection with a Condemnation Action.

(b)      Pending Condemnation Actions.

No Condemnation Action is pending nor, to Borrower's knowledge, is threatened for the partial or total condemnation or taking of the Mortgaged Property.

Section 10.02      Covenants.

(a)      Notice of Condemnation.

Borrower shall:

(1)      promptly notify Lender of any Condemnation Action of which Borrower has knowledge;

(2)      appear in and prosecute or defend, at its own cost and expense, any action or proceeding relating to any Condemnation Action, including any defense of Lender's interest in the Mortgaged Property tendered to Borrower by Lender, unless otherwise directed by Lender in writing; and

(3)      execute such further evidence of assignment of any condemnation award in connection with a Condemnation Action as Lender may require.

(b)      Condemnation Proceeds.

Borrower shall pay to Lender all awards or proceeds of a Condemnation Action promptly upon receipt.

Section 10.03      Mortgage Loan Administration Matters Regarding Condemnation.

    (a)     Application of Condemnation Awards.

Lender may apply any awards or proceeds of a Condemnation Action, after the deduction of Lender's expenses incurred in the collection of such amounts, to:

        (1)     the restoration or repair of the Mortgaged Property, if applicable;

        (2)     the payment of the Indebtedness, with the balance, if any, paid to Borrower; or

        (3)     Borrower.

    (b)     Payment Obligations Unaffected.

The application of any awards or proceeds of a Condemnation Action to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment or any other installments referred to in this Loan Agreement or in any other Loan Document.

    (c)     Appointment of Lender as Attorney-In-Fact.

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

    (d)     Preservation of Mortgaged Property.

If a Condemnation Action results in or from damage to the Mortgaged Property and Lender elects to apply the proceeds or awards from such Condemnation Action to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property. Rather, Borrower shall restrict access to any portion of the Mortgaged Property which has been damaged or destroyed in connection with such Condemnation Action and, at Borrower's expense and regardless of whether such costs are covered by insurance, clean up any debris resulting in or from the Condemnation Action, and, if required by any Governmental Authority or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition. Nothing in this Section 10.03(d) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

    (e)     REMIC Trust.

Notwithstanding the foregoing provisions in this Section 10, if the Loan or any portion thereof is included in a REMIC Trust and immediately following a release of any portion of the Lien of the Security Instrument in connection with a Condemnation Action  (but taking into account any proposed Restoration of the remaining portion of the Property that remains subject to the Lien), the Loan-to-Value Ratio of the remaining portion of the Property that remains subject to the Lien is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any) , then the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Condemnation proceeds or award, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-to-Value Ratio (as so determined by Lender) does not increase after the release unless Lender receives an opinion of counsel that if such amount is not paid, the securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.

ARTICLE 11 - LIENS, TRANSFERS, AND ASSUMPTIONS

Section 11.01     Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 11.01 are made as of the date hereof and the Effective Date and are true and correct.

    (a)     No Labor or Materialmen's Claims.

All parties furnishing labor and materials on behalf of Borrower have been paid in full. There are no mechanics' or materialmen's liens (whether filed or unfiled) outstanding for work, labor, or materials (and no claims or work outstanding that under applicable law could give rise to any such mechanics' or materialmen's liens) affecting the Mortgaged Property, whether prior to, equal with, or subordinate to the Lien of the Security Instrument.

    (b)     No Other Interests.

No Person:

        (1)     other than Borrower has any possessory ownership or interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of existing Leases, the material terms of all such Leases having been previously disclosed in writing to Lender; nor

        (2)     has an option, right of first refusal, or right of first offer (except as required by applicable law) to purchase the Mortgaged Property, or any interest in the Mortgaged Property.

**Section 11.02     Covenants.**

(a)     Liens; Encumbrances.

Borrower shall not permit the grant, creation, or existence of any Lien, whether voluntary, involuntary, or by operation of law, on all or any portion of the Mortgaged Property (including any voluntary, elective, or non-compulsory tax lien or assessment pursuant to a voluntary, elective, or non-compulsory special tax district or similar regime) other than:

(1)     Permitted Encumbrances;

(2)     the creation of any tax lien, municipal lien, utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Mortgaged Property if bonded off, released of record, or otherwise remedied to Lender's satisfaction within sixty (60) days after the earlier of the date Borrower has actual notice or constructive notice of the existence of such lien, or the creation of any mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(3)     the lien created by the Loan Documents.

(b)     Transfers.

(1)     Mortgaged Property.

Borrower shall not Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property (including any interest in the Mortgaged Property) other than:

(A)     a Transfer to which Lender has consented in writing;

(B)     Leases permitted pursuant to the Loan Documents;

(C)     [Intentionally Deleted.];

(D)     a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality which are free of Liens (other than those created by the Loan Documents);

(E)     the grant of an easement, servitude, or restrictive covenant to which Lender has consented, and Borrower has paid to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request;

(F)     a lien permitted pursuant to Section 11.02(a) of this Loan Agreement; or

(G)     the conveyance of the Mortgaged Property following a Foreclosure Event.

(2)     Interests in Borrower, Key Principal, or Guarantor.

Other than a Transfer to which Lender has consented in writing, Borrower shall not Transfer, or cause or permit to be Transferred:

(A)     any direct or indirect ownership interest in Borrower, Key Principal, or Guarantor (if applicable) if such Transfer would cause a change in Control;

(B)     a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor (if applicable);

(C)     any or all of Key Principal's or Guarantor's direct or indirect ownership interests in Borrower that existed on the Effective Date (individually or on an aggregate basis); or

(D)     the economic benefits or rights to cash flows attributable to any ownership interests in Borrower, Key Principal, or Guarantor (if applicable) separate from the Transfer of the underlying ownership interests if the Transfer of the underlying ownership interest is prohibited by this Loan Agreement.

Notwithstanding the foregoing, if any direct or indirect ownership interests in Borrower, Key Principal, or Guarantor are owned by a Publicly-Held Corporation or a Publicly-Held Trust, a Transfer of any ownership interests in such Publicly-Held Corporation or Publicly-Held Trust shall not be prohibited under this Loan Agreement as long as (i) such Transfer does not result in a conversion of such Publicly-Held Corporation or Publicly-Held Trust to a privately held entity, and (ii) Borrower provides written notice to Lender not later than thirty (30) days thereafter of any such Transfer that results in any Person owning ten percent (10%) or more of the ownership interests in such Publicly-Held Corporation or Publicly-Held Trust.

(3)     Name Change or Entity Conversion.

Lender shall consent to Borrower changing its name, changing its jurisdiction of organization, or converting from one type of legal entity into another type of legal entity for any lawful purpose, provided that Borrower shall not be permitted to convert to a Delaware Statutory Trust, and provided further that:

Page 24 of 45

(A)     Lender receives written notice at least thirty (30) days prior to such change or conversion, which notice shall include organizational charts that reflect the structure of Borrower both prior to and subsequent to such name change or entity conversion;

(B)     such Transfer is not otherwise prohibited under the provisions of Section 11.02(b);

(C)     Borrower executes an amendment to this Loan Agreement and any other Loan Documents required by Lender documenting the name change or entity conversion;

(D)     Borrower agrees and acknowledges, at Borrower's expense, that (i) Borrower will execute and record in the land records any instrument required by the Property Jurisdiction to be recorded to evidence such name change or entity conversion (or provide Lender with written confirmation from the title company (via electronic mail or letter) that no such instrument is required), (ii) Borrower will execute any documents required by Lender, including the amendment to this Loan Agreement, and allow such documents to be recorded or filed in the land records of the Property Jurisdiction, (iii) Lender will obtain a "date down" endorsement to the Lender's Loan Policy (or obtain a new Loan Policy if a "date down" endorsement is not available in the Property Jurisdiction), evidencing title to the Mortgaged Property being in the name of the successor entity and the Lien of the Security Instrument against the Mortgaged Property, and (iv) Lender will file any required UCC-3 financing statement and make any other filing deemed necessary to maintain the priority of its Liens in the Mortgaged Property; and

(E)     no later than ten (10) days subsequent to such name change or entity conversion, Borrower shall provide Lender (i) the documentation filed with the appropriate office in Borrower's state of formation evidencing such name change or entity conversion, (ii) copies of the organizational documents of Borrower, including any amendments, filed with the appropriate office in Borrower's state of formation reflecting the post-conversion Borrower name, form of organization, and structure, and (iii) if available, new certificates of good standing or valid formation for Borrower.

(4)     No Delaware Statutory Trust or Series LLC Conversion.

Notwithstanding any provisions herein to the contrary, no Borrower, Guarantor, or Key Principal shall convert to a Delaware Statutory Trust or a series limited liability company.

(e)     No Other Indebtedness and Mezzanine Financing.

Other than the Mortgage Loan, Borrower shall not incur or be obligated at any time with respect to any loan or other indebtedness (except trade payables as otherwise permitted in this Loan Agreement), including any indebtedness secured by a Lien on, or the cash flows from, the Mortgaged Property. Neither Borrower nor any direct or indirect owner of Borrower shall (1) incur any "mezzanine debt" or issue any Preferred Equity other than Permitted Preferred Equity, or (2) incur any similar indebtedness or issue any similar equity.

Section 11.03     Mortgage Loan Administration Matters Regarding Liens, Transfers, and Assumptions

(a)     Assumption of Mortgage Loan.

Lender may consent in its sole discretion to a Transfer of the Mortgaged Property to, and an assumption of the Mortgage Loan by, a new borrower if each of the following conditions is satisfied prior to the Transfer:

(1)     Lender determines that the Transfer will not result in a "significant modification" under Section 1001 of the Internal Revenue Code of any Mortgage Loan;

(2)     Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(a);

(3)     no Event of Default has occurred and is continuing, and no event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing;

(4)     Lender determines that;

(A)     the proposed new borrower, new key principal, and any other new guarantor fully satisfy all of Lender's then-applicable borrower, key principal or guarantor eligibility, credit, management, and other loan underwriting standards, which shall include an analysis of (i) the previous relationships between Lender and the proposed new borrower, new key principal, new guarantor, and any Person in Control of them, and the organization of the new borrower, new key principal, and new guarantor (if applicable), and (ii) the operating and financial performance of the Mortgaged Property, including physical condition and occupancy;

(B)     none of the proposed new borrower, new key principal, and any new guarantor, or any owners of the proposed new borrower, new key principal, and any new guarantor, are a Prohibited Person; and

(C)     none of the proposed new borrower, new key principal, and any new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date;

Page 25 of 45

    (5)    [Intentionally Deleted.];

    (6)    the proposed new borrower has:

        (A)    executed an assumption agreement acceptable to Lender that, among other things, requires the proposed new borrower to assume and perform all obligations of Borrower (or any other transferor), and that may require that the new borrower comply with any provisions of any Loan Document that previously may have been waived by Lender for Borrower, subject to the terms of Section 11.03(h);

        (B)    if required by Lender, delivered to the Title Company for filing and/or recording in all applicable jurisdictions, all applicable Loan Documents including the assumption agreement to correctly evidence the assumption and the confirmation, continuation, perfection, and priority of the Liens created hereunder and under the other Loan Documents; and

        (C)    delivered to Lender a "date-down" endorsement to the Title Policy acceptable to Lender (or a new title insurance policy if a "date-down" endorsement is not available);

    (7)    one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

        (A)    an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any guaranty given in connection with the Mortgage Loan; or

        (B)    a substitute guaranty in a form acceptable to Lender;

    (8)    Lender has reviewed and approved the Transfer documents; and

    (9)    Lender has received the fees described in Section 11.03(h).

Borrower acknowledges that an assumption of a recourse mortgage loan will often result in a "significant modification" under Section 1001 of the Internal Revenue Code. As such, Borrower acknowledges that (A) nothing in this Article 11 or any Loan Document shall be interpreted as indicating that a proposed assumption of the Mortgage Loan will be approved by Lender, and (B) any determination made by Lender will be at Lender's sole discretion.

    (b)    Acceleration or "Due on Sale" provision.

If Borrower shall sell, convey, or alienate the Mortgaged Property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner of way, whether voluntarily or involuntarily, without the written consent of the Lender being first had and obtained, Lender shall have the right, at its option, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any note evidencing the same, immediately due and payable.

    (c)    Estate Planning.

Notwithstanding the provisions of Section 11.02(b)(2), so long as (1) the Transfer does not cause a change in the Control of Borrower, and (2) Key Principal and Guarantor, as applicable, maintain the same right and ability to Control Borrower as existed prior to the Transfer, Lender shall consent to Transfers of direct or indirect ownership interests in Borrower and Transfers of direct or indirect ownership interests in an entity Key Principal or entity Guarantor to:

        (A)    Immediate Family Members of such transferor, each of whom must have obtained the legal age of majority;

        (B)    United States domiciled trusts established for the benefit of the transferor or Immediate Family Members of the transferor; or

        (C)    partnerships or limited liability companies of which the partners or members, respectively, are comprised entirely of (1) such transferor and Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, (2) Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, or (3) United States domiciled trusts established for the benefit of the transferor or Immediate Family Members of the transferor.

If the conditions set forth in this Section 11.03(c) are satisfied, the Transfer Fee shall be waived provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

    (d)    Termination or Revocation of Trust

If any of Borrower, Guarantor, or Key Principal is a trust, the termination or revocation of such trust without the consent of the Lender is an unpermitted Transfer; provided that the termination or revocation of the trust due to the death of an individual trustor shall not be considered an unpermitted Transfer so long as:

    (1)    Lender is notified within thirty (30) days of the death; and

    (2)    such Borrower, Guarantor, Key Principal, or other Person, as applicable, is replaced with an individual or entity acceptable to Lender, in accordance with the provisions of Section 11.03(a) within ninety (90) days of the date of the death causing the termination or revocation.

(e)　　　[Intentionally Deleted.]

(f)　　　Death of Borrower, Key Principal, or Guarantor.

A Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person who is a Guarantor, a Key Principal, or an owner of the Mortgaged Property shall not be deemed an unpermitted Transfer.

(g)　　　[Intentionally Deleted.]

(h)　　　Further Conditions to Transfers and Assumption.

(1)　　　In connection with any Transfer of the Mortgaged Property, or an ownership interest in Borrower, Key Principal, or Guarantor for which Lender's approval is required under this Loan Agreement (including Section 11.03(a)), Lender may, as a condition to any such approval, require:

(A)　　　additional collateral, guaranties, or other credit support to mitigate any risks concerning the proposed transferee or the performance or condition of the Mortgaged Property;

(B)　　　amendment of the Loan Documents to delete or modify any specially negotiated terms or provisions previously granted for the exclusive benefit of original Borrower, Key Principal, or Guarantor, to the extent such provisions were previously modified; or

(C)　　　a modification to the amounts required to be deposited into the Reserve/Escrow Account pursuant to the terms of the Required Repairs Agreement.

(2)　　　In connection with any request by Borrower for consent to a Transfer, Borrower shall pay to Lender upon demand:

(A)　　　the Transfer Fee (to the extent charged by Lender);

(B)　　　the Review Fee (regardless of whether Lender approves or denies such request); and

(C)　　　all of Lender's out-of-pocket costs (including reasonable attorneys' fees) incurred in reviewing the Transfer request, to the extent such costs exceed the Review Fee and regardless of whether Lender approves or denies such request.

## ARTICLE 12 – IMPOSITIONS

Section 12.01　　　Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 12.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)　　　Payment of Taxes, Assessments, and Other Charges.

Borrower has:

(1)　　　paid (or with the approval of Lender, established an escrow fund sufficient to pay when due and payable) all amounts and charges relating to the Mortgaged Property that have become due and payable before any fine, penalty interest, lien, or costs may be added thereto, including Impositions, leasehold payments, and ground rents;

(2)　　　paid all Taxes for the Mortgaged Property that have become due before any fine, penalty interest, lien, or costs may be added thereto pursuant to any notice of assessment received by Borrower and any and all taxes that have become due against Borrower before any fine, penalty, interest, lien, or costs may be added thereto;

(3)　　　no knowledge of any basis for any additional assessments;

(4)　　　no knowledge of any presently pending special assessments against all or any part of the Mortgaged Property, or any presently pending special assessments against Borrower; and

(5)　　　not received any written notice of any contemplated special assessment against the Mortgaged Property, or any contemplated special assessment against Borrower.

Section 12.02　　　Covenants.

(a)　　　Imposition Deposits, Taxes, and Other Charges.

Borrower shall:

(1)　　　deposit the Imposition Deposits with Lender on each Payment Date (or on another day designated in writing by Lender) in amount sufficient, in Lender's discretion, to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added, plus an amount equal to no more than one-sixth (1/6) (or the amount permitted by applicable law) of the Impositions for the trailing twelve (12) months (calculated based on the aggregate annual Imposition costs divided by twelve (12) and multiplied by two (2));

(2)      deposit with Lender, within ten (10) days after written notice from Lender (subject to applicable law), such additional amounts estimated by Lender to be reasonably necessary to cure any deficiency in the amount of the Imposition Deposits held for payment of a specific Imposition;

(3)      except as set forth in Section 12.03(c) below, pay, or cause to be paid, all Impositions, leasehold payments, ground rents, and Borrower taxes when due and before any fine, penalty interest, lien, or costs may be added thereto;

(4)      promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and, if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments; and

(5)      promptly deliver to Lender a copy of all notices of any special assessments and contemplated special assessments against the Mortgaged Property or Borrower.

Section 12.03      Mortgage Loan Administration Matters Regarding Impositions.

(a)      Maintenance of Records by Lender.

Lender shall maintain records of the monthly and aggregate Imposition Deposits held by Lender for the purpose of paying Taxes, insurance premiums, and each other obligation of Borrower for which Imposition Deposits are required.

(b)      Imposition Accounts.

All Imposition Deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and which accounts meet the standards for custodial accounts as required by Lender from time to time. Lender shall not be obligated to open additional accounts, or deposit Imposition Deposits in additional institutions, when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty. No interest, earnings, or profits on the Imposition Deposits shall be paid to Borrower unless applicable law so requires. Imposition Deposits shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose in accordance with this Loan Agreement. For the purposes of 9-104(a)(3) of the UCC, Lender is the owner of the Imposition Deposits and shall be deemed a "customer" with sole control of the account holding the Imposition Deposits.

(c)      Payment of Impositions; Sufficiency of Imposition Deposits.

Lender may pay an Imposition according to any bill, statement, or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement, or estimate or into the validity of the Imposition. Imposition Deposits shall be required to be used by Lender to pay Taxes, insurance premiums and any other individual Imposition only if:

(1)      no Event of Default exists;

(2)      Borrower has timely delivered to Lender all applicable bills or premium notices that it has received; and

(3)      sufficient Imposition Deposits are held by Lender for each Imposition at the time such Imposition becomes due and payable.

Lender shall have no liability to Borrower for failing to pay any Imposition if any of the conditions are not satisfied. If at any time the amount of the Imposition Deposits held for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender to be held in connection with such Imposition, the excess may be credited against future installments of Imposition Deposits for such Imposition.

(d)      Imposition Deposits Upon Event of Default.

If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in such amount and in such order as Lender determines, to pay any Impositions or as a credit against the Indebtedness.

(e)      Contesting Impositions.

Other than insurance premiums, Borrower may contest, at its expense, by appropriate legal proceedings, the amount or validity of any Imposition if:

(1)      Borrower notifies Lender of the commencement or expected commencement of such proceedings;

(2)      Lender determines that the Mortgaged Property is not in danger of being sold or forfeited;

(3)      Borrower deposits with Lender (or the applicable Governmental Authority if required by applicable law) reserves sufficient to pay the contested Imposition, if required by Lender (or the applicable Governmental Authority);

(4)      Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested in writing by Lender; and

(5)      Borrower commences, and at all times thereafter diligently prosecutes, such contest in good faith until a final determination is made by the applicable Governmental Authority.

(f)      Release to Borrower.

Upon payment in full of all sums secured by the Security Instrument and this Loan Agreement and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower the balance of any Imposition Deposits then on deposit with Lender.

## ARTICLE 13 - INTENTIONALLY OMITTED

## ARTICLE 14 - DEFAULTS/REMEDIES

Section 14.01      Events of Default.

The occurrence of any one or more of the following in this Section 14.01 shall constitute an Event of Default under this Loan Agreement:

(1)      any failure by Borrower to pay any Monthly Debt Service Payment within ten (10) days after the applicable Payment Date or any failure by Borrower to pay or deposit when due any other amount required by the Note, this Loan Agreement or any other Loan Document;

(2)      any failure by Borrower to maintain the Insurance coverage required by any Loan Document;

(3)      Intentionally Deleted;

(4)      if any warranty, representation, certification, or statement of Borrower, Guarantor, or Key Principal in this Loan Agreement or any of the other Loan Documents is false, inaccurate, or misleading in any material respect when made;

(5)      fraud, gross negligence, willful misconduct, or material misrepresentation or material omission by or on behalf of Borrower, or any of its officers, directors, trustees, partners, members, or managers, or Guarantor or Key Principal or any of their officers, directors, trustees, partners, members, or managers in connection with:

(A)      the application for, or creation of, the Indebtedness, including any financial statements, rent roll, corporate documentation, data or other information provided by or on behalf of the Borrower to Lender in consideration of its making the Mortgage Loan;

(B)      any financial statement, rent roll, or other report or information provided to Lender during the term of the Mortgage Loan; or

(C)      any request for Lender's consent to any proposed action, including a request for disbursement of Reserve/Escrow Account Funds or Collateral Account Funds;

(6)      the occurrence of any Transfer not permitted by the Loan Documents;

(7)      the occurrence of a Bankruptcy Event;

(8)      the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Loan Agreement or the Security Instrument or Lender's interest in the Mortgaged Property;

(9)      [Intentionally Deleted.];

(10)      any failure by Borrower to complete any Repair related to fire, life, or safety issues in accordance with the terms of this Loan Agreement within the Completion Period (or such other date set forth on the Required Repairs Agreement or otherwise required by Lender in writing for such Repair);

(11)      any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust, or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(12)      any failure by Borrower, Key Principal or Guarantor to comply with the provisions of Section 5.02(b) and Section 5.02(c);

(13)      any failure by Borrower to perform any obligation under this Loan Agreement or any Loan Document that is subject to a specified written notice and cure period, which failure continues beyond such specified written notice and cure period as set forth herein or in the applicable Loan Document; and

(14)     any failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document (other than those specified in Section 14.01(1) through (13) above) as and when required if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30) days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan.

Section 14.02    Remedies.

(a)    Acceleration; Foreclosure.

If an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower, unless applicable law requires otherwise (and in such case, after any required written notice has been given). Lender may exercise this option to accelerate regardless of any prior forbearance. In addition, Lender shall have all rights and remedies afforded to it hereunder and under the other Loan Documents, including, foreclosure on and/or the power of sale of the Mortgaged Property, as provided in the Security Instrument, and any rights and remedies available to it at law or in equity (subject to Borrower's statutory rights of reinstatement, if any, prior to a Foreclosure Event). Any proceeds of a foreclosure or other sale under this Loan Agreement or any other Loan Document may be held and applied by Lender as additional collateral for the Indebtedness pursuant to this Loan Agreement. Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender.

(b)    Loss of Right to Disbursements from Collateral Accounts.

If an Event of Default has occurred and is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve/Escrow Accounts and any Collateral Accounts. During the continuance of any such Event of Default, Lender may use the Reserve/Escrow Account Funds and any Collateral Account Funds (or any portion thereof) for any purpose, including:

(1)    repayment of the Indebtedness, including principal prepayments and the Prepayment Premium applicable to such full or partial prepayment, as applicable (however, such application of funds shall not cure or be deemed to cure any Event of Default);

(2)    reimbursement of Lender for all losses and expenses (including reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default;

(3)    completion of the Replacement or Repair or for any other replacement or repair to the Mortgaged Property; and

(4)    payment of any amount expended in exercising (and the exercise of) all rights and remedies available to Lender at law or in equity or under this Loan Agreement or under any of the other Loan Documents.

Nothing in this Loan Agreement shall obligate Lender to apply all or any portion of the Reserve/Escrow Account Funds or Collateral Account Funds on account of any Event of Default by Borrower or to repayment of the Indebtedness or in any specific order of priority.

(c)    Remedies Cumulative.

Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of additional default by Borrower in order to exercise any of its remedies with respect to an Event of Default.

Section 14.03    Additional Lender Rights; Forbearance.

(a)    No Effect Upon Obligations.

Lender may, but shall not be obligated to, agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, Guarantor, Key Principal, or other third party obligor, to take any of the following actions:

(1)    the time for payment of the principal of or interest on the Indebtedness may be extended, or the Indebtedness may be renewed in whole or in part;

Page 30 of 46

(2)    the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

(3)    the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(4)    the maturity of the Indebtedness may be accelerated as provided in the Loan Documents;

(5)    any or all payments due under this Loan Agreement or any other Loan Document may be reduced;

(6)    any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(7)    any amounts under this Loan Agreement or any other Loan Document may be released;

(8)    any security for the Indebtedness may be modified, exchanged, released, surrendered, or otherwise dealt with, or additional security may be pledged or mortgaged for the Indebtedness;

(9)    the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower;

(10)    any payments made by Borrower to Lender may be applied to the Indebtedness in such priority as Lender may determine in its discretion; or

(11)    any other terms of the Loan Documents may be modified.

(b)    No Waiver of Rights or Remedies.

Any waiver of an Event of Default or forbearance by Lender in exercising any right or remedy under this Loan Agreement or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of any other Event of Default or preclude the exercise or failure to exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise or failure to exercise of any other right available to Lender. Lender's receipt of any condemnation awards or insurance proceeds shall not operate to cure or waive any Event of Default.

(c)    Appointment of Lender as Attorney-In-Fact.

Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any officer of Lender or any Person designated by Lender for that purpose) as Borrower's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Borrower's name, place, and stead, with full power of substitution, to:

(1)    use any of the funds in the Reserve/Escrow Account for the purpose of making or completing the Replacements or Repairs;

(2)    make such additions, changes, and corrections to the Replacements or Repairs as shall be necessary or desirable to complete the Replacements or Repairs;

(3)    employ such contractors, subcontractors, agents, architects, and inspectors as shall be required for such purposes;

(4)    pay, settle, or compromise all bills and claims for materials and work performed in connection with the Replacements or Repairs, or as may be necessary or desirable for the completion of the Replacements or Repairs, or for clearance of title;

(5)    adjust and compromise any claims under any and all policies of insurance required pursuant to this Loan Agreement and any other Loan Document, subject only to Borrower's rights under this Loan Agreement;

(6)    appear in and prosecute any action arising from any insurance policies;

(7)    collect and receive the proceeds of insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds;

(8)    commence, appear in, and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation;

(9)    settle or compromise any claim in connection with any condemnation;

(10)    execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

(11)    prosecute and defend all actions or proceedings in connection with the Mortgaged Property or the rehabilitation and repair of the Mortgaged Property;

Page 31 of 45

(12)     take such actions as are permitted in this Loan Agreement and any other Loan Documents;

(13)     execute such financing statements and other documents and to do such other acts as Lender may require to perfect and preserve Lender's security interest in, and to enforce such interests in, the collateral; and

(14)     carry out any remedy provided for in this Loan Agreement and any other Loan Documents, including endorsing Borrower's name to checks, drafts, instruments and other items of payment and proceeds of the collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of Borrower, changing the address of Borrower to that of Lender, opening all envelopes addressed to Borrower, and applying any payments contained therein to the Indebtedness.

Borrower hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable and shall not be affected by the disability or incompetence of Borrower. Borrower specifically acknowledges and agrees that this power of attorney granted to Lender may be assigned by Lender to Lender's successors or assigns as holder of the Note (and the Mortgage Loan). However, the foregoing shall not require Lender to incur any expense or take any action. Borrower hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Loan Agreement and any other Loan Documents.

(d)      Borrower Waivers.

If more than one Person signs this Loan Agreement as Borrower, each Borrower, with respect to any other Borrower, hereby agrees that Lender, in its discretion, may:

(1)     bring suit against Borrower, or any one or more of Borrower, jointly and severally, or against any one or more of them;

(2)     compromise or settle with any one or more of the persons constituting Borrower, for such consideration as Lender may deem proper;

(3)     release one or more of the persons constituting Borrower, from liability; or

(4)     otherwise deal with Borrower, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from any Borrower the full amount of the Indebtedness.

**Section 14.04      Waiver of Marshaling.**

Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Loan Agreement, any other Loan Document or applicable law. Lender shall have the right to determine the order in which all or any part of the Indebtedness is satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Loan Agreement waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement or any other Loan Documents.

## ARTICLE 15 – MISCELLANEOUS

**Section 15.01      Governing Law; Consent to Jurisdiction and Venue.**

(a)      Governing Law.

This Loan Agreement and any other Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the Property Jurisdiction without regard to the application of choice of law principles.

(b)      Venue.

Any controversy arising under or in relation to this Loan Agreement or any other Loan Document shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Loan Agreement or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence, or otherwise.

**Section 15.02      Notice**

(a)      Process of Serving Notice.

Except as otherwise set forth herein or in any other Loan Document, all notices under this Loan Agreement and any other Loan Document shall be:

(1)     in writing and shall be:

(A)     delivered, in person;

(B)      mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

(C)      sent by overnight courier; or

(D)      sent by electronic mail with originals to follow by overnight courier;

(2)      addressed to the intended recipient at Borrower's Notice Address and Lender's Notice Address, as applicable; and

(3)      deemed given on the earlier to occur of:

(A)      the date when the notice is received by the addressee; or

(B)      if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)      **Change of Address.**

Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other parties identified on the Summary of Loan Terms in accordance with this Section 15.02.

(c)      **Default Method of Notice.**

Any required notice under this Loan Agreement or any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 15.02.

(d)      **Receipt of Notices.**

Neither Borrower nor Lender shall refuse or reject delivery of any notice given in accordance with this Loan Agreement. Each party is required to acknowledge, in writing, the receipt of any notice upon request by the other party.

**Section 15.03    Successors and Assigns Bound; Sale of Mortgage Loan.**

(a)      **Binding Agreement.**

This Agreement shall bind, and the rights granted by this Loan Agreement shall inure to, the successors and assigns of Lender and the permitted successors and assigns of Borrower. However, a Transfer not permitted by this Loan Agreement shall be an Event of Default and shall be void ab initio.

(b)      **Sale of Mortgage Loan; Change of Loan Servicer.**

Nothing in this Loan Agreement shall limit Lender's (including its successors and assigns) right to sell or transfer the Mortgage Loan or any interest in the Mortgage Loan. The Mortgage Loan or a partial interest in the Mortgage Loan (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior written notice to Borrower. A sale may result in a change of the Loan Servicer.

**Section 15.04    Counterparts.**

This Loan Agreement may be executed in any number of counterparts with the same effect as if the parties hereto had signed the same document and all such counterparts shall be construed together and shall constitute one instrument.

**Section 15.05    Joint and Several (or Solidary) Liability.**

If more than one Person signs this Loan Agreement as Borrower, the obligations of such Persons shall be joint and several (solidary instead for purposes of Louisiana law).

**Section 15.06    Relationship of Parties; No Third Party Beneficiary.**

(a)      **Solely Creditor and Debtor.**

The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement shall create any other relationship between Lender and Borrower. Nothing contained in this Loan Agreement shall constitute Lender as a joint venturer, partner, or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations, or contracts of Borrower.

(b)      **No Third Party Beneficiaries.**

No creditor of any party to this Loan Agreement and no other person shall be a third party beneficiary of this Loan Agreement or any other Loan Document or any account created or contemplated under this Loan Agreement or any other Loan Document. Nothing contained in this Loan Agreement shall be deemed or construed to create an obligation on the part of Lender to any third party nor shall any third party have a right to enforce against Lender any right that Borrower may have under this Loan Agreement. Without limiting the foregoing:

(1)      any Servicing Arrangement between Lender and any Loan Servicer shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness;

(2)      Borrower shall not be a third party beneficiary of any Servicing Arrangement; and

(3)        no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**Section 15.07**     Severability; Entire Agreement; Amendments.

The invalidity or unenforceability of any provision of this Loan Agreement or any other Loan Document shall not affect the validity or enforceability of any other provision of this Loan Agreement or of any other Loan Document, all of which shall remain in full force and effect, including the Guaranty. This Loan Agreement contains the complete and entire agreement among the parties as to the matters covered, rights granted, and the obligations assumed in this Loan Agreement. This Loan Agreement may not be amended or modified except by written agreement signed by the parties hereto.

**Section 15.08**     Construction.

(a)        The captions and headings of the sections of this Loan Agreement and the Loan Documents are for convenience only and shall be disregarded in construing this Loan Agreement and the Loan Documents.

(b)        Any reference in this Loan Agreement to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit or Schedule attached to this Loan Agreement or to a Section or Article of this Loan Agreement.

(c)        Any reference in this Loan Agreement to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(d)        Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular.

(e)        As used in this Loan Agreement, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only and not a limitation.

(f)        Whenever Borrower's knowledge is implicated in this Loan Agreement or the phrase "to Borrower's knowledge" or a similar phrase is used in this Loan Agreement, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(g)        Unless otherwise provided in this Loan Agreement, if Lender's approval, designation, determination, selection, estimate, action, or decision is required, permitted, or contemplated hereunder, such approval, designation, determination, selection, estimate, action, or decision shall be made in Lender's sole and absolute discretion.

(h)        All references in this Loan Agreement to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(i)        "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

(j)        If the Mortgage Loan proceeds are disbursed on a date that is later than the Effective Date, as described in Section 2.02, the representations and warranties in the Loan Documents with respect to the ownership and operation of the Mortgage Property shall be deemed to be made as of the disbursement date.

**Section 15.09**     Mortgage Loan Servicing.

All actions regarding the servicing of the Mortgage Loan, including the collection of payments, the giving and receipt of notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such written notice from Lender shall govern. The Loan Servicer may change from time to time (whether related or unrelated to a sale of the Mortgage Loan). If there is a change of the Loan Servicer, Borrower will be given written notice of the change.

**Section 15.10**     Disclosure of Information.

Lender may furnish information regarding Borrower, Key Principal, or Guarantor, or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase, or securitization of the Mortgage Loan, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

**Section 15.11**     Waiver; Conflict.

No specific waiver of any of the terms of this Loan Agreement shall be considered as a general waiver. If any provision of this Loan Agreement is in conflict with any provision of any other Loan Document, the provision contained in this Loan Agreement shall control.

**Section 15.12**     No Reliance.

Borrower acknowledges, represents, and warrants that:

(a)        it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents;

(b)        it is familiar with the provisions of all of the documents and instruments relating to such transactions;

Page 34 of 45

(c)      it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property;

(d)      it has had the opportunity to consult counsel; and

(e)      it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

Section 15.13      Subrogation.

If, and to the extent that, the proceeds of the Mortgage Loan are used to pay, satisfy, or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust, or other lien encumbering the Mortgaged Property, such Mortgage Loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by such prior lien, whether or not such prior lien is released.

Section 15.14      Counting of Days.

Except where otherwise specifically provided, any reference in this Loan Agreement to a period of "days" means calendar days, not Business Days. If the date on which Borrower is required to perform an obligation under this Loan Agreement is not a Business Day, Borrower shall be required to perform such obligation by the Business Day immediately preceding such date; provided, however, in respect of any Payment Date, or if the Maturity Date is other than a Business Day, Borrower shall be obligated to make such payment by the Business Day immediately following such date.

Section 15.15      Revival and Reinstatement of Indebtedness.

If the payment of all or any part of the Indebtedness by Borrower, Guarantor, or any other Person, or the transfer to Lender of any collateral or other property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection therewith, and the Indebtedness shall automatically be revived, reinstated, and restored by such amount and shall exist as though such Voidable Transfer had never been made.

Section 15.16      Time is of the Essence.

Borrower agrees that, with respect to each and every obligation and covenant contained in this Loan Agreement and the other Loan Documents, time is of the essence.

Section 15.17      Final Agreement.

THIS LOAN AGREEMENT ALONG WITH ALL OF THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Loan Agreement and the other Loan Documents. This Loan Agreement, the other Loan Documents, and any of their provisions may not be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

Section 15.18      Waiver of Trial by Jury.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (a) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER, THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, Borrower and Lender have signed and delivered this Loan Agreement under seal (where applicable) or have caused this Loan Agreement to be signed and delivered under seal (where applicable) by their duly authorized representatives.  Where applicable law so provides, Borrower and Lender intend that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

C. Ray Kennedy

Cynthia M. Kennedy

Lender:
CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company

By: _____

Name: Jorge L. Ramos

Title:  Executive Vice President

Page 36 of 45

SCHEDULE 1 TO
LOAN AND SECURITY AGREEMENT
Definitions Schedule

Capitalized terms used in the Loan Agreement have the meanings given to such terms in this Definitions Schedule.

"Accrued Interest" means unpaid interest, if any, on the Mortgage Loan that has not been added to the unpaid principal balance of the Mortgage Loan pursuant to Section 2.02(b) (Capitalization of Accrued But Unpaid Interest) of the Loan Agreement.

"Adjustable Rate" has the meaning set forth in the Summary of Loan Terms.

"Amortization Period" " has the meaning set forth in the Summary of Loan Terms.

"Amortization Type" has the meaning set forth in the Summary of Loan Terms.

"Balloon Payment" has the meaning set forth in the Summary of Loan Terms.

"Bank Secrecy Act" means the Bank Secrecy Act of 1970, as amended (e.g., 31 U.S.C. Sections 5311-5330).

"Bankruptcy Event" means any one or more of the following:

(a)      the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Borrower;

(b)      the acknowledgment in writing by Borrower (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

(c)      the making of a general assignment for the benefit of creditors by Borrower;

(d)      the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Borrower; or

(e)      the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Borrower or any substantial part of the assets of Borrower;

provided, however, that any proceeding or case under (d) or (e) above shall not be a Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Guarantor, or Key Principal, (2) any Person Controlling Borrower, Guarantor or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Guarantor or Key Principal (in which event such case or proceeding shall be a Bankruptcy Event immediately).

"Borrower" means, individually (and jointly and severally (solidarily instead for purposes of Louisiana law) if more than one), the individual (or individuals) or the entity (or entities) identified as "Borrower" in the first paragraph of the Loan Agreement.

"Borrower Affiliate" means, as to Borrower, Guarantor or Key Principal:

(a)      any Person that owns any direct ownership interest in Borrower, Guarantor or Key Principal;

(b)      any Person that indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in Borrower, Guarantor or Key Principal;

(c)      any Person Controlled by, under common Control with, or which Controls, Borrower, Guarantor or Key Principal;

Page 37 of 45

(d)        any entity in which Borrower, Guarantor or Key Principal directly or indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such entity, or

(e)        any other individual that is related (to the third degree of consanguinity) by blood or marriage to Borrower, Guarantor or Key Principal.

"Borrower's Notice Address" has the meaning set forth in the Summary of Loan Terms.

"Business Day" means any day other than (a) a Saturday, (b) a Sunday, (c) a day on which Lender is not open for business, or (d) a day on which the Federal Reserve Bank of New York is not open for business.

"Collateral Account Funds" means, collectively, the funds on deposit in any or all of the Collateral Accounts, including the Reserve/Escrow Account Funds.

"Collateral Accounts" means any account designated as such by Lender pursuant to a Collateral Agreement or as established pursuant to this Loan Agreement, including the Reserve/Escrow Account.

"Collateral Agreement" means any separate agreement between Borrower and Lender for the establishment of any other fund, reserve or account.

"Completion Period" has the meaning set forth in the Required Repairs Agreement.

"Condemnation Action" has the meaning set forth in the Security Instrument.

"Control" (including with correlative meanings, such as "Controlling," "Controlled by" and "under common Control with") means, as applied to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and operations of such entity, whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"Credit Score" " means a numerical value or a categorization derived from a statistical tool or modeling system used to measure credit risk and predict the likelihood of certain credit behaviors, including default.

"Current Index" has the meaning set forth in the Summary of Loan Terms.

"Debt Service Amounts" means the Monthly Debt Service Payments and all other amounts payable under the Loan Agreement, the Note, the Security Instrument or any other Loan Document.

"Default Rate" means an interest rate equal to the lesser of:

(a)        the sum of the Interest Rate plus four (4) percentage points; or

(b)        the maximum interest rate which may be collected from Borrower under applicable law.

"Definitions Schedule" " means this Schedule 1 (Definitions Schedule) to the Loan Agreement.

"Effective Date" has the meaning set forth in the Summary of Loan Terms.

"Employee Benefit Plan" means a plan described in Section 3(3) of ERISA, regardless of whether the plan is subject to ERISA.

"Enforcement Costs" has the meaning set forth in the Security Instrument.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated as of the Effective Date made by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"Environmental Inspections" has the meaning set forth in the Environmental Indemnity Agreement.

"Environmental Laws" has the meaning set forth in the Environmental Indemnity Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean, with respect to Borrower, any entity that, together with Borrower, would be treated as a single

employer under Section 414(b) or (c) of the Internal Revenue Code, or Section 4001(a)(14) of ERISA, or the regulations thereunder.

"ERISA Plan" means any employee pension benefit plan within the meaning of Section 3(2) of ERISA (or related trust) that is subject to the requirements of Title IV of ERISA, Sections 430 or 431 of the Internal Revenue Code, or Sections 302, 303, or 304 of ERISA, which is maintained or contributed to by Borrower or its ERISA Affiliates.

"Event of Default" means the occurrence of any event listed in Section 14.01 (Events of Default) of the Loan Agreement.

"First Payment Change Date" has the meaning set forth in the Summary of Loan Terms.

"First Payment Date" has the meaning set forth in the Summary of Loan Terms.

"First Rate Change Date" has the meaning set forth in the Summary of Loan Terms.

"Fixed Rate" has the meaning set forth in the Summary of Loan Terms.

"Fixtures" has the meaning set forth in the Security Instrument.

"Force Majeure" shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of Borrower), strikes, lockouts, fire, unavoidable casualties or any other causes beyond the reasonable control of Borrower (other than lack of financing), and of which Borrower shall have notified Lender in writing within ten (10) days after its occurrence.

"Foreclosure Event" means:

    (a)    foreclosure under the Security Instrument;

    (b)    any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including Insolvency Laws) as holder of the Mortgage Loan and/or the Security Instrument, as a result of which Lender (or its designee or nominee) or a third party purchaser becomes owner of the Mortgaged Property;

    (c)    delivery by Borrower to Lender (or its designee or nominee) of a deed or other conveyance of Borrower's interest in the Mortgaged Property in lieu of any of the foregoing; or

    (d)    in Louisiana, any dation en paiement.

"Governmental Authority" means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over Borrower or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

"Guarantor" means, individually and collectively, any guarantor of the Indebtedness or any other obligation of Borrower under any Loan Document.

"Guarantor Bankruptcy Event" means any one or more of the following:

    (a)    the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Guarantor;

    (b)    the acknowledgment in writing by Guarantor (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

    (c)    the making of a general assignment for the benefit of creditors by Guarantor;

    (d)    the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Guarantor; or

    (e)    the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Guarantor or any substantial part of the assets of Guarantor, as applicable; provided, however, that any proceeding or case under (d) or (e) above shall not be a Guarantor Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so

long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Guarantor, or Key Principal, (2) any Person Controlling Borrower, Guarantor or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Guarantor or Key Principal (in which event such case or proceeding shall be a Guarantor Bankruptcy Event immediately).

"Guarantor's Notice Address" has the meaning set forth in the Summary of Loan Terms.

"Guaranty" means, individually and collectively, any Payment Guaranty, Non-Recourse Guaranty or other guaranty executed by Guarantor in connection with the Mortgage Loan.

"Immediate Family Members" means a child, stepchild, grandchild, spouse, sibling, or parent, each of whom is not a Prohibited Person.

"Imposition Deposits" has the meaning set forth in the Security Instrument.

"Impositions" has the meaning set forth in the Security Instrument

"Improvements" has the meaning set forth in the Security Instrument.

"Indebtedness" has the meaning set forth in the Security Instrument.

"Index" has the meaning set forth in the Summary of Loan Terms.

has the meaning set forth in the Required Repairs Agreement.

"Insolvency Laws" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar laws, proceedings, or equitable principles affecting the enforcement of creditors' rights, as amended from time to time.

"Insolvent" means:

(a)      that the sum total of all of a specified Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of such Person's non-exempt assets, i.e., all of the assets of such Person that are available to satisfy claims of creditors; or

(b)      such Person's inability to pay its debts as they become due.

"Intended Prepayment Date" means the date upon which Borrower intends to make a prepayment on the Mortgage Loan, as set forth in the Prepayment Notice.

"Interest Accrual Method" has the meaning set forth in the Summary of Loan Terms.

"Interest Only Term" has the meaning set forth in the Summary of Loan Terms.

"Interest Rate" means the annual rate at which interest accrues on the Mortgage Loan as set forth in the Summary of Terms.

"Interest Rate Type" has the meaning set forth in the Summary of Loan Terms.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Investor" means any Person to whom Lender intends to sell, transfer, deliver or assign the Mortgage Loan in the secondary mortgage market.

"Key Principal" means, collectively:

(a)      the natural person(s) or entity that Controls Borrower that Lender determines is critical to the successful operation and management of Borrower and the Mortgaged Property, as identified as such in the Summary of Loan Terms; or

Page 40 of 45

(b)        any natural person or entity who becomes a Key Principal after the date of the Loan Agreement and is identified as such in an assumption agreement, or another amendment or supplement to the Loan Agreement.

"Land" means the land described in Exhibit A to the Security Instrument.

"Last Interest Only Payment Date" has the meaning set forth in the Summary of Loan Terms, if applicable.

"Late Charge" means an amount equal to the delinquent amount then due under the Loan Documents multiplied by five percent (5%).

"Leases" has the meaning set forth in the Security Instrument.

"Lender" means the entity identified as "Lender" in the first paragraph of the Loan Agreement and its transferees, successors and assigns, or any subsequent holder of the Note.

"Lender's General Business Address" has the meaning set forth in the Summary of Loan Terms.

"Lender's Notice Address" has the meaning set forth in the Summary of Loan Terms.

"Lender's Payment Address" has the meaning set forth in the Summary of Loan Terms.

"Lien" " has the meaning set forth in the Security Instrument.

"Loan Agreement" means the Loan and Security Agreement made as of the Effective Date executed by and between Borrower and Lender to which this Definitions Schedule is attached, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan Amount" has the meaning set forth in the Summary of Loan Terms.

"Loan Application" means the application for the Mortgage Loan submitted by Borrower to Lender.

"Loan Documents" means the Note, the Loan Agreement, the Security Instrument, the Environmental Indemnity Agreement, the Guaranty, the Required Repairs Agreement (if required in accordance with the Summary of Loan Terms), all guaranties, all indemnity agreements, all Collateral Agreements, all O&M Plans, and any other documents now or in the future executed by Borrower, Guarantor, Key Principal, any other guarantor or any other Person in connection with the Mortgage Loan, as such documents may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan to Value Ratio" means the fraction expressed as a percentage, the numerator of which is the outstanding principal balance of the Loan and the denominator of which is the fair market value of the Property.

"Loan Servicer" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Loan Agreement, the Security Instrument and any other Loan Document, and otherwise to service the Mortgage Loan for the benefit of Lender. Unless Borrower receives notice to the contrary, the Loan Servicer shall be the Lender originally named on the Summary of Loan Terms.

"Loan Term" has the meaning set forth in the Summary of Loan Terms.

"Margin" has the meaning set forth in the Summary of Loan Terms.

"Material Lease" has the meaning set forth in the Summary of Loan Terms.

"Maturity Date" has the meaning set forth in the Summary of Loan Terms.

"Maximum Inspection Fee" has the meaning set forth in the Required Repairs Agreement, if any.

"Monthly Debt Service Payment" has the meaning set forth in the Summary of Loan Terms.

"Mortgage Loan" means the mortgage loan made by Lender to Borrower in the principal amount of the Note made pursuant to the Loan Agreement, evidenced by the Note and secured by the Loan Documents that are expressly stated to be security for the Mortgage Loan.

"Mortgaged Property" has the meaning set forth in the Security Instrument.

"Note" means that certain Promissory Note of even date with this Loan Agreement in the original principal amount of the stated Loan Amount made by Borrower in favor of Lender, and all schedules, riders, allonges and addenda attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"O&M Plan" has the meaning set forth in the Environmental Indemnity Agreement.

"OFAC" means the United States Treasury Department, Office of Foreign Assets Control, and any successor thereto.

"Payment Change Date" has the meaning set forth in the Summary of Loan Terms.

"Payment Date" means the First Payment Date and the first day of each month thereafter until the Mortgage Loan is fully paid.

"Payment Guaranty" means, if applicable, that certain Guaranty (Payment) of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Permitted Encumbrance" has the meaning set forth in the Security Instrument.

"Permitted Preferred Equity" means Preferred Equity that does not (a) require mandatory dividends, distributions, payments or returns (including at maturity or in connection with a redemption), or (b) provide the Preferred Equity owner with rights or remedies on account of a failure to receive any preferred dividends, distributions, payments or returns (or, if such rights are provided, the exercise of such rights do not violate the Loan Documents or are otherwise exercised with the prior written consent of Lender in accordance with Article 11 (Liens, Transfers and Assumptions) of the Loan Agreement and the payment of all applicable fees and expenses as set forth in Section 11.03(h) (Further Conditions to Transfers and Assumption)).

"Permitted Prepayment Date" means the last Business Day of a calendar month.

"Person" means an individual, an estate, a trust, a corporation, a partnership, a limited liability company or any other organization or entity (whether governmental or private).

"Personal Property" means the Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"Personalty" has the meaning set forth in the Security Instrument.

"Preferred Equity" means a direct or indirect equity ownership interest in, economic interests in, or rights with respect to, Borrower that provide an equity owner preferred dividend, distribution, payment or return treatment relative to other equity owners.

"Prepayment Notice" means the written notice that Borrower is required to provide to Lender in accordance with Section 2.03 (Prepayment) of the Loan Agreement in order to make a prepayment on the Mortgage Loan, which shall include, at a minimum, the Intended Prepayment Date.

"Prepayment Premium" means the amount payable by Borrower in connection with a prepayment of the Mortgage Loan, as provided in Section 2.03 (Prepayment) of the Loan Agreement and calculated in accordance with the Prepayment Premium

Schedule.

"Prepayment Premium Period End Date" has the meaning set forth in the Prepayment Premium Schedule.

"Prepayment Premium Period Term" has the meaning set forth in the Prepayment Premium Schedule.

"Prepayment Premium Schedule" means that certain Schedule 4 (Prepayment Premium Schedule) to the Loan Agreement.

"Prohibited Person" means:

    (a)    any Person with whom Lender is prohibited from doing business pursuant to any law, rule, regulation, judicial proceeding or administrative directive; or

    (b)    any Person identified on the United States Department of Housing and Urban Development's "Limited Denial of Participation, HUD Funding Disqualifications and Voluntary Abstentions List," or on the General Services Administration's "Excluded Parties List System," each of which may be amended from time to time, and any successor or replacement thereof; or

    (c)    any Person that is determined by Lender to pose an unacceptable credit risk due to the aggregate amount of debt of such Person owned or held by Lender; or

    (d)    any Person that has caused any unsatisfactory experience of a material nature with Lender, such as a default, fraud, intentional misrepresentation, litigation, arbitration or other similar act.

"Property Jurisdiction" has the meaning set forth in the Security Instrument.

"Publicly-Held Corporation" means a corporation, the outstanding voting stock of which is registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"Publicly-Held Trust" means a real estate investment trust, the outstanding voting shares or beneficial interests of which are registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"Rate Change Date" has the meaning set forth in the Summary of Loan Terms.

"Remaining Amortization Period" has the meaning set forth in the Summary of Loan Terms.

"REMIC Trust" means a securitization trust that elects to be classified as a REMIC within the meaning of Sections 860A - 860G of the Internal Revenue Code of 1986, as amended.

"Rents" has the meaning set forth in the Security Instrument.

"Repairs" means, individually and collectively, those items listed on the Required Repair and Replacement Schedule or any other repairs required by the Lender in accordance with the Loan Documents.

"Replacements" means, individually and collectively, those items listed on the Required Repair and Replacement Schedule or any other replacements required by the Lender in accordance with the Loan Documents.

"Required Repair and Replacement Schedule" means that certain Schedule 2 (Required Repair and Replacement Schedule) to the Required Repairs Agreement.

"Required Repairs Agreement" means that certain Required Repairs Agreement between the Borrower and Lender of even date herewith, if any.

"Reserve/Escrow Account Funds" means, collectively, the funds on deposit in the Reserve/Escrow Accounts.

"Reserve/Escrow Account" means the account established by Lender into which the Lender deposits the amount set forth as the Reserve/Escrow Deposit in the Required Repairs Agreement.

"Reserve/Escrow Deposit" means the account to be deposited into the Reserve/Escrow Account as set from in the Required Repairs Agreement, if any.

"Restoration" means restoring and repairing the Mortgaged Property to the equivalent of its physical condition immediately prior to the casualty or to a condition approved by Lender following a casualty.

"Restricted Ownership Interest" means, with respect to any entity, the following:

    (a)    if such entity is a general partnership or a joint venture, fifty percent (50%) or more of all general partnership or joint venture interests in such entity;

    (b)    if such entity is a limited partnership:

        (1)    the interest of any general partner; or

        (2)    fifty percent (50%) or more of all limited partnership interests in such entity;

    (c)    if such entity is a limited liability company or a limited liability partnership:

        (1)    the interest of any non-member manager or managing member; or

        (2)    fifty percent (50%) or more of all membership or other ownership interests in such entity;

    (d)    if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, fifty percent (50%) or more of voting stock in such corporation;

    (e)    if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, the amount of shares of voting stock sufficient to have the power to elect the majority of directors of such corporation; or

    (f)    if such entity is a trust (other than a land trust or a Publicly-Held Trust), the power to Control such trust vested in the trustee of such trust or the ability to remove, appoint or substitute the trustee of such trust (unless the trustee of such trust after such removal, appointment or substitution is a trustee identified in the trust agreement approved by Lender).

"Review Fee" means the non-refundable fee of Three Thousand Dollars ($3,000) payable to Lender.

"Schedule of Interest Rate Type Provisions" means that certain Schedule 3 (Schedule of Interest Rate Type Provisions) to the Loan Agreement.

"Security Instrument" means that certain mortgage, deed to secure debt or deed of trust executed and delivered by Borrower as security for the Mortgage Loan and encumbering the Mortgaged Property, including all riders or schedules attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Servicing Arrangement" means any arrangement between Lender and the Loan Servicer for loss sharing or interim advancement of funds.

"Summary of Loan Terms" means that certain Schedule 2 (Summary of Loan Terms) to the Loan Agreement.

"Taxes" has the meaning set forth in the Security Instrument.

"Title Policy" means the mortgagee's loan policy of title insurance issued in connection with the Mortgage Loan and insuring the lien of the Security Instrument as set forth therein, as approved by Lender.

"Transfer" means:

    (a)    a sale, assignment, transfer or other disposition (whether voluntary, involuntary, or by operation of law);

    (b)    a granting, pledging, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary, or by operation of law);

    (c)    an issuance or other creation of a direct or indirect ownership interest;

    (d)    a withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity; or

    (e)    a merger, consolidation, dissolution or liquidation of a legal entity.

"Transfer Fee" means a fee equal to one percent (1%) of the unpaid principal balance of the Mortgage Loan payable to Lender in connection with a Transfer of the Mortgaged Property or of an ownership interest in Borrower, Guarantor or Key Principal for which Lender's consent is required (including in connection with an assumption of the Mortgage Loan).

"UCC" has the meaning set forth in the Security Instrument.

"UCC Collateral" has the meaning set forth in the Security Instrument.

"Voidable Transfer" means any fraudulent conveyance, preference or other voidable or recoverable payment of money or transfer of property.

_____
C. Ray Kennedy

_____
Cynthia M. Kennedy

SCHEDULE 2 TO
LOAN AND SECURITY AGREEMENT
Summary of Loan Terms
ARM Loan
(Hybrid Arm Balloon, Hybrid Arm No Balloon, ARM and Partial IO)

| I.   GENERAL PARTY AND PROPERTY INFORMATION | |
|---|---|
| Borrower(s) | 1. C. Ray Kennedy<br>2. Cynthia M. Kennedy |
| Lender | CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company |
| Key Principal(s) | N/A |
| Guarantor(s) | Ramsey-Peele Corporation , a North Carolina corporation |
| Mortgaged Property Address | 1. 6025 Clarke Creek, CHARLOTTE, NC 28269<br>2. 16701 Northcross Dr., CHARLOTTE, NC 28269 |
| Loan Servicer | Ocwen Loan Servicing, LLC |
| II.   ADDRESSES | |
| Borrower's Notice Address | 1. 4324 Satterwythe Ln  CHARLOTTE, NC 28215<br>2. 4324 Satterwythe Ln  CHARLOTTE, NC 28215 |
| Mortgaged Property County | MECKLENBURG |
| Guarantor's Notice Address | 8350 Arrowridge Blvd  Charlotte  NC |
| Lender's Business Address | 20955 Pathfinder Road, #205Diamond Bar, CA 91765 |
| Lender's Notice Address | 20955 Pathfinder Road, #205Diamond Bar, CA 91765 |
| Lender's Payment Address | 20955 Pathfinder Road, #205Diamond Bar, CA 91765 |

Page 1 of 3

Signatory Initial(s):

## III. PROPERTY INFORMATION

| | |
|---|---|
| Property Manager | N/A |
| Material Leases | 1. Lease, dated October 1, 2017, between borrower and Ramsey-Peele Corporation d/b/a University Child Development Center for premises located on the Mortgaged Property.<br>2. Lease, dated October 1, 2017, between borrower and Ramsey-Peele Corporation d/b/a University Child Development Center for premises located on the Mortgaged Property. |
| Required Repairs Agreement | No |

## IV. MORTGAGE LOAN INFORMATION

| | |
|---|---|
| Interest Rate | Fixed Rate during Fixed Term and thereafter, the Adjustable Rate |
| Interest Rate Type | Hybrid ARM |
| Adjustable Rate | From and after each Rate Change Date until the next Rate Change Date, a per annum interest rate that is the sum of (i) the Current Index, and (ii) the Margin, which sum is then rounded to the nearest three (3) decimal places, provided, however, that the Adjustable Rate shall not (1) exceed the Fixed Rate by more than 6.00% at any time, (2) be lower than the Fixed Rate at any time, (3) if such Rate Change Date is the First Rate Change Date, increase by more than 1.000% from the Fixed Rate, and (4) if such Rate Change Date is other than the First Rate Change Date, change by more than 1.000% , plus or minus, from the Adjustable Rate in effect for the period immediately preceding the Rate Change Date. |
| Initial Adjustable Rate | To be determined on the First Rate Change Date. |
| Amortization Period | 360 months |
| Amortization Type | Amortizing |
| Current Index | The published Index that is effective on the forty-fifth (45th) day before |
| Effective Date and Interim Interest | The date the Mortgage Loan proceeds are disbursed by the closing agent.  If the Effective Date is any day other than the first day of the month, interest for the period beginning on the Effective Date and ending on and including the last day of the month in which the disbursement occurs shall be (i) credited to the Borrower on the Effective Date if the first Payment Date is the first day of the month immediately following the month in which the Effective Date occurs or (ii) payable by Borrower on the Effective Date if the first Payment Date is the first day of the second month following the month in which the Effective Date occurs. |
| First Payment Date | The first day of November, 2017 |
| First Rate Change Date | The first day of October, 2022 |
| First Payment Change Date | The first day of November, 2022 |
| Fixed Rate | 7.75% per annum |
| Fixed Term | 60 Months |
| Index | The British Bankers Association fixing of the London Inter-Bank Offered Rate for six (6)-month U.S. Dollar-denominated deposits as reported by Reuters through electronic transmission.  In the event that the Index becomes unavailable or otherwise unpublished, the Lender will select a comparable alternative index over which it has no direct control and which is readily verifiable. |

Page 2 of 3

Signatory Initial(s): _____

| | |
|---|---|
| Interest Accrual Method | 30/360 (computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months). |
| Loan Amount | Three Million and 00/100 Dollars ($3,000,000) |
| Loan Term | 360 months |
| Margin | 4% |
| Maturity Date | The first day of October, 2047, or any earlier date on which the unpaid principal balance of the Mortgage Loan becomes due and payable by acceleration or otherwise. |
| Monthly Debt Service Payment | (i)    $21,492.37 for the First Payment Date and each Payment Date thereafter to but excluding the First Payment Change Date; and <br><br> (ii)    for the First Payment Change Date and each Payment Date thereafter until the Mortgage Loan is fully paid, such amount as shall cause the unpaid principal balance of Mortgage Loan to be amortized in equal monthly installments over the Remaining Amortization Period at the Adjustable Rate. |
| Balloon Payment | N/A |
| Taxes and Insurance Impositions Deposit (monthly) | The amount in addition to the Monthly Debt Service Payment to be paid to the Lender on each Payment Date. This additional amount will be equal to 1/12th of the annual amount due for taxes and insurance for the year in which such Payment Date occurs. The annual amount initially will be determined prior to the Closing Date and will be adjusted from time to time by the Loan Servicer during the term of the loan to reflect changes in the amounts due each year. |
| Payment Change Date | The first (1st) day of the month following each Rate Change Date until the Mortgage Loan is fully paid. |
| Rate Change Date | The First Rate Change Date and the first (1st) day of every sixth (6th) month thereafter, until the Mortgage Loan is fully paid. |
| Remaining Amortization Period | As of the First Payment Change Date and each Payment Change Date thereafter, the Amortization Period minus the number of scheduled Monthly Debt Service Payments that have elapsed since the Effective Date. |

C. Ray Kennedy

Cynthia M. Kennedy

Signatory Initial(s)

Page 3 of 3

**SCHEDULE 3 TO**
**LOAN AND SECURITY AGREEMENT**
Schedule of Interest Rate Type Provisions
(ARM Loans)

1.    Defined Terms.

Capitalized terms not otherwise defined in this Schedule have the meanings given to such terms in the Definitions Schedule to the Loan Agreement.

2.    Interest Accrual.

Except as otherwise provided in the Loan Agreement, interest shall accrue at the Fixed Rate until the First Rate Change Date. Thereafter, interest shall accrue at the Adjustable Rate until the Mortgage Loan is fully paid.

3.    Adjustable Rate Adjustments.

The Adjustable Rate shall change on each Rate Change Date based on fluctuations in the Current Index. Borrower acknowledges that the initial Adjustable Rate that becomes effective on the First Rate Change Date may exceed the Fixed Rate by up to 6 basis points. If the Index is no longer available, or is no longer posted through electronic transmission, Lender will choose a new index that is based upon comparable information and provide notice thereof to Borrower.

4.    Notice of Interest Rate Change and Monthly Debt Service Payment.

Before each Payment Change Date, Lender shall notify Borrower of any change in the Adjustable Rate or the amount of the next Monthly Debt Service Payment.

5.    Correction to Monthly Debt Service Payment.

If Lender determines at any time that it has miscalculated the amount of a Monthly Debt Service Payment (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the Monthly Debt Service Payment (and the corrected Adjustable Rate, if applicable) and (a) if the corrected amount of the Monthly Debt Service Payment represents an increase, then Borrower shall, within thirty (30) calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated to pay to Lender had the amount of the Monthly Debt Service Payment not been miscalculated, or (b) if the corrected amount of the Monthly Debt Service Payment represents a decrease and Borrower is not otherwise in default under any of the Loan Documents, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the Monthly Debt Service Payment not been miscalculated.

C. Ray Kennedy

Cynthia M. Kennedy

Page 1 of 1

SCHEDULE 4 TO
LOAN AND SECURITY AGREEMENT
Prepayment Premium Schedule
(Graduated Prepayment Premium)

| PREPAYMENT PREMIUM INFORMATION | |
|---|---|
| Prepayment Premium Period End Date | The last day of September, 2022 |
| Prepayment Premium Period Term | 60 months |

1.    Defined Terms.

All capitalized terms used but not defined in this Prepayment Premium Schedule shall have the meanings assigned to them in the Loan Agreement.

2.    Interest Accrual.

(a)    Any Prepayment Premium payable under Section 2.03 (Prepayment) of the Loan Agreement shall be equal to the following percentage of the amount of principal being prepaid at the time of such prepayment, acceleration or application:

| | |
|---|---|
| First Loan Year | 5.00% |
| Second Loan Year | 4.00% |
| Third Loan Year | 3.00% |
| Fourth Loan Year | 2.00% |
| Fifth Loan Year | 1.00% |

(b)    Notwithstanding the provisions of Section 2.03 (Prepayment) of the Loan Agreement, no Prepayment Premium shall be payable with respect to any prepayment made after the Prepayment Premium Period Term has elapsed.

C. Ray Kennedy

Cynthia M. Kennedy

Page 1 of 1

SCHEDULE 5 TO
LOAN AND SECURITY AGREEMENT
Insurance Requirements

Insurance Requirements

(a)    Property Damage Insurance. Insurance against loss or damage to the Mortgaged Property by fire, windstorm, tornado and hail and against loss and damage by such other, further and additional risks as may be now or hereafter embraced by an "all-risk" or "special form" of insurance policy must be maintained. The amount of such insurance shall be not less than the lesser of (i) the original principal balance of the Mortgage Loan and (ii) one hundred percent (100%) of the full replacement cost (insurable value) of the Improvements (as established by an appraisal). The determination of the replacement cost amount shall be adjusted annually. Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor. Borrower shall also maintain insurance against loss or damage to furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Mortgaged Property and owned by Borrower from time to time, to the extent applicable, in the amount of the cost of replacing the same, in each case, with inflation guard coverage to reflect the effect of inflation, or annual valuation. Each such policy or policies shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to Lender's approval. The maximum deductible shall be $10,000 per occurrence for loans over $1,000,000 and $5,000 for loans at or over $1,000,000, but never more than $25,000 in the aggregate per year. Such "all-risk" or "special form" of insurance policy shall not, as of the Effective Date, specifically exclude Acts of Terrorism, as defined in in the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2007, from coverage, or if such coverage is excluded, it is covered by a separate terrorism insurance policy.

(b)    Liability Insurance. Commercial general liability insurance against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Mortgaged Property in amounts not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate must be maintained. During any construction on the Mortgaged Property, Borrower's general contractor for such construction shall also provide the insurance required in this Subsection (b). Lender hereby retains the right to periodically review the amount of said liability insurance being maintained by Borrower and to require an increase in the amount of said liability insurance should Lender deem an increase to be reasonably prudent under then existing circumstances. The maximum deduction shall be the greater of one percent (1%) of the principal amount of the Note or $5,000 per occurrence, but not more than $25,000 in the aggregate per year.

(c)    Boiler and Machinery Insurance. Boiler and machinery insurance is required if steam boilers or other pressure-fired vessels are in operation at the Property. Minimum liability coverage per accident must equal the greater of the replacement cost (insurable value) of the Improvements housing such boiler or pressure-fired machinery or $2,000,000.00. If one or more large HVAC units is in operation at the Property, "Systems Breakdowns" coverage shall be required, as determined by Lender.

Minimum liability coverage per accident must equal the value of such unit(s). The maximum deductible shall not exceed $5,000.

(d)    Flood Insurance. If the Improvements or any part thereof are situated in an area now or subsequently designated by the Federal Emergency Management Agency ("FEMA") as a special flood hazard area (Zone A or Zone V), flood insurance must be obtained in an amount equal to 100% of the amount required to compensate for any damage or loss on a replacement basis. If full replacement cost coverage is not available for the the type of building insured, then the maximum insuranceinsurance available under the appropriate National Flood Insurance Administration program.  The maximum deductible shall not exceed the greater of (i) $5,000.00 and (ii) one percent of the applicable amount of coverage.

(e)    Construction Insurance. During the period of any construction, renovation or alteration of the Improvements which exceeds the lesser of 10% of the principal amount of the Note or $500,000.00, at Lender's request, a completed value, "All Risk" Builder's Risk form, or "Course of Construction" insurance policy in non-reporting form with replacement cost and no co-insurance, in an amount approved by Lender, may be required.  During the period of any construction of any addition to the existing Improvements, a completed value, "All Risk" Builder's Risk form or "Course of Construction" insurance policy in non-reporting form, in an amount approved by Lender, shall be required.

(f)    Worker's Compensation and Employer's Liability Insurance. When required by applicable law, ordinance or other regulation, Worker's Compensation and Employer's Liability Insurance must be maintained covering all persons subject to the workers' compensation laws of the state in which the Property is located.

(g)    Business Income / Rent Loss Coverage Insurance. Business income (loss of rents) insurance in amounts sufficient to compensate Borrower for all Rents or income during a period of not less than twelve (12) months must be maintained.  The amount of coverage shall be adjusted annually to reflect the Rents or income payable during the succeeding twelve (12) month period. The amount of coverage shall be adjusted annually. The maximum deductible shall be two weeks' rents per occurrence. Such business interruption policy shall not, as of the Effective Date, specifically exclude Acts of Terrorism, as defined in in the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2007, from coverage, or if such coverage is excluded, it is covered by a separate terrorism insurance policy.

(h)    Other Insurance. Such other insurance on the Mortgaged Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards, casualties or matters which at the time are commonly insured against in the case of property similarly situated, including, without limitation, sinkhole, mine subsidence, earthquake, terrorism, environmental and law and ordinance insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(i)    General Requirements. All such insurance shall (I) be with insurers fully licensed and authorized to do business in the state within which the Mortgaged Property is located and which insurers, unless otherwise approved in writing by Lender, shall have and maintain a rating of at (I) have a "B+" rating or better in the latest edition of "Best's Insurance

Guide", (ii) be licensed to do business in the state in which the Land is located, and (iii) be licensed to transact the lines of insurance required hereunder; (2) contain the complete address of the Land (or a complete legal description); (3) be for terms of at least one year with premium prepaid; (4) be subject to the approval of Lender as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates; (5) contain deductibles which do not exceed $20,000.00 on loan balances over $1,000,000 and $10,000.00 on loan balances equal or less than $1,000,000; and (6) include a standard, non-contributory, Lender clause naming:

Ocwen Loan Servicing, LLC, as servicer for
CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company, its successors and assigns
P.O. Box 6723
Springfield, OH 45501-6723

(i) as an additional insured under all liability insurance policies, (ii) as the first mortgagee on all property insurance policies and (iii) as the loss payee on all loss of rents or loss of business income insurance policies.

(j)    Windstorm Coverage. If the Mortgaged Property is located within 25 miles of the coast of the Gulf of Mexico or the Atlantic coast of Florida, Georgia, South Carolina or North Carolina, the Borrower is required to maintain coverage for windstorm and/or windstorm related perils and/or "named storms" issued by an acceptable insurer as described above or endorsement covering damage from windstorm and/or windstorm related perils and/or named storms.

(k)    Ordinance and Law Coverage. In the event that the Land or the Improvements constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances, all policies shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost" and Coverage C: "Increased Cost of Construction" coverage.

Borrower further agrees that each such insurance policy: (i) shall provide for at least thirty (30) days' prior written notice to Lender prior to (x) any policy reduction, cancellation or termination for any reason and (y) any modification thereof which affects the interest of Lender; (ii) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Lender in accordance with the terms of such policy notwithstanding any act or negligence of Borrower which might otherwise result in forfeiture of such insurance; (iii) shall waive all rights of subrogation against Lender; and (iv) may be in the form of a blanket policy provided that, in the event that any such coverage is provided in the form of a blanket policy, Borrower hereby acknowledges and agrees that failure to pay any portion of the premium therefor which is not allocable to the Mortgaged Property or by any other action not relating to the Mortgaged Property which would otherwise permit the issuer thereof to cancel the coverage thereof, would require the Mortgaged Property to be insured by a separate, single-property policy. The blanket policy must properly identify and fully protect the Mortgaged Property as if a separate policy were issued for 100% of Replacement Cost at the time of loss and otherwise meet all of Lender's applicable insurance requirements set forth in this

shall constitute an assignment of all proceeds payable under such insurance policies relating to the Mortgaged Property by Borrower to Lender as further security for the Indebtedness.  Lender shall not be responsible for nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of Borrower to furnish such insurance.  To the extent that at any time Lender agrees to accept (a) insurance in amounts less than that which is required by the foregoing provisions of this Schedule 5 or (b) insurance from an insurer that is rated less than that which is required by the foregoing provisions of this Schedule 5, Lender may terminate its waiver and reassert the aforesaid minimum coverage amounts and rating requirements upon any renewal of any insurance coverage or at any time if (x) the coverage provided under such policies is reduced or (y) the rating of any insurer is reduced or (z) Lender determines that any other material adverse event has occurred with respect to the financial condition of such insurer.


C. Ray Kennedy

Cynthia M. Kennedy

## GUARANTY
### (Payment)

This GUARANTY (Payment) (this "Guaranty"), dated as of September 26, 2017, is executed by undersigned ("Guarantor"), to and for the benefit of CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("Lender").

### RECITALS:

A.     Pursuant to that certain Loan and Security Agreement dated as of the date hereof, by and between C. Ray Kennedy & Cynthia M. Kennedy ("Borrower") and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), Lender is making a loan to Borrower in the original principal amount of Three Million and 00/100 Dollars ($3,000,000) (the "Mortgage Loan"), as evidenced by that certain Promissory Note dated as of the date hereof, executed by Borrower and made payable to the order of Lender in the amount of the Mortgage Loan (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note").

B.     The Note will be secured by, among other things, a Security Instrument (as defined in the Loan Agreement) encumbering the real property described in the Security Instrument (the "Property").

C.     Guarantor has an economic interest in Borrower or will otherwise obtain a material financial benefit from the Mortgage Loan.

D.     As a condition to making the Mortgage Loan to Borrower, Lender requires that Guarantor execute this Guaranty.

NOW, THEREFORE, in order to induce Lender to make the Mortgage Loan to Borrower, and in consideration thereof, Guarantor agrees as follows:

### AGREEMENTS:

1.   Recitals

The recitals set forth above are incorporated herein by reference as if fully set forth in the body of this Guaranty.

2.   Defined Terms.

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement.

3.   Guaranteed Obligations.

Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the full and prompt payment and performance when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, of:

(a)      the entire Indebtedness;

Page 1 of 11


EXHIBIT
3

(a).     the entire Indebtedness;

(b)     all amounts, obligations and liabilities owed to Lender under Article 3 (Personal Liability) of the Loan Agreement (including the payment and performance of all indemnity obligations of Borrower described in Section 3.03 (Personal Liability for Indemnity Obligations) of the Loan Agreement and including all of Borrower's obligations under the Environmental Indemnity Agreement); and

(c)     all costs and expenses, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

4.     **Survival of Guaranteed Obligations**

The obligations of Guarantor under this Guaranty shall survive any Foreclosure Event, and any recorded release or reconveyance of the Security Instrument or any release of any other security for any of the Indebtedness.

5.     **Guaranty of Payment; Community Property.**

Guarantor's obligations under this Guaranty constitute a present and unconditional guaranty of payment and not merely a guaranty of collection. If Guarantor (or any Guarantor, if more than one) is a married person, and the state of residence of Guarantor or Guarantor's spouse is a community property jurisdiction, Guarantor (or each such married Guarantor, if more than one) agrees that Lender may satisfy Guarantor's obligations under this Guaranty to the extent of all Guarantor's separate property and Guarantor's interest in any community property.

6.     **Obligations Unsecured; Cross-Default.**

The obligations of Guarantor under this Guaranty shall not be secured by the Security Instrument or the Loan Agreement. However, a default under this Guaranty shall be an Event of Default under the Loan Agreement, and a default under this Guaranty shall entitle Lender to be able to exercise all of its rights and remedies under the Loan Agreement and other Loan Documents.

7.     **Continuing Guaranty.**

The obligations of Guarantor under this Guaranty shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any provision of this Guaranty, the Note, the Loan Agreement, the Security Instrument or any other Loan Document. Guarantor agrees that performance of the obligations hereunder shall be a primary obligation, shall not be subject to any counterclaim, set-off, recoupment, abatement, deferment or defense based upon any claim that Guarantor may have against Lender, Borrower, any other guarantor of the obligations hereunder or any other person or entity, and shall remain in full force and effect without regard to, and shall not be released, discharged or affected in any way by any circumstance or condition (whether or not Guarantor shall have any knowledge thereof), including:

(a)    any furnishing, exchange, substitution or release of any collateral securing repayment of the Mortgage Loan, or any failure to perfect any lien in such collateral;

(b)    any failure, omission or delay on the part of Borrower, Guarantor, any other guarantor of the obligations hereunder or Lender to conform or comply with any term of any of the Loan Documents or failure of Lender to give notice of any Event of Default;

(c)    any action or inaction by Lender under or in respect of any of the Loan Documents, any failure, lack of diligence, omission or delay on the part of Lender to perfect, enforce, assert or exercise any lien, security interest, right, power or remedy conferred upon it in any of the Loan Documents, or any other action or inaction on the part of Lender;

(d)    any Bankruptcy Event, or any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshaling of assets and liabilities or similar events or proceedings with respect to Guarantor or any other guarantor of the obligations hereunder, or any of their respective property or creditors or any action taken by any trustee or receiver or by any court in such proceeding;

(e)    any merger or consolidation of Borrower into or with any entity or any sale, lease or Transfer of any asset of Borrower, Guarantor or any other guarantor of the obligations hereunder to any other Person;

(f)    any change in the ownership of Borrower or any change in the relationship between Borrower, Guarantor or any other guarantor of the obligations hereunder, or any termination of such relationship;

(g)    any release or discharge by operation of law of Borrower, Guarantor or any other guarantor of the obligations hereunder, or any obligation or agreement contained in any of the Loan Documents; or

(h)    any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing, and whether seen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which otherwise might limit recourse against Borrower or Guarantor to the fullest extent permitted by law.

8.    **Guarantor Waivers.**

Guarantor hereby waives:

(a)    the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty (and agrees that Guarantor's obligations shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or a guarantor);

(b)    the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors;

Page 3 of 11

(c)      diligence in collecting the Indebtedness, presentment, demand for payment, protest and all notices with respect to the Loan Documents and this Guaranty which may be required by statute, rule of law or otherwise to preserve Lender's rights against Guarantor under this Guaranty, including notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any Event of Default, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest and notice of the incurring by Borrower of any obligation or indebtedness; and

(d)      all rights to require Lender to:

(1)      proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness;

(2)      proceed against or pursue any remedy it may now or hereafter have against Borrower or any guarantor, or, if Borrower or any guarantor is a partnership, any general partner of Borrower or general partner of any guarantor; or

(3)      demand or require collateral security from Borrower, any other guarantor or any other Person as provided by applicable law or otherwise.

(e)      Guarantor also waives, to the fullest extent permitted by law, all rights, including, without limitation, all rights granted by Sections 26-7 through 26-9, inclusive, of the North Carolina Statutes, to require Lender to:

(1)      proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness;

(2)      proceed against or pursue any remedy it may now or hereafter have against Borrower or any guarantor, or, if Borrower or any guarantor is a partnership, any general partner of Borrower or general partner of any guarantor; or

(3)      demand or require collateral security from Borrower, any other guarantor or any other Person as provided by applicable law or otherwise.


9.      **No Effect Upon Obligations.**

At any time or from time to time and any number of times, without notice to Guarantor and without releasing, discharging or affecting the liability of Guarantor:

(a)      the time for payment of the principal of or interest on the Indebtedness may be extended or the Indebtedness may be renewed in whole or in part;

(b)      the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

(c)      the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

Page 4 of 11

otherwise dealt with or additional security may be pledged or mortgaged for the Indebtedness;

(i)    the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower;

(j)    any payments made by Borrower to Lender may be applied to the Indebtedness in such priority as Lender may determine in its discretion; and

(k)    any other terms of the Loan Documents may be modified as required by Lender.

10.    **Joint and Several (or Solidary) Liability.**

If more than one Person executes this Guaranty as Guarantor, such Persons shall be liable for the obligations hereunder on a joint and several (solidary instead for purposes of Louisiana law) basis. Lender, in its discretion, may:

(a)    to the extent permitted by applicable law, bring suit against Guarantor, or any one or more of the Persons constituting Guarantor, and any other guarantor, jointly and severally (solidarily instead for purposes of Louisiana law), or against any one or more of them;

(b)    compromise or settle with any one or more of the Persons constituting Guarantor, or any other guarantor, for such consideration as Lender may deem proper;

(c)    discharge or release one or more of the Persons constituting Guarantor, or any other guarantor, from liability or agree not to sue such Person; and

(d)    otherwise deal with Guarantor and any guarantor, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from Guarantor any amount guaranteed by Guarantor under this Guaranty.
Nothing contained in this Section 10 shall in any way affect or impair the rights or obligations of Guarantor with respect to any other guarantor.

11.    **Subordination of Affiliated Debt.**

Any indebtedness of Borrower held by Guarantor now or in the future is and shall be subordinated to the Indebtedness and any such indebtedness of Borrower shall be collected, enforced and received by Guarantor, as trustee for Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

12.    **Subrogation.**

Guarantor shall have no right of, and hereby waives any claim for, subrogation or reimbursement against Borrower or any general partner of Borrower by reason of any payment by Guarantor under this Guaranty, whether such right or claim arises at law or in equity or under any contract or statute, until the

Indebtedness has been paid in full and there has expired the maximum possible period thereafter during which any payment made by Borrower to Lender with respect to the Indebtedness could be deemed a preference under the Insolvency Laws.

13.    **Voidable Transfer.**

If any payment by Borrower is held to constitute a preference under any Insolvency Laws or similar laws, or if for any other reason Lender is required to refund any sums to Borrower, such refund shall not constitute a release of any liability of Guarantor under this Guaranty. It is the intention of Lender and Guarantor that Guarantor's obligations under this Guaranty shall not be such discharged except by Guarantor's performance of such obligation and then only to the extent of performance. If any payment by any Guarantor should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the obligations guaranteed hereunder shall automatically be revived, reinstated and restored by the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses and legal fees incurred by Lender in connection therewith, and shall exist as though such Voidable Transfer had never been made, and any other guarantor, if any, shall remain liable for such obligations in full.

14.    **Credit Report/Credit Score.**

Guarantor acknowledges and agrees that Lender is authorized, no more frequently than once in any twelve (12) month period, to obtain a credit report (if applicable) on Guarantor, the cost of which shall be paid for by Guarantor. Guarantor acknowledges and agrees that Lender is authorized to obtain a Credit Score (if applicable) for Guarantor at any time at Lender's expense.

15.    **Financial Reporting.**

Guarantor shall deliver to Lender such Guarantor financial statements as required by Section 8.02 (Books and Records; Financial Reporting—Covenants) of the Loan Agreement.

16.    **Further Assurances.**

Guarantor acknowledges that Lender (including its successors and assigns) may sell or transfer the Mortgage Loan, or any interest in the Mortgage Loan.

(a)        Guarantor shall, subject to Section 16(b) below:

Page 8 of 11

(1)      do anything necessary to comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days of the request, at Borrower's and Guarantor's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

(A)      Lender to sell the Mortgage Loan to such Investor;

(B)      Lender to obtain a refund of any commitment fee from any such Investor; or

(C)      any such Investor to further sell or securitize the Mortgage Loan;

(2)      confirm that Guarantor is not in default under this Guaranty or in observing any of the covenants or agreements contained in this Guaranty (or, if Guarantor is in default, describing such default in reasonable detail); and

(3)      execute and deliver to Lender and/or any Investor such other documentation, including any amendments, corrections, deletions or additions to this Guaranty as is reasonably required by Lender or such Investor.

(b)      Nothing in this Section 16 shall require Guarantor to do any further act that has the effect of:

(1)      changing the essential economic terms of the Mortgage Loan set forth in the related commitment letter between Borrower and Lender;

(2)      imposing on Borrower or Guarantor greater personal liability under the Loan Documents than that set forth in the related commitment letter between Borrower and Lender; or

(3)      materially changing the rights and obligations of Borrower or Guarantor under the commitment letter.

17.      Successors and Assigns.

Lender may assign its rights under this Guaranty in whole or in part and, upon any such assignment, all the terms and provisions of this Guaranty shall inure to the benefit of such assignee to the extent so assigned. Guarantor may not assign its rights, duties and obligations under this Guaranty, in whole or in part, without Lender's prior written consent and any such assignment shall be deemed void ab initio. The terms used to designate any of the parties herein shall be deemed to include the heirs, legal representatives, successors and assigns of such parties.

18.   Final Agreement.

Guarantor acknowledges receipt of a copy of each of the Loan Documents and this Guaranty. THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. All prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Guaranty. Neither this Guaranty nor any of its provisions may be waived, modified, amended, discharged or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in that agreement.

19.   Governing Law.

This Guaranty shall be governed by and construed in accordance with the substantive law of the Property Jurisdiction without regard to the application of choice of law principles that would result in the application of the laws of another jurisdiction.

20.   Property Jurisdiction.

Guarantor agrees that any controversy arising under or in relation to this Guaranty shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Guaranty or any other Loan Document with respect to the subject matter hereof. Guarantor irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

21.   Time is of the Essence.

Guarantor agrees that, with respect to each and every obligation and covenant contained in this Guaranty, time is of the essence.

22.   No Reliance.

Guarantor acknowledges, represents and warrants that:

(a)   it understands the nature and structure of the transactions contemplated by this Guaranty and the other Loan Documents;

(b)   it is familiar with the provisions of all of the documents and instruments relating to such transactions;

Page 6 of 11

(c)       it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property or of the assets of Guarantor;

(d)       it has had the opportunity to consult counsel; and

(e)       it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Guaranty or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into or otherwise in connection with this Guaranty, any other Loan Document or any of the matters contemplated hereby or thereby.

23.     **Notices.**

Guarantor agrees to notify Lender of any change in Guarantor's address within ten (10) Business Days after such change of address occurs.  All notices under this Guaranty shall be:

(a)       in writing and shall be

(1)       delivered, in person;

(2)       mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

(3)       sent by overnight courier; or

(4)       sent by electronic mail with originals to follow by overnight courier;

(b)       addressed to the intended recipient at the notice addresses provided under the signature block at the end of this Guaranty; and

(c)       deemed given on the earlier to occur of:

(1)       the date when the notice is received by the addressee; or

(2)       if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

24.     **Construction.**

(a)       Any reference in this Guaranty to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Guaranty or to a Section or Article of this Guaranty.

(b)       Any reference in this Guaranty to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(c)      Use of the singular in this Guaranty includes the plural and use of the plural includes the singular.

(d)      As used in this Guaranty, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(e)      Whenever Guarantor's knowledge is implicated in this Guaranty or the phrase "to Guarantor's knowledge" or a similar phrase is used in this Guaranty, Guarantor's knowledge or such phrase(s) shall be interpreted to mean to the best of Guarantor's knowledge after reasonable and diligent inquiry and investigation.

(f)      Unless otherwise provided in this Guaranty, if Lender's approval, designation, determination, selection, estimate, action or decision is required, · permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(g)      All references in this Guaranty to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(h)      "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

25.    WAIVER OF JURY TRIAL.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF GUARANTOR AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS GUARANTY OR ANY LOAN DOCUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY GUARANTOR AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

26.    Schedules.

The schedules, if any, attached to this Guaranty are incorporated fully into this Guaranty by this reference and each constitutes a substantive part of this Guaranty.

ATTACHED SCHEDULE. The following Schedule is attached to this Guaranty:

NONE

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, Guarantor has signed and delivered this Guaranty under seal (where applicable) or has caused this Guaranty to be signed and delivered under seal (where applicable) by its duly authorized representative. Where applicable law so provides, Guarantor intends that this Guaranty shall be deemed to be signed and delivered as a sealed instrument.

GUARANTOR:

Ramsey-Peele Corporation , a North Carolina corporation

By _____
Name: C. Ray Kennedy
Title: President

Address for Notices:
8350 Arrowridge Blvd
Charlotte  NC

B32153 - P103

For Registration Fredrick Smith
Register of Deeds
Mecklenburg County, NC
Electronically Recorded
2017 Sep 28 10:01 AM          RE Excise Tax: $ 0.00
Book: 32153        Page: 103          Fee: $ 64.00
Instrument Number:    2017131364

Prepared by, and after recording
return to:
Cherrywood Commercial Lending, LLC
20955 Pathfinder Road, Suite 370
Diamond Bar, CA 91765
Attn:   Penny Groel, Esq.



EXHIBIT
4

# DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT
## AND FIXTURE FILING

### (NORTH CAROLINA)

Submitted electronically by "Hutchens Law Firm"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Mecklenburg County Register of Deeds.

B32153 - P104

## DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT
## AND FIXTURE FILING

This DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Security Instrument") dated as of September 26, 2017 is executed by C. Ray Kennedy and wife, Cynthia M. Kennedy, as grantor ("Borrower"), to Chicago Title Company, LLC, as trustee ("Trustee"), for the benefit of Cherrywood Commercial Lending, LLC, a limited liability company organized and existing under the laws of Delaware, as beneficiary ("Lender").

Borrower, in consideration of (i) the loan in the original principal amount of $3,000,000.00 (the "Mortgage Loan") evidenced by that certain Promissory Note dated as of the date of this Security Instrument, executed by Borrower and made payable to the order of Lender (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Note"), (ii) that certain Loan and Security Agreement dated as of the date of this Security Instrument, executed by and between Borrower and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), and (iii) the trust created by this Security Instrument, and to secure to Lender the repayment of the Indebtedness (as defined in this Security Instrument), and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (as defined in the Loan Agreement), excluding the Environmental Indemnity Agreement (as defined in this Security Instrument), irrevocably and unconditionally mortgages, grants, warrants, conveys, bargains, sells, and assigns to Trustee, in trust, for benefit of Lender, with power of sale and right of entry and possession, the Mortgaged Property (as defined in this Security Instrument), including the real property located in Mecklenburg County, State of North Carolina, and described in Exhibit A attached to this Security Instrument and incorporated by reference (the "Land"), to have and to hold such Mortgaged Property unto Trustee and Trustee's successors and assigns, forever; Borrower hereby releasing, relinquishing and waiving, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the Property Jurisdiction (as defined in this Security Instrument), if applicable.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, warrant, convey, bargain, sell, and assign the Mortgaged Property, and that the Mortgaged Property is not encumbered by any Lien (as defined in this Security Instrument) other than Permitted Encumbrances (as defined in this Security Instrument). Borrower covenants that Borrower will warrant and defend the title to the Mortgaged Property against all claims and demands other than Permitted Encumbrances.

Security Instrument – North Carolina (2012)
Kennedy

Page 2 of 22

B32153 - P105

Borrower, and by their acceptance hereof, each of Trustee and Lender covenants and agrees as follows:

1.      Defined Terms.

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement. All terms used and not specifically defined herein, but which are otherwise defined by the UCC, shall have the meanings assigned to them by the UCC. The following terms, when used in this Security Instrument, shall have the following meanings:

"Condemnation Action" means any action or proceeding, however characterized or named, relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect.

"Enforcement Costs" means all expenses and costs, including reasonable attorneys' fees and expenses, fees and out-of-pocket expenses of expert witnesses and costs of investigation, incurred by Lender as a result of any Event of Default under the Loan Agreement or in connection with efforts to collect any amount due under the Loan Documents, or to enforce the provisions of the Loan Agreement or any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy or insolvency proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or Foreclosure Event) or judicial or non-judicial foreclosure proceeding, to the extent permitted by law.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated as of the date of this Security Instrument, executed by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"Environmental Laws" has the meaning set forth in the Environmental Indemnity Agreement.

"Event of Default" has the meaning set forth in the Loan Agreement.

"Fixtures" means all Goods that are so attached or affixed to the Land or the Improvements as to constitute a fixture under the laws of the Property Jurisdiction.

"Goods" means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators, and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and

B32153 - P106

apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers, and other appliances; light fixtures, awnings, storm windows, and storm doors; pictures, screens, blinds, shades, curtains, and curtain rods; mirrors, cabinets, paneling, rugs, and floor and wall coverings; fences, trees, and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs, and social network pages; computer equipment (hardware and software); and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

"Imposition Deposits" means deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the Impositions when due.

"Impositions" means

(a)    any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property;

(b)    the premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under the Loan Agreement;

(c)    Taxes; and

(d)    amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender.

"Improvements" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land.

"Indebtedness" means the principal of, interest on, and all other amounts due at any time under the Note, the Loan Agreement, this Security Instrument or any other Loan Document (other than the Environmental Indemnity Agreement and Guaranty), including Prepayment Premiums, late charges, interest charged at the Default Rate, and accrued interest as provided in the Loan Agreement and this Security Instrument, advances, costs and expenses to perform the obligations of Borrower or to protect the Mortgaged Property or the security of this Security Instrument, all other monetary obligations of Borrower under the Loan Documents (other than the Environmental Indemnity Agreement), including amounts due as a result of any indemnification obligations, and any Enforcement Costs.

"Land" means the real property described in Exhibit A.

B32153 - P107

"Leases" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals thereof.

"Lien" means any claim or charge against property for payment of a debt or an amount owed for services rendered, including any mortgage, deed of trust, deed to secure debt, security interest, tax lien, any materialman's or mechanic's lien, or any lien of a Governmental Authority, including any lien in connection with the payment of utilities, or any other encumbrance.

"Mortgaged Property" means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

    (a)    the Land;

    (b)    the Improvements;

    (c)    the Personalty;

    (d)    current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

    (e)    insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

    (f)    awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

    (g)    contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

Security Instrument -- North Carolina (2012)
Kennedy

Page 5 of 22

B32153 - P108

(h)    Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(i)    earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(j)    Imposition Deposits;

(k)    refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(l)    tenant security deposits;

(m)    names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(n)    Collateral Accounts and all Collateral Account Funds;

(o)    products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

(p)    all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

"Permitted Encumbrance" means only the easements, restrictions and other matters listed in a schedule of exceptions to coverage in the Title Policy and Taxes for the current tax year that are not yet due and payable.

"Personality" means all of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation

B32153 - P109

of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"Prepayment Premium" has the meaning set forth in the Loan Agreement.

"Property Jurisdiction" means the jurisdiction in which the Land is located.

"Rents" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits.

"Software" means a computer program and any supporting information provided in connection with a transaction relating to the program. The term does not include any computer program that is included in the definition of Goods.

"Taxes" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Document.

"Title Policy" has the meaning set forth in the Loan Agreement.

"UCC" means the Uniform Commercial Code in effect in the Property Jurisdiction, as amended from time to time.

"UCC Collateral" means any or all of that portion of the Mortgaged Property in which a security interest may be granted under the UCC and in which Borrower has any present or hereafter acquired right, title or interest.

2.    Security Agreement; Fixture Filing.

   (a)    To secure to Lender, the repayment of the Indebtedness, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower hereby pledges, assigns, and grants to Lender a continuing security interest in the UCC Collateral. This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Mortgaged Property that is or may become a Fixture under applicable law, and will be recorded as a "fixture filing" in accordance with the UCC. Borrower hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form

B32153 - P110

as Lender may require to perfect or continue the perfection of this security interest without the signature of Borrower. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Document. Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Borrower and the secured party is Lender. The name and address of the debtor and secured party are set forth after Borrower's signature below which are the addresses from which information on the security interest may be obtained.

(b)     Borrower represents and warrants that: (1) Borrower maintains its chief executive office at the location set forth after Borrower's signature below, and Borrower will notify Lender in writing of any change in its chief executive office within five (5) days of such change; (2) Borrower is the record owner of the Mortgaged Property; (3) Borrower's state of incorporation, organization, or formation, if applicable, is as set forth on Page 1 of this Security Instrument; (4) Borrower's exact legal name is as set forth on Page 1 of this Security Instrument; (5) Borrower's organizational identification number, if applicable, is as set forth after Borrower's signature below; (6) Borrower is the owner of the UCC Collateral subject to no liens, charges or encumbrances other than the lien hereof; (7) except as expressly provided in the Loan Agreement, the UCC Collateral will not be removed from the Mortgaged Property without the consent of Lender; and (8) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

(c)     All property of every kind acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further conveyance or assignment become subject to the lien and security interest created by this Security Instrument. Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, mortgages, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

3.     Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Leases and Rents. It is the intention of Borrower to establish present, absolute and irrevocable transfers and assignments to Lender of all Leases and Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Borrower and Lender intend the assignments of Leases and Rents to be effective immediately and to constitute absolute present assignments, and not assignments for additional security only. Only for purposes of giving effect to these absolute assignments of Leases and Rents, and for no other purpose, the Leases and

B32153 - P111

Rents shall not be deemed to be a part of the Mortgaged Property. However, if these present, absolute and unconditional assignments of Leases and Rents are not enforceable by their terms under the laws of the Property Jurisdiction, then each of the Leases and Rents shall be included as part of the Mortgaged Property, and it is the intention of Borrower, in such circumstance, that this Security Instrument create and perfect a lien on each of the Leases and Rents in favor of Lender, which liens shall be effective as of the date of this Security Instrument.

(b)    Until an Event of Default has occurred and is continuing, but subject to the limitations set forth in the Loan Documents, Borrower shall have a revocable license to exercise all rights, power and authority granted to Borrower under the Leases (including the right, power and authority to modify the terms of any Lease, extend or terminate any Lease, or enter into new Leases, subject to the limitations set forth in the Loan Documents), and to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities and Impositions (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing (and no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing), the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument.

(c)    If an Event of Default has occurred and is continuing, without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, the revocable license granted to Borrower pursuant to Section 3(b) shall automatically terminate, and Lender shall immediately have all rights, powers and authority granted to Borrower under any Lease (including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease) and, without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid. During the continuance of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Borrower shall, upon Borrower's receipt of any Rents from any sources, pay the total amount of such receipts to Lender. Although the foregoing rights of Lender are self-effecting, at any time during the continuance of an Event of Default, Lender may make demand for all Rents, and Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts that are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.

B32153 - P112

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower, and even in the absence of waste, enter upon, take and maintain full control of the Mortgaged Property, and may exclude Borrower and its agents and employees therefrom, in order to perform all acts that Lender, in its discretion, determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents (including through use of a lockbox, at Lender's election), the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing this assignment of Rents, protecting the Mortgaged Property or the security of this Security Instrument and the Mortgage Loan, or for such other purposes as Lender in its discretion may deem necessary or desirable.

(e)    Notwithstanding any other right provided Lender under this Security Instrument or any other Loan Document, if an Event of Default has occurred and is continuing, and regardless of the adequacy of Lender's security or Borrower's solvency, and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in Section 3. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law. Borrower consents to shortened time consideration of a motion to appoint a receiver. Lender or the receiver, as applicable, shall be entitled to receive a reasonable fee for managing the Mortgaged Property and such fee shall become an additional part of the Indebtedness. Immediately upon appointment of a receiver or Lender's entry upon and taking possession and control of the Mortgaged Property, possession of the Mortgaged Property and all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property, and all security deposits and prepaid Rents, shall be surrendered to Lender or the receiver, as applicable. If Lender or receiver takes possession and control of the Mortgaged Property, Lender or receiver may exclude Borrower and its representatives from the Mortgaged Property.

(f)    The acceptance by Lender of the assignments of the Leases and Rents pursuant to this Section 3 shall not at any time or in any event obligate Lender to take any action under any Loan Document or to expend any money or to incur any expense. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in, on or about the Mortgaged Property. Prior to Lender's actual entry upon and taking possession and control of the Land and Improvements, Lender shall not be:

(1)    obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease);

      (2)     obligated to appear in or defend any action or proceeding relating to any Lease or the Mortgaged Property; or

      (3)     responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.

The execution of this Security Instrument shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking possession and control by Lender of the Land and Improvements.

      (g)     Lender shall be liable to account only to Borrower and only for Rents actually received by Lender. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law, provided that Lender shall not be released from liability that occurs as a result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final, non-appealable court order. If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall be added to, and become a part of, the principal balance of the Indebtedness, be immediately due and payable, and bear interest at the Default Rate from the date of disbursement until fully paid. Any entering upon and taking control of the Mortgaged Property by Lender or the receiver, and any application of Rents as provided in this Security Instrument, shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument or any Loan Document.

4.     **Protection of Lender's Security.**

     If Borrower fails to perform any of its obligations under this Security Instrument or any other Loan Document, or any action or proceeding is commenced that purports to affect the Mortgaged Property, Lender's security, rights or interests under this Security Instrument or any Loan Document (including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Environmental Laws, fraudulent conveyance or reorganizations or proceedings involving a debtor or decedent), Lender may, at its option, make such appearances, disburse or pay such sums and take such actions, whether before or after an Event of Default or whether directly or to any receiver for the Mortgaged Property, as Lender reasonably deems necessary to perform such obligations of Borrower and to protect the Mortgaged Property or Lender's security, rights or interests in the Mortgaged Property or the Mortgage Loan, including:

      (a)     paying fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants;

B32163 - P114

(b)      entering upon the Mortgaged Property to make repairs or secure the Mortgaged Property;

(c)      obtaining (or force-placing) the insurance required by the Loan Documents; and

(d)      paying any amounts required under any of the Loan Documents that Borrower has failed to pay.

Any amounts so disbursed or paid by Lender shall be added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid. The provisions of this Section 4 shall not be deemed to obligate or require Lender to incur any expense or take any action.

5.    Default; Acceleration; Remedies.

(a)      If an Event of Default has occurred and is continuing, Lender, at its option, may declare the Indebtedness to be immediately due and payable without further demand, and may either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (1) to enforce payment of the Mortgage Loan; (2) to foreclose this Security Instrument judicially or non-judicially by the power of sale granted herein; (3) to enforce or exercise any right under any Loan Document; and (4) to pursue any one (1)or more other remedies provided in this Security Instrument or in any other Loan Document or otherwise afforded by applicable law. Each right and remedy provided in this Security Instrument or any other Loan Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or otherwise afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Borrower has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Borrower to acceleration and sale.

(b)      Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender without prior judicial hearing. In the event Lender invokes the power of sale and if it is determined in a hearing held in accordance with applicable law that Trustee can proceed to sale:

(1)      Lender shall send to Borrower and any other Persons required to receive such notice, written notice of Lender's election to cause the Mortgaged Property to be sold. Borrower hereby authorizes and empowers Trustee to take possession of the Mortgaged Property, or any part thereof, and hereby grants to Trustee a power of sale and authorizes and empowers Trustee to sell (or, in the case of the default of any purchaser, to resell) the Mortgaged Property or any part thereof, in compliance with applicable law, including compliance with any and all notice and timing requirements for such sale;

(2)      Trustee shall have the authority to determine the terms of the sale, subject to applicable law. In connection with any such sale, the whole of the Mortgaged Property

B32153 - P115

may be sold in one (1) parcel as an entirety or in separate lots or parcels at the same or different times. Lender shall have the right to become the purchaser at any such sale. Trustee shall be entitled to receive fees and expenses from such sale not to exceed the amount permitted by applicable law;

(3)    within a reasonable time after the sale, Trustee shall deliver to the purchaser of the Mortgaged Property a deed or such other appropriate conveyance document conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in such deed or document shall be prima facie evidence of the truth of the statements made in those recitals; and

(4)    the outstanding principal amount of the Mortgage Loan and the other Indebtedness, if not previously due, shall be and become immediately due and payable without demand or notice of any kind. If the Mortgaged Property is sold for an amount less than the amount outstanding under the Indebtedness, the deficiency shall be determined by the purchase price at the sale or sales. Borrower waives all rights, claims, and defenses with respect to Lender's ability to obtain a deficiency judgment.

(c)    Borrower acknowledges and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.

(d)    In connection with the exercise of Lender's rights and remedies under this Security Instrument and any other Loan Document, there shall be allowed and included as Indebtedness: (1) all expenditures and expenses authorized by applicable law and all other expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable legal fees, appraisal fees, outlays for documentary and expert evidence, stenographic charges and publication costs; (2) all expenses of any environmental site assessments, environmental audits, environmental remediation costs, appraisals, surveys, engineering studies, wetlands delineations, flood plain studies, and any other similar testing or investigation deemed necessary or advisable by Lender incurred in preparation for, contemplation of or in connection with the exercise of Lender's rights and remedies under the Loan Documents; and (3) costs (which may be reasonably estimated as to items to be expended in connection with the exercise of Lender's rights and remedies under the Loan Documents) of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurance with respect to title as Lender may deem reasonably necessary either to prosecute any suit or to evidence the true conditions of the title to or the value of the Mortgaged Property to bidders at any sale which may be held in connection with the exercise of Lender's rights and remedies under the Loan Documents. All expenditures and expenses of the nature mentioned in this Section 5, and such other expenses and fees as may be incurred in the protection of the Mortgaged Property and rents and income therefrom and the maintenance of the lien of this Security Instrument, including the fees of any attorney employed by Lender in any litigation or proceedings affecting this Security Instrument, the Note, the other Loan Documents, or the Mortgaged Property, including bankruptcy proceedings, any Foreclosure Event, or in preparation

of the commencement or defense of any proceedings or threatened suit or proceeding, or otherwise in dealing specifically therewith, shall be so much additional Indebtedness and shall be immediately due and payable by Borrower, with interest thereon at the Default Rate until paid.

(e)     Any action taken by Trustee or Lender pursuant to the provisions of this Section 5 shall comply with the laws of the Property Jurisdiction.  Such applicable laws shall take precedence over the provisions of this Section 5, but shall not invalidate or render unenforceable any other provision of any Loan Document that can be construed in a manner consistent with any applicable law.  If any provision of this Security Instrument shall grant to Lender (including Lender acting as a mortgagee-in-possession), Trustee or a receiver appointed pursuant to the provisions of this Security Instrument any powers, rights or remedies prior to, upon, during the continuance of or following an Event of Default that are more limited than the powers, rights, or remedies that would otherwise be vested in such party under any applicable law in the absence of said provision, such party shall be vested with the powers, rights, and remedies granted in such applicable law to the full extent permitted by law.

6.     **Waiver of Statute of Limitations and Marshaling.**

Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Document.  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and/or any other Loan Document or by applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower, for itself and all who may claim by, through, or under it, and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels (at the same time or different times) in connection with the exercise of any of the remedies provided in this Security Instrument or any other Loan Document, or afforded by applicable law.

7.     **Waiver of Redemption; Rights of Tenants.**

(a)     Borrower hereby covenants and agrees that it will not at any time apply for, insist upon, plead, avail itself, or in any manner claim or take any advantage of, any appraisement, stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter enacted or in force in order to prevent or hinder the enforcement or foreclosure of this Security Instrument. Without limiting the foregoing:

B32153 - P117

(1)     Borrower for itself and all Persons who may claim by, through, or under Borrower, hereby expressly waives any so-called "Moratorium Law" and any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Security Instrument, it being the intent hereof that any and all such "Moratorium Laws," and all rights of reinstatement and redemption of Borrower and of all other Persons claiming by, through, or under Borrower are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law;

(2)     Borrower shall not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

(3)     If Borrower is a trust, Borrower represents that the provisions of this Section 7 (including the waiver of reinstatement and redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction over Borrower, and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons mentioned above.

(b)     Lender shall have the right to foreclose subject to the rights of any tenant or tenants of the Mortgaged Property having an interest in the Mortgaged Property prior to that of Lender.  The failure to join any such tenant or tenants of the Mortgaged Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect the Indebtedness, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Mortgaged Property, any statute or rule of law at any time existing to the contrary notwithstanding.

8.    Notice.

(a)     All notices under this Security Instrument shall be:

(1)     in writing, and shall be (A) delivered, in person, (B) mailed, postage prepaid, either by registered or certified delivery, return receipt requested, or (C) sent by overnight express courier;

(2)     addressed to the intended recipient at its respective address set forth at the end of this Security Instrument; and

(3)     deemed given on the earlier to occur of:

(A)     the date when the notice is received by the addressee; or

Security Instrument – North Carolina (2012)                                    Page 15 of 22
Kennedy

B32153 - P118

(B)    if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)    Any party to this Security Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.

(c)    Any required notice under this Security Instrument which does not specify how notices are to be given shall be given in accordance with this Section 8.

9.    **Mortgagee-in-Possession.**

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred in this Security Instrument shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

10.    **Release.**

Upon payment in full of the Indebtedness, Lender shall cause the release of this Security Instrument and Borrower shall pay Lender's costs incurred in connection with such release.

11.    **Substitute Trustee.**

Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee in accordance with the laws of the Property Jurisdiction. Without conveyance of the Mortgaged Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee in this Security Instrument and by applicable law.

12.    **North Carolina State Specific Provisions.**

In the event of any inconsistencies between the terms and conditions of this Section 12 and the other terms and conditions of this Security Instrument, the terms and conditions of this Section 12 shall control and be binding.

(a)    Borrower hereby waives and releases any rights Borrower may have with regard to release of liability or obligations of Borrower pursuant to N.C. Gen. Stat. Section 45-45.1 (or any amendment thereto).

(b)    This Security Instrument secures all present and future advances and obligations of Borrower to Lender. The time period within which future advances and obligations are to be made and incurred and secured by this Security Instrument is the period between the date hereof and the date which is thirty (30) years from the date hereof, including any future loans, advances

Security Instrument – North Carolina (2012)                                    Page 16 of 22
Kennedy

B32153 - P119

and readvances which may be made from time to time by Lender to Borrower, and any and all amendments or modifications thereto which may hereafter be entered into from time to time between Borrower and Lender or any other instrument, document or agreement between Borrower and Lender. The maximum principal amount, including present and future obligations, which may be secured by this Security Instrument at any one (1) time is two hundred percent (200%) of the original principal amount of the Note, plus accrued interest, fees and expenses. Any additional amounts advanced pursuant to the provisions of this Security Instrument shall be deemed necessary expenditures for the protection of the security. Borrower does not need to sign any instrument or notation evidencing or stipulating that future advances are secured by this Security Instrument.

13.   Governing Law; Consent to Jurisdiction and Venue.

This Security Instrument shall be governed by the laws of the Property Jurisdiction without giving effect to any choice of law provisions thereof that would result in the application of the laws of another jurisdiction. Borrower agrees that any controversy arising under or in relation to this Security Instrument shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies that arise under or in relation to any security for the Indebtedness. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

14.   Miscellaneous Provisions.

(a)   This Security Instrument shall bind, and the rights granted by this Security Instrument shall benefit, the successors and assigns of Lender. This Security Instrument shall bind, and the obligations granted by this Security Instrument shall inure to, any permitted successors and assigns of Borrower under the Loan Agreement. If more than one (1) person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several. The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. No creditor of any party to this Security Instrument and no other person shall be a third party beneficiary of this Security Instrument or any other Loan Document.

(b)   The invalidity or unenforceability of any provision of this Security Instrument or any other Loan Document shall not affect the validity or enforceability of any other provision of this Security Instrument or of any other Loan Document, all of which shall remain in full force and effect. This Security Instrument contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by written agreement signed by the parties hereto.

B32153 - P120

(c)    The following rules of construction shall apply to this Security Instrument:

(1)    The captions and headings of the sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.

(2)    Any reference in this Security Instrument to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Security Instrument or to a Section or Article of this Security Instrument.

(3)    Any reference in this Security Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(4)    Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular.

(5)    As used in this Security Instrument, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(6)    Whenever Borrower's knowledge is implicated in this Security Instrument or the phrase "to Borrower's knowledge" or a similar phrase is used in this Security Instrument, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(7)    Unless otherwise provided in this Security Instrument, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(8)    All references in this Security Instrument to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(9)    "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

15.    Time is of the Essence.

Borrower agrees that, with respect to each and every obligation and covenant contained in this Security Instrument and the other Loan Documents, time is of the essence.

Security Instrument – North Carolina (2012)
Kennedy

16.    WAIVER OF TRIAL BY JURY.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

ATTACHED EXHIBITS.  The following Exhibits are attached to this Security Instrument and incorporated fully herein by reference:

Exhibit A                Description of the Land

[Remainder of Page Intentionally Blank]

B32153 - P122

IN WITNESS WHEREOF, Borrower has signed and delivered this Security Instrument under seal (where applicable) or has caused this Security Instrument to be signed and delivered by its duly authorized representative under seal (where applicable). Where applicable law so provides, Borrower intends that this Security Instrument shall be deemed to be signed and delivered as a sealed instrument.

BORROWER:

C. Ray Kennedy

Cynthia M. Kennedy

The name, chief executive office and organizational identification number Debtor under any applicable Uniform Commercial Code) are:
Debtor Name/Record Owner:
C. Ray Kennedy and Cynthia M. Kennedy Debtor Chief Executive Office A
4324 Satterwythe Ln , CHARLOTTE NC 28215

The name and chief executive office of Lender (as Secured Party) are:
Secured Party Name: Cherrywood Commercial Lending, LLC
Secured Party Chief Executive Office Address:
20955 Pathfinder Road, #370
Diamond Bar, CA 91765

NOTICE ADDRESS FOR TRUSTEE:
Chicago Title Company, LLC
200 South Tryon Street, Suite 800
Charlotte, NC 28202

B32153 - P123

<u>Mecklenburg</u> County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

<u>C. RAY KENNEDY and CYNTHIA M. KENNEDY</u>
Name(s) of principal(s)

Date: <u>9.26.17</u>

(Official Seal)

_____
Official Signature of Notary

<u>John F. Renger III</u>, Notary Public
Notary's printed or typed name

My commission expires:

<u>4.22.21</u>

*JOHN F. RENGER, III*
*NOTARY*
*Comm. Exp.*
*4-22-2021*
*PUBLIC*
*MECKLENBURG COUNTY, NC*

Security Instrument – North Carolina (2012)
Kennedy

Page 21 of 22

B32153 - P124

## EXHIBIT A

TRACT ONE:

Lying and being situate in Mecklenburg County, NC, and being more particularly described as follows:

Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), according to the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deeds of Mecklenburg County, NC.

For informational purposes: 6025 Clarke Creek, Charlotte, NC 28269

TRACT TWO:

Lying and being situate in Mecklenburg County, NC, and being more particularly described as follows:

Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat thereof recorded in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

For informational purposes: 16701 Northcrosse Drive, Charlotte, NC 28269

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

Plaintiff,

v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST, not
in its individual capacity but solely as the Owner
Trustee of Residential Credit Opportunities Trust II;
and PHH MORTGAGE CORPORATION,

Defendants.

## CERTIFICATE OF SERVICE

I, as attorney of record for Defendants Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation, hereby certify that on the 26 day of November, 2025, I served a copy of the Affidavit *of Juliana Thurab* by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

Thomas D. Bumgardner, Esq.
13925 Ballantyne Corporate Place, Suite 280
Charlotte, NC 28277
(by email)

HUTCHENS LAW FIRM LLP
Attorneys for Defendants Wilmington Savings Fund
Society, FSB, d/b/a Christiana Trust, not in its individual
capacity but solely as the Owner Trustee of Residential
Credit Opportunities Trust II and PHH Mortgage
Corporation

By: _____
William Walt Pettit
N.C. Bar No. 9407
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Telephone: (704) 362-9255
Email: walt.pettit@hutchenslawfirm.com

O.

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION;

Defendants.

**WITHDRAWAL OF NOTICE OF
HEARING WITHOUT PREJUDICE**

PLEASE TAKE NOTICE that Plaintiffs hereby withdraw their notice of hearing, without prejudice, for their motion for preliminary injunction currently scheduled for hearing on 4 December 2025 at 2:00pm in Courtroom 6310 of the Mecklenburg County Courthouse.

This is the 3rd day of December 2025.

/s/ Thomas D. Bumgardner
_____
Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing Notice of Hearing upon all parties to this action by eCourts File and Serve, and first-class United States Mail, postage prepaid and addressed as follows:

Walt Pettit
Hutchens Law Firm
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Walt.pettit@hutchenslawfirm.com
*Attorney for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation*

William Kirk
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277
will@regentlawnc.com
*Attorney for Substitute Trustee Services, Inc.*

This is the 3rd day of December 2025.

/s/ Thomas D. Bumgardner

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Plaintiffs*

p.

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M.
KENNEDY; and RAMSEY-PEELE
CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as
Substitute Trustee; SUBSTITUTE TRUSTEE
SERVICES, INC.; WILMINGTON SAVINGS
FUND SOCIETY, FSB, D/B/A CHRISTIANA
TRUST, not in its individual capacity but solely
as the Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION;

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

**<u>NOTICE OF VOLUNTARY DISMISSAL
WITHOUT PREJUDICE AS TO ALL
CLAIMS AGAINST WILLIAM F. KIRK</u>**

NOW COME the Plaintiffs, by and through counsel, and pursuant to Rule 41 of the North Carolina Rules of Civil Procedure, hereby enter notice of voluntary dismissal, without prejudice, as to all claims in this action against Defendant William F. Kirk.

This is the 3rd day of December 2025.

/s/ Thomas D. Bumgardner

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing Notice of Voluntary Dismissal Without Prejudice as to All Claims Against William F. Kirk upon all parties to this action by eCourts File and Serve, and first-class United States Mail, postage prepaid and addressed as follows:

Walt Pettit
Hutchens Law Firm
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Walt.pettit@hutchenslawfirm.com
*Attorney for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation*

William Kirk
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277
will@regentlawnc.com
*Attorney for Substitute Trustee Services, Inc.*

This is the 3rd day of December 2025.

/s/ Thomas D. Bumgardner

Thomas D. Bumgardner
Law Office of Thomas D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, North Carolina 28277
(704)-887-4981
thomas@ballantynelegal.com
*Attorney for Plaintiffs*

q.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST,
not in its individual capacity but solely as the
Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

Defendants.

## **MOTION TO EXTEND TIME**

Defendants Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation (hereinafter collectively "Defendants"), by and through counsel, hereby move the Court for an extension of time to respond to Plaintiffs' Complaint. This Motion is filed before the time for responding to the Complaint has expired. Defendants request a thirty (30) day extension, through and including January 16, 2026 to respond to Plaintiffs' Complaint; and for such other and further relief as is just and proper.

This the 4th day of December, 2025.

> HUTCHENS LAW FIRM, LLP
> Attorneys for Defendants Wilmington Savings Fund
> Society, FSB, d/b/a Christiana Trust, not in its individual
> capacity but solely as the Owner Trustee of Residential
> Credit Opportunities Trust II and PHH Mortgage
> Corporation
>
> By: _____
>   William Walt Pettit
>   N.C. Bar No. 9407
>   6230 Fairview Road, Suite 315

U:\WWP Files\WHH\Kennedy, Calvin\CVS\Motion to Extend Time, Order and COS.docx

Charlotte, N.C. 28210
Telephone: (704) 362-9255
Telecopier: (704) 362-9268
Email: walt.pettit@hutchenslawfirm.com

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST,
not in its individual capacity but solely as the
Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

Defendants.

## CERTIFICATE OF SERVICE

I, as attorney of record for the undersigned, hereby certify that on the 4th day of December, 2025, I served a copy of the Motion to Extend Time, Order Extending Time and Certificate of Service by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

Thomas D. Bumgardner, Esq.
Law Office of Thoms D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, NC 28277

William Fay Kirk, III, Esq.
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277

HUTCHENS LAW FIRM, LLP
Attorneys for Defendants Wilmington Savings Fund
Society, FSB, d/b/a Christiana Trust, not in its individual
capacity but solely as the Owner Trustee of Residential
Credit Opportunities Trust II and PHH Mortgage
Corporation

By: _____
William Walt Pettit
N.C. Bar No. 9407

U:\WWP Files\PHH\Kennedy, Calvin\CVS\Motion to Extend Time, Order and COS.docx

6230 Fairview Road, Suite 315
Charlotte, N.C. 28210
Telephone: (704) 362-9255
Telecopier: (704) 362-9268
Email: walt.pettit@hutchenslawfirm.com

r.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

                 Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST,
not in its individual capacity but solely as the
Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

                 Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

FILED
DATE: December 5, 2025
TIME: 1:19:11 PM
MECKLENBURG COUNTY
CLERK OF SUPERIOR COURT
BY: R. Smith

## ORDER EXTENDING TIME

       THIS CAUSE, coming on to be heard and being heard before the undersigned Assistant Clerk of Superior Court of Mecklenburg, North Carolina upon the Motion to Extend Time filed herein by Defendants Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation; and

       It appearing to the Court for good cause shown that said Motion should be granted.

       NOW, THEREFORE, IT HEREWITH IS ORDERED, ADJUDGED AND DECREED that the time for Defendants Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as the Owner Trustee of Residential Credit Opportunities Trust II and PHH Mortgage Corporation to answer Plaintiffs' Complaint, pursuant to Rules 6 and 12 of the North Carolina Civil Procedure, is hereby extended for a period of thirty (30) days or up through January 16, 2026.

12/5/2025 1:19:00 PM

This the \_\_\_\_\_ day of December, 2025.

                                    Assistant Clerk, Mecklenburg County

U:\WWP Files\PHH\Kennedy, Calvin\CVS\Motion to Extend Time, Order and COS.docx

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV060201-590

C. RAY KENNEDY; CYNTHIA M. KENNEDY;
and RAMSEY-PEELE CORPORATION,

                Plaintiffs,

v.

WILLIAM F. KIRK, in his capacity as Substitute
Trustee; SUBSTITUTE TRUSTEE SERVICES,
INC.; WILMINGTON SAVINGS FUND
SOCIETY, FSB, D/B/A CHRISTIANA TRUST,
not in its individual capacity but solely as the
Owner Trustee of Residential Credit
Opportunities Trust II; and PHH MORTGAGE
CORPORATION,

                Defendants.

## CERTIFICATE OF SERVICE

I, as attorney of record for the undersigned, hereby certify that on the _9th_ day of December, 2025, I served a copy of the Notice of Removal and Certificate of Service by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

Thomas D. Bumgardner, Esq.
Law Office of Thoms D. Bumgardner, PLLC
13925 Ballantyne Corporate Place, Suite 280
Charlotte, NC 28277

James H. Henderson, Esq.
The Henderson Law Firm
2030 South Tryon St., Ste. 3H
Charlotte, NC 28203

William Fay Kirk, III, Esq.
Regent Law
3430 Toringdon Way, Suite 101
Charlotte, NC 28277

U:\WWP Files\PHH\Kennedy, Calvin\CVS\Notice of Removal.docx

HUTCHENS LAW FIRM, LLP
Attorneys for Defendants Wilmington Savings Fund
Society, FSB, d/b/a Christiana Trust, not in its individual
capacity but solely as the Owner Trustee of Residential
Credit Opportunities Trust II and PHH Mortgage
Corporation

By: _____
William Walt Pettit
N.C. Bar No. 9407
6230 Fairview Road, Suite 315
Charlotte, N.C. 28210
Telephone: (704) 362-9255
Telecopier: (704) 362-9268
Email: walt.pettit@hutchenslawfirm.com